Andrew R. Missel (OSB # 181793)
Elizabeth H. Potter (OSB # 105482)
Hannah A. Goldblatt (OSB # 205324)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388
amissel@advocateswest.org
epotter@advocateswest.org
hgoldblatt@advocateswest.org


*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| **XERCES SOCIETY FOR INVERTEBRATE CONSERVATION and CENTER FOR BIOLOGICAL DIVERSITY,** | **Case No.: 3:22-cv-00790-HZ** |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |
| **KEVIN SHEA, in his official capacity as Administrator of the Animal and Plant Health Inspection Service; and the ANIMAL AND PLANT HEALTH INSPECTION SERVICE,** | |
| Federal Defendants, | |
| and | |
| **STATE OF WYOMING and STATE OF MONTANA,** | |
| Intervenor-Defendants. | |

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiffs hereby move the Court to enter summary judgment in their favor on their First, Second, Third, Fifth, Sixth, and Eighth Claims for Relief in their Second Supplemental and Amended Complaint. ECF No. 43. (Plaintiffs are not pursuing their Fourth and Seventh Claims for Relief.) Summary judgment is appropriate as Plaintiffs' claims involve no genuine disputes of material fact and Plaintiffs are entitled to judgment as a matter of law. Counsel for Plaintiffs, counsel for Federal Defendants, and counsel for Intervenors conferred by telephone on September 28, 2023 in a good-faith effort to resolve this dispute, but they were unable to do so. *See* Local Rule 7-1(a)(1)(A). This motion is being filed today (October 3, 2023) consistent with the Court's instructions. ECF No. 45.

This motion is supported by the accompanying memorandum in support; the declarations of Lori Ann Burd, Sharon Selvaggio, Roger Rosentreter, Bruce Ostermann, Marian Lyman, and Curt Bradley; the declaration of Hannah Goldblatt and exhibits filed with that declaration; the Second Amended and Supplemental Complaint; and such other and further material as may be presented to the Court before decision hereon.

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTUAL AND LEGAL BACKGROUND ............................................................... 3

    I.       The Essential Role of Insects in Rangeland Ecosystems. ...................................... 3

    II.     APHIS's Grasshopper Program. ......................................................................... 5
          A.     The Legal Basis for APHIS's Program. ...................................................... 5
          B.     How APHIS's Program Works in Practice. ................................................. 6
          C.     The Pesticides Used in APHIS's Program. .................................................. 9

    III.    The Grasshopper Program and the National Environmental Policy Act. ............ 11
          A.     The 1987 and 2002 Environmental Impact Statements. ............................ 12
          B.     The 2019 EIS. ............................................................................................ 13
          C.     The State-Level Environmental Assessments. .......................................... 14

    IV.    The Grasshopper Program and the Endangered Species Act. .............................. 18

ARGUMENT .............................................................................................................. 20

    I.       The 2019 EIS Unlawfully Failed to Consider Alternatives that Would Take a
          Holistic Approach to Grasshopper Control with an Emphasis on Prevention. ..... 20

    II.     APHIS Failed to Take a "Hard Look" at the Effects of Its Chosen Alternative in
          the 2019 EIS. ..................................................................................................... 23
          A.     The 2019 EIS Does Not Establish Baseline Conditions. .......................... 24
          B.     The EIS Does Not Take a "Hard Look" at the Impacts of APHIS's
               Program on Bees, Butterflies, and Moths. ................................................. 27

    III.    APHIS Violated the ESA by Failing to Complete Consultation with the Fish and
          Wildlife Service Before Adopting the 2019 ROD. .............................................. 31

    IV.    The State-Level EAs Violate NEPA. .................................................................. 33
          A.     The State-Level EAs Fail to Analyze the Site-Specific Impacts of the
               Rangeland Pesticides Program. ................................................................. 33
          B.     The State-Level EAs Fail to Disclose and Analyze Baseline Information
               Regarding Past Pesticide Treatments and Sensitive Species. ................... 36
          C.     The State-Level EAs Fail to Analyze the Cumulative Effects of APHIS's
               Program Combined with Other Pesticide Applications. ........................... 39

    V.     If the Court Grants Summary Judgment to Plaintiffs on Any of Their Claims, It
          Should Order Additional Briefing Regarding the Proper Remedy. ...................... 41

CONCLUSION ........................................................................................................... 42

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies,*
    907 F.3d 1105 (9th Cir. 2018) ........................................................................ 41

*Asarco, Inc. v. EPA,*
    616 F.2d 1153 (9th Cir. 1980) .......................................................................... 9

*Ass'n of Public Agency Customers, Inc. v. BPA,*
    126 F.3d 1158 (9th Cir. 1997) ........................................................................ 11

*Audubon Soc'y of Portland v. Haaland,*
    40 F.4th 967 (9th Cir. 2022) .......................................................................... 11

*Bark v. U.S. Forest Serv.,*
    958 F.3d 865 (9th Cir. 2020) .......................................................................... 40

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................................ 19

*California ex rel. Lockyer v. Dep't of Agric.,*
    575 F.3d 999 (9th Cir. 2009) .......................................................................... 19

*California v. Block,*
    690 F.2d 753 (9th Cir. 1982) .................................................................... 25, 33

*Cascade Forest Conservancy v. Heppler,*
    No. 3:19-cv-00424-HZ, 2021 WL 641614 (D. Or. Feb. 15, 2021) ................ 42

*Cascadia Wildlands v. Bureau of Indian Affairs,*
    801 F.3d 1105 (9th Cir. 2015) .................................................................... 24, 26

*City of Carmel-By-The-Sea v. Dep't of Transp.,*
    123 F.3d 1142 (9th Cir. 1997) ........................................................................ 20

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) .............................................................. 31, 32, 33

*Ctr. for Biological Diversity v. Bernhardt,*
    982 F.3d 723 (9th Cir. 2020) .................................................................... 25, 35

*Ctr. for Biological Diversity v. Dep't of the Interior,*
    623 F.3d 633 (9th Cir. 2010) .......................................................................... 11

*Del. Riverkeeper Network v. FERC,*
    753 F.3d 1304 (D.C. Cir. 2014) ...................................................................... 35

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
    36 F.4th 850 (9th Cir. 2022) ................................................................ 31, 32

*Grand Canyon Tr. v. FAA*,
    290 F.3d 339 (D.C. Cir. 2002) ............................................................. 29, 41

*Great Basin Res. Watch v. BLM*,
    844 F.3d 1095 (9th Cir. 2016) .............................................. 24, 25, 36, 38

*Ground Zero for Non-Violent Action v. Dep't of the Navy*,
    860 F.3d 1244 (9th Cir. 2017) ............................................................. 11, 34

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,
    857 F.2d 505 (9th Cir. 1988) ............................................................... 24, 36

*Kern v. BLM*,
    284 F.3d 1062 (9th Cir. 2002) ................................................................... 29

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ..................................................................... 6

*Lathan v. Brinegar*,
    506 F.2d 677 (9th Cir. 1974) (en banc) ...................................................... 1

*Mountain Cmtys. for Fire Safety v. Elliott*,
    25 F.4th 667 (9th Cir. 2022) ........................................................................ 3

*N. Alaska Env't Ctr. v. Lujan*,
    961 F.2d 886 (9th Cir. 1992) ..................................................................... 29

*N. Plains Res. Council v. U.S. Army Corps of Eng'rs*,
    454 F.Supp.3d 985 (D. Mont. 2020) .......................................................... 32

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) .............................................................. 26, 38

*Nat'l Family Farm Coal. v. EPA*,
    966 F.3d 893 (9th Cir. 2020) ....................................................................... 6

*Nat'l Parks Conservation Ass'n v. BLM*,
    606 F.3d 1058 (9th Cir. 2010) .............................................................. 20, 23

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    184 F.Supp.3d 861 (D. Or. 2016) ............................................................... 25

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    524 F.3d 917 (9th Cir. 2008) ..................................................................... 18

*Native Ecosystems Council v. Dombeck*,
  304 F.3d 886 (9th Cir. 2002) ................................................................ 29

*Native Village of Point Hope v. Jewell*,
  740 F.3d 489 (9th Cir. 2014) .............................................. 25, 29, 31

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ........................................ 29, 30, 40, 41

*ONDA v. Jewell*,
  840 F.3d 562 (9th Cir. 2016) ......................................... 11, 25, 34, 38

*ONDA v. Rose*,
  921 F.3d 1185 (9th Cir. 2019) ........................................................... 24

*Protect Our Cmtys. Found. v. Jewell*,
  825 F.3d 571 (9th Cir. 2016) ............................................................. 27

*Roberston v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ............................................................................ 38

*S. Fork Band Council of W. Shoshone of Nev. v. Dep't of Interior*,
  588 F.3d 718 (9th Cir. 2009) (per curiam) ................................. 27, 28

*S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*,
  720 F.2d 1475 (9th Cir. 1983) ........................................................... 28

*Save Our Ecosystems v. Clark*,
  747 F.2d 1240 (9th Cir. 1984), *abrogated on other grounds by Amoco Prod. Co. v.
  Village of Gambell, Alaska*, 480 U.S. 531 (1987) ............................. 28

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
  443 F.Supp.3d 995 (D. Alaska 2020) ................................... 33, 34, 36

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2018) ......................................................... 35

*Solar Energy Indus. Ass'n v. FERC*,
  - F.4th -, 2023 WL 5691711 (9th Cir. Sep. 5, 2023) ....................... 35

*W. Watersheds Project v. Grimm*,
  921 F.3d 1141 (9th Cir. 2019) ............................................................. 3

*W. Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) ............................................................. 12

*Westlands Water Dist. v. Dep't of Interior*,
  376 F.3d 853 (9th Cir. 2004) ....................................................... 20, 21

*WildEarth Guardians v. Mont. Snowmobile Ass'n,*
   790 F.3d 920 (9th Cir. 2015) ........................................................ 38

## Statutes

16 U.S.C. § 1536 ........................................................ 18, 32, 33

7 U.S.C. § 136r-1 ........................................................ 5, 21, 22

7 U.S.C. § 148 (1982) ........................................................ 22

7 U.S.C. § 7717 ........................................................ 5, 6, 8, 21

Pub. L. No. 99-198, tit. XVII, § 1773, 99 Stat. 1354 (1985) ........................ 12

## Rules

Fed. R. Evid. 1006 ........................................................ 7

## Regulations

25 C.F.R. § 166.4 ........................................................ 3

40 C.F.R. § 1500.1 (2019) ........................................................ 11

40 C.F.R. § 1501.6 (2019) ........................................................ 22

40 C.F.R. § 1502.13 ........................................................ 20

40 C.F.R. § 1502.14 (2019) ........................................................ 22

40 C.F.R. § 1502.20 (2019) ........................................................ 12

40 C.F.R. § 1508.7 (2019) ........................................................ 29

50 C.F.R. § 402.14 ........................................................ 18, 31

## Federal Register

85 Fed. Reg. 81,813 (Dec. 17, 2020) ........................................................ 26

## INTRODUCTION

Almost 50 years ago, the Ninth Circuit said that the goals of the National Environmental Policy Act ("NEPA") "can be achieved only if the [statute's] prescribed procedures are faithfully followed; grudging, pro forma compliance will not do." *Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir. 1974) (en banc). Unfortunately, the Animal and Plant Health Inspection Service ("APHIS") has taken a "grudging, pro forma" approach to the NEPA analysis of its "Rangeland Grasshopper and Mormon Cricket Suppression Program." That program—more aptly called a "rangeland pesticides" program—involves the application of toxic pesticides to millions of acres of public lands across the American West in an effort to "suppress" naturally occurring outbreaks of grasshoppers. Despite the scale of the program and the threat it poses to rangeland ecosystems, APHIS has failed to conduct adequate environmental analyses of the program, violating NEPA.

One telling example of APHIS's approach: in 2021, APHIS "protected" over 1.3 million acres of rangeland in Montana with aerial pesticide treatments—an area slightly smaller than Delaware. MT010479; MT010141. The next year, APHIS released new environmental assessments ("EAs") under NEPA purporting to analyze the effects of its program in Montana. Amazingly, those EAs do not even mention the extensive spraying in Montana the previous year. *See* MT000003–000052; MT000135–MT000181. In fact, they are strikingly similar to the previous year's EAs. *Compare, e.g.*, MT000003–52 (2022 EA), *with* MT009832–91 (2021 EA). Rather than analyze and disclose the 1.3 million acres sprayed in 2021 and the effects of that spraying, as NEPA demands, APHIS largely recycled its analysis from the previous year.

APHIS's "grudging, pro forma" approach to NEPA is not limited to Montana. In both its programmatic environmental impact statement ("EIS") for the rangeland pesticides program as a

whole and in subsequent environmental assessments ("EAs") focused on Oregon, Wyoming, Montana, and Idaho, APHIS has refused to disclose and analyze even the most basic information concerning its program—where pesticide treatments have occurred in the past, what effects those treatments have had on the environment, where treatments are likely to occur going forward, and what sensitive environmental resources, such as native bees and other pollinators, are located in those areas. And the programmatic EIS suffers from an even more fundamental problem: it is focused only on pesticide treatments, despite the fact that Congress has instructed APHIS to take a holistic, prevention-first approach to grasshopper control.

These violations of NEPA—as well as APHIS's violation of the Endangered Species Act's ("ESA") "consultation" requirement—have led to millions of acres of public lands in the American West being doused with toxic pesticides without either the public or APHIS having sufficient information about the environmental effects of APHIS's program. This "spray first, don't even ask questions later" approach threatens serious harm to sensitive pollinator species, sage-grouse, and other fragile rangeland resources. To prevent further harm, Plaintiffs Xerces Society for Invertebrate Conservation ("Xerces") and the Center for Biological Diversity ("the Center") ask this Court to grant their motion for summary judgment and force APHIS to "faithfully follow" NEPA's and the ESA's procedures.

**FACTUAL AND LEGAL BACKGROUND**

**I.        The Essential Role of Insects in Rangeland Ecosystems.**

Rangeland grasshoppers[1] are "natural elements of a complex ecological system that is highly productive for livestock and wildlife." OR001420. As APHIS itself has said, grasshoppers "are part of rangeland ecosystems, serving as food for wildlife and playing an important role in nutrient cycling." EIS000013. For instance, grasshoppers are "a critical food supply for ... grassland birds," EIS004410, including the greater sage-grouse, EIS015320, an iconic species "in a state of decline throughout most of [its] entire range," EIS000099. In this way, grasshoppers are an integral part of rangeland ecosystems, which are treasured by scientists, conservationists, and other members of the public for recreational, scientific, and other purposes.[2]

Rangeland grasshopper populations can sometimes spike to the point that grasshoppers begin affecting the amount of forage available for livestock. EIS004411; OR000010. But "most years, in most places, most grasshopper species do not harm the rangeland resource." EIS004315. In fact, out of the nearly 400 species of grasshoppers that live on rangelands in the

---

[1] This case concerns both grasshoppers—a term that refers to hundreds of different species of insects, EIS000014—and Mormon crickets, a flightless species of katydid, EIS00016. Plaintiffs will refer to these species collectively as "grasshoppers." As for "rangeland," the term is not defined in the rangeland pesticides program's authorizing statute, but it is generally considered to refer to land "on which native vegetation is predominantly grasses, grass-like plants, half-shrubs or shrubs ...." 25 C.F.R. § 166.4.

[2] Plaintiffs have members with recreational, scientific, spiritual, and/or aesthetic interests in Western rangeland ecosystems and the species that live in them, and those interests are threatened by APHIS's grasshopper suppression activities. *See* Burd Decl.; Selvaggio Decl.; Rosentreter Decl.; Lyman Decl.; Ostermann Decl. Relief from this Court could lead APHIS to alter its operations in a way that inures to the benefit of affected rangeland ecosystems and, therefore, Plaintiffs' members. *See W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1146–48 (9th Cir. 2019) (discussing standing for procedural injuries). Accordingly, Plaintiffs have Article III standing. *See Mountain Communities for Fire Safety v. Elliott*, 25 F.4th 667, 674 n.1 (9th Cir. 2022) (setting out the test for associational standing).

Western U.S., fewer than two dozen are capable of causing economically significant harm to forage and crops. EIS004413. And some studies suggest that even short-term "harm" in the form of reduced forage for livestock is more than offset by long-term ecosystem benefits. *See* EIS004276 ("grasshoppers actually stimulate forage production between years and this long-term enhancement exceeds annual losses"). Even the Department of the Interior—the federal agency that manages far more rangeland than any other entity in the country—has said that "there is very little evidence that these insects have any appreciable long-term effect on natural rangeland vegetation, or that impacts can negatively affect wildlife." EIS002811.

In addition to grasshoppers, Western rangelands are home to a wide variety of other insects, including hundreds or thousands of species of native bees, butterflies, and moths. *E.g.*, ID000825–26. According to APHIS, "[t]he majority of rangeland plants require insect-mediated pollination" and "[n]ative, solitary bee species are important pollinators on western rangeland." *E.g.*, WY000030. Unfortunately, there is a general scientific consensus that native bees, butterflies, and moths are in decline both globally and within the United States. *See* EIS000274 ("Focusing on just the Lepidoptera (butterflies and moths), ... there is strong evidence of declines in abundance globally (35% over 40 years)."); EIS003192 ("Wild pollinators have declined in occurrence and diversity (and abundance for certain species) at local and regional scales in ... North America."); *see generally* EIS002942–43 (Xerces comments referencing several studies).

Given the importance of native pollinators to rangeland ecosystems, these declines are cause for serious concern. *See* EIS003104 ("The loss of pollinator diversity may have wide-ranging effects on both natural (e.g., wildflower pollination) and agricultural systems ...."); OR001383 ("[A] decrease in [pollinator] numbers has been associated with decline in fruit and seed production of plants," which "may have dramatic repercussions throughout the rangeland

food chain.”). One of the drivers of the decline of pollinators (and insects more generally) is the widespread use of pesticides. *See* EIS003193 (“Threats [to pollinators] include land-use change, intensive agricultural management and pesticide use, environmental pollution, ...”).

## II.       APHIS’s Grasshopper Program.

### A.       The Legal Basis for APHIS’s Program.

APHIS is authorized to “carry out a program to control grasshoppers and Mormon crickets on all Federal lands to protect rangeland.” 7 U.S.C. § 7717(a). The statute that authorizes this program—7 U.S.C. § 7717—requires the Department of the Interior to “transfer to [APHIS], from any no-year appropriations, funds for the *prevention*, suppression, and control of actual *or potential* grasshopper and Mormon cricket outbreaks” on lands managed by Interior. *Id.* § 7717(b)(1) (emphasis added).

The statute also provides a mechanism for APHIS to treat outbreaks of grasshoppers when requested to do so by Interior and other land managers. Subject to funding, and “on request of the administering agency or the agriculture department of an affected State, [APHIS], to protect rangeland, shall immediately treat Federal, State, or private lands that are infested with grasshoppers or Mormon crickets at levels of economic infestation, unless [APHIS] determines that delaying treatment will not cause greater economic damage to adjacent owners of rangeland.” *Id.* § 7717(c)(1).

In addition to the grasshopper-specific statute codified at 7 U.S.C. § 7717, APHIS’s grasshopper activities are governed by section 303 of the Food Quality Protection Act of 1996, codified at 7 U.S.C. § 136r-1. That statute provides that “Federal agencies shall use Integrated Pest Management techniques in carrying out pest management activities and shall promote Integrated Pest Management through procurement and regulatory policies, and other activities.”

"Integrated Pest Management"—sometimes referred to as "IPM"—is defined in the statute as "a sustainable approach to managing pests by combining biological, cultural, physical, and chemical tools in a way that minimizes economic, health, and environmental risks."

**B.     How APHIS's Program Works in Practice.**

In recent years, APHIS has focused its grasshopper control efforts on reactive pesticide treatments conducted at the request of land managers—that is, it has focused on § 7717(c)(1), which authorizes the agency to "immediately treat ... lands that are infested with grasshoppers or Mormon crickets at levels of economic infestation." *See* EIS000129 ("APHIS' authority under the Plant Protection Act is to treat Federal, State and private lands for grasshoppers and Mormon cricket populations."); *see also* EIS000029. In some years, APHIS treats hundreds of thousands or even millions of acres of rangelands with pesticides. EIS000087; OR010210. In other years, far fewer acres are treated. EIS000087.

APHIS's program operates in 17 Western states. EIS000011. Over the last 20 years, certain geographic regions within those 17 states have been repeatedly selected for pesticide treatments by APHIS and land managers. In Idaho, the Owyhee Front southwest of Boise has been treated at least half a dozen times since 2006, most recently in 2019 and 2020. *See* ID008764–66 (maps showing actual treatments from 2006–2018); Goldblatt Decl. Ex. D (map showing areas selected for treatment from 2008–2021).[3] In Wyoming, the southern portion of the

---

[3] Plaintiffs ask the Court to consider Exhibits A through H to the Goldblatt Declaration for two purposes. First, these exhibits confirm that there is Article III standing because there is a "geographic nexus" between APHIS's activities and the areas in which Plaintiffs' members have recreational, aesthetic, spiritual, and/or scientific interests. *See Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 909 (9th Cir. 2020). Second, it is appropriate for the Court to supplement the administrative record with these exhibits because they are necessary to show that APHIS failed to consider all relevant factors and explain its decisions. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). Specifically, the maps help show that certain geographic areas tend to be repeatedly selected for treatment, which APHIS did not take into account in deciding on the

Bighorn Basin in Hot Springs and Washakie Counties has been treated six times since 2010, most recently in 2021. *See* WY000446 (map showing treatments in Wyoming from 2010–2021); Goldblatt Decl. Ex. E (map showing areas selected for treatment from 2008 through 2021). In Oregon, there is a tall, narrow strip east of Steens Mountain that has had areas selected for treatment several times since 2008. Goldblatt Decl. Ex. B. There are several areas in Montana that have been selected for treatment on multiple occasions in recent years, including some areas southeast of Billings and an area in Musselshell County just a few files outside of Roundup. Goldblatt Decl. Ex. H; Ex. G. As APHIS admits, its "programs frequently repeat in specific areas where the public demand for such work is high." OR000125.

Pesticide treatments under the program typically occur during late spring and summer. *See, e.g.*, OR000009. To predict where grasshopper outbreaks may occur in a given year, APHIS conducts surveys. EIS000019–20. APHIS first creates a "hazard map" near the end of each calendar year based on surveys of adult grasshoppers from that year. EIS009612–13; *see also* WY000102 (hazard map for Wyoming). The hazard map shows where adult density populations were highest during the year; this can be used to forecast the locations where outbreaks are likely to occur the following year. *See, e.g.*, WY000102. APHIS then conducts surveys of grasshopper nymphs—young, immature grasshoppers—in the spring of the following year. EIS009611;

---

level of site-specificity of its state-level environmental assessments. *See infra* pp. 33–36. Although the maps themselves were generated by Plaintiffs for purposes of this litigation, the treatment data underlying the maps is predecisional (save for 2020 Idaho treatments) and comes from APHIS. Goldblatt Decl. ¶ 5. Rather than introduce this voluminous treatment information to show what APHIS failed to consider, Plaintiffs seek to supplement the record with the maps as summary evidence. *See* Fed. R. Evid. 1006 ("The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.").

MT010840. These nymphal surveys provide a more precise picture of where treatments are likely to occur in the future. *See, e.g.*, OR000012.

Before treating a grasshopper outbreak under § 7717(c)(1), APHIS must receive a request from a land owner or manager, such as the Bureau of Land Management ("BLM") or a state agriculture department (on behalf of a state or local government, or private group or individual). Interestingly, although § 7717(a) provides that APHIS is supposed to carry out its program "to protect rangeland," in practice, APHIS often conducts treatments on rangeland for the purpose of preventing outbreaks from reaching adjacent croplands. *See* OR000009 ("Benefits of control may include protection of ... adjacent cropland"); ID00008; WY000007–08; MT010838; MT010985. In fact, in Idaho, pesticide treatments under APHIS's program are "limited to federal rangelands within one (1) mile of private agricultural lands." ID000023.

APHIS begins receiving preliminary or informal requests in the late winter and early spring. *See* OR000572 (discussing "preliminary requests" for the 2022 spraying season); *see also* OR000698. Formal treatment requests made by federal land managers are supposed to be in writing and accompanied by a "pesticide use proposal." *See, e.g.*, MT010841–42. Once it has received a treatment request, APHIS must determine whether the outbreak rises to the level of an economic infestation, thus permitting treatment under § 7717(c)(1). *See, e.g.*, OR000013 (discussing factors "that may be considered when determining if an economic threshold has been reached for proposed program sites").

APHIS typically uses contractors to conduct aerial pesticide treatments. *See* MT010898–900 (describing procedures for aerial treatments); *see also* EIS009594. When APHIS decides that a particular area should be treated, the agency puts out a request for quote or contract solicitation with details about that treatment. EIS009594–98; *see also* Goldblatt Decl. Exs. I–J

(example of a request for quote and treatment maps for Oregon in 2021).[4] The time between the issuance of a request for quote and actual treatment is very short—typically less than two weeks. *See* MT009764 ("APHIS typically does not have 14 days between planning a treatment and the actual application").

Following treatment, APHIS is supposed to conduct environmental monitoring in treated areas to ensure that treatments have been carried out in accordance with applicable requirements and that any adverse environmental effects were properly considered during the NEPA process. *See, e.g.*, MT010899; MT013284. In practice, these "environmental monitoring reports" appear to offer little to no information about observed effects to sensitive species such as native bees and butterflies and sage-grouse. *See, e.g.*, MT013283–89 (2022 report).

C.     **The Pesticides Used in APHIS's Program.**

There are four pesticides that APHIS can potentially use to suppress grasshopper outbreaks: malathion, carbaryl, diflubenzuron (Dimilin), and chlorantraniliprole. EIS000012.

Malathion works by "preventing the natural breakdown of various cholines and ultimately causing the neuromuscular system to seize." EIS013195. It is a "broad-spectrum" insecticide, EIS000066, meaning that it affects a wide variety of organisms. EIS000322. Malathion is "highly toxic to terrestrial invertebrates," EIS013394, and highly toxic to freshwater invertebrates, EIS012430–31.

Like malathion, carbaryl is a broad-spectrum insecticide that works by inhibiting the operation of acetylcholinesterase, leading to neurotoxicity. EIS009870. Carbaryl is "highly toxic to insects, including native bees, honeybees, and aquatic insects." EIS000048. It is also "highly

---

[4] Exhibits I and J to the Goldblatt Declaration are provided to the Court as "background information." *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980).

to very highly toxic to most aquatic crustaceans" and "slightly to highly toxic to fish." *Id.* In 2021, the Environmental Protection Agency ("EPA") concluded that the use of carbaryl across the country is "likely to adversely affect" 1,640 different species listed as threatened or endangered under the ESA—everything from the yellow-billed cuckoo to the Lahontan cutthroat trout to the grizzly bear.[5]

Diflubenzuron is a chitin inhibitor—it works by retarding the growth of chitin, which insects use to build their exoskeletons. EIS005856. "All arthropods, including insects, mites, and crustaceans, use chitin to build their exoskeletons and will die if they are unable to produce it during the next molt." *Id.* Like malathion and carbaryl, diflubenzuron is a "broad-spectrum" pesticide, EIS005415, meaning that "it affects all arthropods that ingest it, except adult insects, which do not molt. Consequently, application of [diflubenzuron] has the potential to significantly reduce not only target populations but all terrestrial and aquatic arthropods within treatment zones." EIS005856. Diflubenzuron was originally approved for use on the gypsy moth, and it is especially harmful to moths and butterflies, which are part of the order Lepidoptera. EIS004478–83; EIS005345. *See also* EIS000062 ("Immature grasshoppers, beetle larvae, lepidopteran larvae, and chewing herbivorous (plant-eating) insects appear to be more susceptible to diflubenzuron than other invertebrates."). EPA has determined that honeybee larvae are "highly sensitive" to diflubenzuron. EIS002819; *see also* EIS013609–11 (EPA risk assessment from 2018).

Chlorantraniliprole is the newest insecticide in APHIS's program. EIS000079. It works by "impair[ing] muscle regulation and caus[ing] paralysis and eventual death in insects." EIS009954. At least one study has shown that chlorantraniliprole can suppress reproduction in

---

[5] The EPA's final biological evaluation is available here: https://www.epa.gov/endangered-species/final-national-level-listed-species-biological-evaluation-carbaryl#executive-summary It was referenced in Plaintiffs' comments on several of the state-level EAs. *See, e.g.*, MT001936.

bumblebees, MT012112, and multiple studies have shown that lepidopteran caterpillars are highly sensitive to chlorantraniliprole, MT011690.

### III.        The Grasshopper Program and the National Environmental Policy Act.

NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2019).[6] NEPA's ultimate goals are to foster informed agency decisionmaking and allow for meaningful public engagement in the decisionmaking process. *Ground Zero for Non-Violent Action v. Dep't of the Navy*, 860 F.3d 1244, 1256 (9th Cir. 2017). "The centerpiece of environmental review under NEPA is the environmental impact statement ("EIS"), in which the responsible federal agency describes the proposed project and its impacts, alternatives to the project, and possible mitigation for any impacts." *ONDA v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016).

Two of the key requirements of NEPA are relevant to this case. First, an agency preparing an EIS must "'[r]igorously explore and objectively evaluate all reasonable alternatives' to th[e] [proposed] action" as well as the proposed action itself. *Ctr. for Biological Diversity v. Dep't of the Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (quoting 40 C.F.R. § 1502.14(a)). "The analysis of alternatives to the proposed action is the heart of the [EIS]." *Id.* (cleaned up). Second, an agency preparing an EIS or other NEPA analysis must take a "'hard look' at the environmental consequences of [its] decision." *Ass'n of Public Agency Customers, Inc. v. BPA*, 126 F.3d 1158, 1183 (9th Cir. 1997). To take a "hard look," an agency must "provide [a] full and fair discussion" of the environmental effects of its action sufficient to ensure informed

---

[6] The EIS's compliance with NEPA is measured against the NEPA regulations in effect in 2019. *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 980 n.3 (9th Cir. 2022).

decisionmaking and public participation. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 486–87 (9th Cir. 2011) (cleaned up).

Also relevant to this case is the concept of "tiered" NEPA review. When an agency uses "tiered" review, it prepares a "programmatic" EIS that analyzes the environmental effects of a policy or program at a broad level; subsequent NEPA analyses, sometimes referred to as "site-specific" analyses, "summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference." 40 C.F.R. § 1502.20 (2019).

## A. The 1987 and 2002 Environmental Impact Statements.

The Food Security Act of 1985 included a new authorization for APHIS's grasshopper control activities. Pub. L. No. 99-198, tit. XVII, § 1773, 99 Stat. 1354, 1658 (1985). APHIS soon thereafter decided to prepare a new EIS under NEPA analyzing the environmental effects of its program and exploring different ways of carrying out that program. EIS008655. The resultant 1987 EIS reflected a change in approach. Whereas APHIS had traditionally employed a "reactive or crisis-oriented approach" to grasshopper management—*i.e.*, spraying pesticides following outbreaks of grasshoppers, EIS008657—APHIS decided in the 1987 EIS to adopt an integrated pest management approach. EIS008656–57; EIS008659–63. This approach "would allow biological or chemical methods to be selected singly or in combination for grasshopper control and would involve ongoing research and testing to identify other feasible control methods (including cultural/mechanical methods) that could be phased into future IPM programs." EIS008659.

Following the passage of the Plant Protection Act in 2000, APHIS prepared a new EIS for its grasshopper control program. *See* EIS009299–9581 (2002 EIS). The resultant EIS, released in 2002, represented a return to the "reactive or crisis-oriented approach" that APHIS

had employed prior to 1987. The program was renamed—from the "Rangeland Grasshopper Cooperative Management Program," EIS008644, to the "Rangeland Grasshopper and Mormon Cricket Suppression Program," EIS009299. Unlike in the 1987 EIS, APHIS did not adopt—did not even give full consideration to—an IPM alternative. EIS009322.

In addition to changing the scope of the grasshopper program, the 2002 EIS introduced the use of reduced agent area treatments ("RAATs"). "The RAATs strategy uses a reduced rate of insecticide from conventional levels by alternating treatment swaths in a spray block, reduced application rates, or both." EIS000026. The 2002 EIS also authorized the use of diflubenzuron, which has since become the most commonly used pesticide in APHIS's program. EIS000088.

### B.    The 2019 EIS.

In 2016, APHIS announced plans to prepare a new EIS for its grasshopper program. EIS000177–78. In its scoping notice, APHIS laid out three alternatives: (1) a "no action" alternative, which would continue the program described in the 2002 EIS; (2) a "no suppression program" alternative, in which "APHIS would not fund or participate in any program to suppress grasshopper infestations"; and (3) an alternative in which APHIS would select either RAATs treatments or treatments at conventional (non-reduced) rates, depending on the situation. EIS000178. The Center submitted comments in response to the scoping notice urging APHIS to "also consider integrated pest management and use of any nonchemical methods, such as mechanical, ecological, cultural, or biological control," rather than only considering alternatives that "rely primarily on chemical control methods." EIS000238–39. Similarly, the National Park Service urged APHIS "to look at alternatives that do not rely on the broadcast application of insecticides to control infestations of grasshoppers." EIS000352.

APHIS did not change course in response to these comments: like the 2002 EIS, the 2019 EIS does not consider a prevention-first, holistic alternative. *See* EIS000031. This omission was criticized by both the Center and Xerces, as well as by the Pollinator Stewardship Council. *See* EIS001290 (Center's comments); EIS001299–1301 (similar comments from the Pollinator Stewardship Council); EIS002941–42 (Xerces comments). APHIS responded to these criticisms by claiming that most preventive activities "are not managed by APHIS," but are rather "the responsibility [of] ... other Federal ..., State, and private land managers." EIS000115. APHIS did acknowledge, however, that "[t]he best grasshopper management strategies are preventative in nature and are long-term efforts that are designed to head off, rather than combat, outbreaks." EIS000029.

Ultimately, APHIS selected the third alternative in the 2019 EIS. EIS000003. In addition to allowing APHIS to select either RAATs or conventional pesticide applications when treating outbreaks, that alternative also allows use of chlorantraniliprole, which was not previously authorized. EIS000002.

### C. The State-Level Environmental Assessments.

The 2019 EIS is a "programmatic" EIS—it is intended "to provide the interested public with a programmatic analysis of the potential for environmental impacts from the alternatives available to APHIS," EIS000016, but it is not intended to analyze the effects of APHIS's program at a granular or "site-specific" level, EIS000026. The 2019 EIS contemplates that, before APHIS actually conducts any pesticide treatments, it "will prepare site-specific" environmental assessments ("EAs") that "tier" to the EIS and "address unique local issues." EIS000011; EIS000026. *See also supra* p. 12 (discussing tiered review).

Since 2019, APHIS has prepared nominally "site-specific" EAs for several states or portions of states. These EAs vary in their geographic scope and duration. For instance, the 2020 Idaho EA covers all of Idaho and is intended to analyze the effects of APHIS's program through 2023. ID000008. In Montana, on the other hand, APHIS has divided the state into three parts and prepared three EAs. MT010901. In this case, Plaintiffs are challenging the adequacy under NEPA of five EAs: the 2020 Idaho EA, the 2022 Oregon EA, the 2022 Wyoming EA, and two of the 2023 Montana EAs.[7]

These EAs share many similarities—in fact, large portions of the EAs are identical to one another. *Compare, e.g.*, OR000031–35, *with* ID000031–42, *with* WY000027–37, *with* MT010852–63. Importantly, the EAs all lack (1) information about where APHIS has applied pesticides in the past and what effects those treatments have had; (2) information about where, specifically, APHIS is likely to apply pesticides in the future; and (3) information about the status, distribution, and abundance of sensitive pollinators such as native bees and butterflies. Salient features of the EA are discussed below.

Oregon

The 2022 Oregon EA covers almost 43 million acres and nearly two thirds of the state. OR000022. It describes the general characteristics of the six ecoregions present in the area, but that information is devoid of any relation to the grasshopper program and its impacts. OR000022–25. The EA includes a map depicting historic economic infestations, OR000011, but lacks any information about the specific areas where pesticide treatments have occurred in the past.

---

[7] Plaintiffs' Fourth Claim for Relief challenges two of the 2022 Montana EAs. Because those EAs have been superseded by the 2023 EAs, Plaintiffs are abandoning this claim.

The Oregon EA also lists public lands that fall within the program area—including six national forests and various national wildlife refuges—but provides no information about the characteristics of those lands or how they might be specifically impacted by program treatments. *See* OR000028. The EA fails to mention other sensitive areas, including Wilderness Study Areas and popular recreation sites, that could be impacted by the program. *See* OR000698 (noting that there were treatment requests for areas within Wilderness Study Areas but BLM "decided to drop" them "due to lack of analysis in the previous EA"); OR000599 (map showing proposed treatments near the Malheur National Wildlife Refuge, Steens Mountain, and the Oregon Desert Trail). The Oregon EA does not contain any detailed information about the abundance or distribution of bees, butterflies, and other pollinators.

Idaho

The 2020 Idaho EA covers 34 counties comprising more than two and a half million acres of federal land. ID000023. Like the Oregon EA, it describes only the general characteristics of the area. ID000023–25. The EA includes a single map of "potential grasshopper treatment areas," ID000088, but does not provide any further explanation of the map, *see* ID000023–24. Like the Oregon EA, the Idaho EA does not contain information about past treatment locations or effects observed as a result of those treatments.

In its section on "site-specific considerations," Idaho's EA does not contain any details of local impacts to recreation sites or sensitive areas. *See* ID000026. In fact, much of the language is identical to Oregon's EA. *Compare* ID000027 *with* OR000027. The analysis of "site-specific" environmental consequences is also nearly identical to Oregon's. *Compare* ID000031 *with* OR000031. The portion of the EA discussing "environmental consequences" contains no analysis of impacts to specific areas likely to be treated under the program. *See* ID000031–57.

The only discussion of pollinators lacks any information about pollinator distribution or abundance. *See* ID000047–48, ID000055–56.

Wyoming

The Wyoming EA covers the entire state, comprising over 62.5 million acres. WY000017. The generalized description of the affected environment lists the major recreational areas in the region, including eleven state parks and eight national forests, but does not indicate which areas are likely to be subject to treatment under the program. WY000017–18. While the EA contains an appendix with the 2021 adult grasshopper survey map for Wyoming, the EA does not identify specific locations on the map or provide any explanation of likely treatments in relation to the map. *See* WY000102. The map is not mentioned in the description or analysis in the EA and did not appear to inform APHIS's analysis in any way. Like the other EAs, the Wyoming EA does not contain information about past treatment locations or effects observed as a result of those treatments.

Unlike for the other states, Wyoming's EA does not even contain a section for "site-specific considerations," instead labeling it "other considerations." WY000018. As the heading signals, this discussion is even more sparse and devoid of detail than Oregon's and Idaho's EAs. *See* WY000018–26. For instance, it notes that there are 43 Wilderness Study Areas in the state. WY000024. But instead of naming, describing, or analyzing potential impacts to those areas, APHIS simply states that it would consult the relevant BLM field office before treating such areas. *Id.*

Montana

The EA for the eastern portion of Montana covers nearly 17 million acres of rangeland in 24 counties. MT010846. The EA for the central portion of the state covers more than 13 million

acres of rangeland in 16 counties. MT010994. Again, the descriptions of the affected

environment are limited to general information about the region. MT010846–47, MT010994–95.

Although the EAs provide the 2023 grasshopper hazard map for the state, MT010839,

MT010986, they do not use or reference the map anywhere to explain likely treatment areas.

Like the other EAs, the Montana EAs do not contain information about past treatment locations

or effects observed as a result of those treatments. The Montana EAs' discussion of pollinators

contains no information about pollinator distribution or abundance in the state. MT010855, 61,

63–64, 71; MT011003, 09, 12, 20.

Plaintiffs have consistently requested that APHIS include more detail in its state-level

EAs, but APHIS has refused, claiming that the EAs are sufficiently "site-specific" and contain

enough detail to satisfy NEPA. *See, e.g.*, OR000883–84, 000907–08 (Xerces comments

requesting more detail on past and potential treatments); OR000200–02 (response to Xerces

comments).

IV.     **The Grasshopper Program and the Endangered Species Act.**

The ESA imposes a substantive obligation on federal agencies to "insure that any action

authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued

existence of any endangered or threatened species or result in the destruction or adverse

modification of" habitat that has been designated as critical for such species. 16 U.S.C.

§ 1536(a)(2); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 924 (9th Cir.

2008). To help fulfill its substantive mandate, the ESA requires a federal agency considering

taking an action that "may affect" listed species to first consult with an expert agency—the U.S.

Fish and Wildlife Service or the National Marine Fisheries Service, depending on the species. 50

C.F.R. § 402.14. The "may affect" standard is low: any possible effect, including benign effects,

meet the standard. *California ex rel. Lockyer v. Dep't of Agric.*, 575 F.3d 999, 1018–19 (9th Cir. 2009).

Consultation can result in a biological opinion ("BiOp") issued by the expert agency, which is "a written statement ... explaining how the proposed action will affect the species or its habitat." *Bennett v. Spear*, 520 U.S. 154, 158 (1997). A BiOp "has a powerful coercive effect on the action agency." *Id.* at 169. When a BiOp prescribes "terms and conditions" for the action agency to comply with, the action agency typically complies with those terms and conditions. *See id.* at 170. In this way, BiOps operate as strong substantive constraints that ensure agency actions do not jeopardize listed species or their critical habitat.

More than 200 species of ESA-listed animals and plants are found in areas potentially subject to treatment under APHIS's program. *See* EIS020999–021019 (discussing species potentially affected by APHIS's program); EIS021080–86 (most recent version of effects determinations). These include the yellow-billed cuckoo, a bird found in many Western states, EIS021082; the Lahontan cutthroat trout, which is found in several states covered by the program, including Oregon, *id.*; and Ute ladies'-tresses, an orchid found in Wyoming, Montana, Idaho, and several other states, EIS021086.

The last programmatic ESA consultation between APHIS and the Fish and Wildlife Service was completed in 1995. OR000565. Until a new programmatic consultation is complete, APHIS consults informally with the Fish and Wildlife Service on a state-by-state basis each year. *E.g.*, 000566. Each of these consultations considers only the effect of APHIS's program in a single state in a single year. *See, e.g.*, MT011345.

## ARGUMENT

### I. The 2019 EIS Unlawfully Failed to Consider Alternatives that Would Take a Holistic Approach to Grasshopper Control with an Emphasis on Prevention.

The 2019 EIS states that "[t]he scope of the [EIS] is on the actions APHIS may consider after making a determination whether treatments are warranted." EIS000115. For this reason, the EIS does not consider any alternatives that take a holistic approach to grasshopper management with a focus on preventive measures. *See* EIS000029 ("Regardless of the various IPM strategies taken, the primary focus of this EIS is on the potential impacts from immediate chemical treatment needs during an outbreak of economic importance.").

By limiting the scope of the EIS in this way, APHIS violated NEPA's requirement that it consider "reasonable alternatives to the proposed action." *City of Carmel-By-The-Sea v. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997) (internal quotation marks omitted). Specifically, APHIS defined the scope of the EIS—the "purpose and need" for the proposed action—in an unreasonably narrow fashion, leading to the elimination of reasonable alternatives. *See Nat'l Parks Conservation Ass'n v. BLM*, 606 F.3d 1058, 1072 (9th Cir. 2010) ("As a result of this unreasonably narrow purpose and need statement, the BLM necessarily considered an unreasonably narrow range of alternatives.").

"Project alternatives derive from an [EIS's] 'Purpose and Need' section, which briefly defines 'the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.'" *City of Carmel*, 123 F.3d at 1155 (quoting 40 C.F.R. § 1502.13). Though agencies have discretion in crafting a purpose and need statement, "this discretion is not unlimited." *Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004). In particular, "an agency cannot define its objectives in unreasonably narrow terms." *City of Carmel*, 123 F.3d at 1155. And "[w]here an action is taken pursuant to a specific statute,

the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS." *Westlands Water Dist.*, 376 F.3d at 866. This Court reviews the 2019 EIS's purpose and need statement under a reasonableness standard. *Id.*

Here, there is a glaring mismatch between the statutes under which APHIS carries out its grasshopper control duties and the scope of the EIS. "The scope of the [EIS] is on the actions APHIS may consider after making a determination whether treatments are warranted." EIS000115; *see also* EIS000026 ("This EIS provides an overview of insecticides and approaches available to APHIS for grasshopper suppression during outbreaks and the potential for environmental impacts from their uses."). The statutes, on the other hand, require a holistic approach to grasshopper control with an emphasis on prevention. *See* 7 U.S.C. § 7717(b)(1) (requiring Interior to transfer funds to APHIS "for the *prevention*, suppression, and control of actual *or potential* grasshopper and Mormon cricket outbreaks on ... lands" managed by Interior) (emphasis added); 7 U.S.C. § 136r-1 ("Federal agencies shall use Integrated Pest Management techniques in carrying out pest management activities ...."). Although reactive pesticide treatments are just one part of the statutory scheme, they are the entire focus of the EIS. In fact, the EIS is essentially an analysis of how APHIS will carry out one paragraph of one statute—7 U.S.C. § 7717(c)(1)—rather than a true programmatic analysis of how APHIS will carry out its grasshopper control duties. Using the "statutory objectives" of APHIS's program "as a guide," *Westlands Water Dist.*, 376 F.3d at 866, the EIS's scope is unreasonably narrow.

The mismatch between the statutes governing APHIS's grasshopper control activities and the scope of the 2019 EIS is particularly striking given the history of the grasshopper control statutes. Prior to 1985, APHIS carried out grasshopper control on rangelands under a statutory scheme that called for the agency to respond to "incipient or emergency outbreaks" of

grasshopper and Mormon crickets and explicitly mentioned "poison bait." 7 U.S.C. §§ 148, 148a

(1982). Given these instructions from Congress, APHIS took a "reactive or crisis-oriented

approach" to grasshopper control that relied almost entirely on pesticides. EIS008657. In 1985,

Congress mandated that APHIS take a different approach to grasshoppers in the Food Security

Act; then, in 1996, Congress explicitly required APHIS (and other agencies engaged in pest

management) to use "a sustainable approach to managing pests by combining biological,

cultural, physical, and chemical tools in a way that minimizes economic, health, and

environmental risks." 7 U.S.C. § 136r-1. And yet the 2019 EIS is narrowly focused on reactive

pesticide treatments, as if APHIS were still operating under the pre-1985 statutory regime.

 In response to comments from Plaintiffs and others that the 2019 EIS should consider a

prevention-focused alternative, APHIS stated that most preventive activities "are not managed by

APHIS," but are rather "the responsibility [of] ... other Federal ..., State, and private land

managers." EIS000115. This is not a valid justification for the narrow scope of the EIS. When

conducting a NEPA analysis of a program whose implementation requires the cooperation or

approval of other agencies, an agency "shall ... [r]equest the participation" of those other

agencies in the NEPA process, and the other agencies "shall be ... cooperating agenc[ies]." 40

C.F.R. § 1501.6 (2019). The availability of the "cooperating agency" mechanism means that an

agency cannot refuse to consider an alternative just because implementing that alternative will

involve other agencies, nor can it define the scope of its action so narrowly so as to eliminate all

such alternatives. *See* 40 C.F.R. § 1502.14 (2019) ("agencies shall ... [i]nclude reasonable

alternatives not within the jurisdiction of the lead agency"). The fact that other agencies—BLM,

the Forest Service, etc.—might ultimately have to carry out or approve some activities to prevent

grasshopper outbreaks as part of a holistic control program was not a valid reason for APHIS to

exclude from consideration all alternatives that involve such activities; rather, it was a reason to include those other agencies in the NEPA process.

APHIS used the "cooperating agency" mechanism in the 1987 EIS. EIS008656. Then, as now, APHIS recognized that a "preventive or anticipatory approach to prevent grasshopper outbreaks" would require cooperation and buy-in from other actors. EIS008657. Rather than artificially narrow the scope of the EIS to exclude such a prevention-focused alternative, APHIS invited the key federal agencies—BLM, the Forest Service, and the Fish and Wildlife Service—to be cooperating agencies. EIS008656. This allowed APHIS to explore and ultimately adopt a true "integrated pest management" approach that included, among other measures, research into mechanical and cultural methods that would ultimately have to be approved by those other agencies. *See* EIS008701–02 (general description of chosen alternative); EIS008707–10 (mechanical and cultural methods). APHIS could have done the same for the 2019 EIS.

The EIS's unreasonably narrow purpose and need/scope led APHIS to eliminate a holistic, prevention-first alternative from detailed consideration. Thus, APHIS failed to consider a reasonable range of alternatives. *See Nat'l Parks Conservation Ass'n*, 606 F.3d at 1072.[8]

## II.    APHIS Failed to Take a "Hard Look" at the Effects of Its Chosen Alternative in the 2019 EIS.

The 2019 EIS does not take a "hard look" at the environmental consequences of APHIS's rangeland pesticides program. First, the EIS does not contain adequate information about past treatments conducted by APHIS and the status of environmental resources in treated areas.

---

[8] To the extent that the 2019 EIS's scope can be construed more broadly, APHIS erred by refusing to consider reasonable alternatives consistent with that scope. A holistic, prevention-focused alternative would be entirely consistent with a broader scope—indeed, the statutes governing the grasshopper control program require such an approach, and even APHIS admits that "[t]he best grasshopper management strategies are preventative in nature and are long-term efforts that are designed to head off, rather than combat, outbreaks." EIS000029.

Second, the EIS does not consider adequately the potential effects of APHIS's program on bees, butterflies, and moths.

A.    The 2019 EIS Does Not Establish Baseline Conditions.

The 2019 EIS is devoid of information about where APHIS has applied pesticides in the past or the status of sensitive environmental resources in those and other potentially affected areas. The sole piece of information in the EIS about the scale of past treatments is a graph showing the total acres treated each year from 2006–2017. EIS000087. There are no maps or even textual descriptions of where those treatments occurred. There is little to no discussion of the status of sensitive,[9] non-ESA-listed species found in those areas, and there is *no* discussion of whether any impacts to those species have been observed in or near sprayed areas since the 2002 EIS.

Because the EIS does not discuss or analyze past treatments and the effects of those treatments, it fails to adequately establish baseline conditions. Agencies have a duty under NEPA "to assess, in some reasonable way, the actual baseline conditions" of the affected environment. *ONDA v. Rose*, 921 F.3d 1185, 1190 (9th Cir. 2019) (internal quotation marks and citation omitted). "Without establishing the baseline conditions which exist ... before [a project] begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016) (quoting *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)). The environmental baseline includes "the cumulative effects of past projects." *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015).

_____

[9] By "sensitive" species, Plaintiffs mean species that are especially likely to be harmed by the pesticides used in APHIS's program but which are not listed under the ESA. This includes butterflies, moths, native bees, and sage-grouse.

An agency's "assessment of baseline conditions 'must be based on accurate information and defensible reasoning.'" *Great Basin Res. Watch*, 844 F.3d at 1101 (quoting *ONDA v. Jewell*, 840 F.3d at 570). As with other NEPA issues, this Court reviews the EIS's baseline discussion using "'a rule of reason' analysis to determine whether the discussion of the environmental consequences included in the EIS is sufficiently thorough." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020).

A programmatic NEPA document like the 2019 EIS need not establish all site-specific baseline conditions, since later site-specific analyses will be conducted. *Cf. California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (discussing the "preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences"). But certain baseline conditions should be established in a programmatic EIS, because it is only at the programmatic stage that the agency considers the impact of the program *as a whole* on the environment. *See Native Village of Point Hope v. Jewell*, 740 F.3d 489, 504 (9th Cir. 2014); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F.Supp.3d 861, 941 (D. Or. 2016) ("site-specific NEPA documents cannot suffice to evaluate the large-scale project").

Here, APHIS should have established baseline conditions in the EIS for sensitive environmental resources and species that are found throughout multiple states in which the rangeland pesticides program operates. In particular, APHIS should have established baselines for species of native bees, butterflies, and moths that are found in multiple states, as well as for the sage-grouse, which is found in large swaths of the region covered by the EIS. Given that Lepidoptera and bees are especially sensitive to the pesticides used in APHIS's program, *see supra* pp. 9–11, and that many of these species are in decline, *see supra* pp. 4–5, it was

especially important that APHIS analyze and disclose to the public the status of these species in the analysis area and whether past treatments have affected these species.

In its comments, Xerces pointed out several species of native bees and butterflies that might be affected by APHIS's program, and even provided maps showing the range of some of the bee species. *See* EIS002942–43 (discussing these species); EIS002947–52 (maps); EIS002953–64 (list of butterflies). Many of these species have ranges that sweep across multiple states covered by the EIS. *See* EIS002947–64. For instance, the monarch butterfly—which was, at the time of the EIS, being considered for listing under the ESA[10]—famously migrates across and breeds in some of those states each year. EIS002812; EIS002955. Yet the EIS does not even mention these species, much less attempt to provide baseline information about them, such as their range or abundance. And there is no discussion whatsoever of whether past treatments have occurred in these species' habitats and, if so, whether any adverse effects have been observed. Such an utter failure to establish baseline conditions for species that may be affected by a project violates NEPA. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083–85 (9th Cir. 2011).

The EIS does actually discuss the sage-grouse, and even admits that "sage grouse adults and chicks are likely to be present in some areas where grasshopper treatments are made." EIS000098–100. But there is no attempt to establish a baseline—either in terms of where sage-grouse are located relative to probable treatment areas or whether past treatments have affected sage-grouse. *See Cascadia Wildlands*, 801 F.3d at 1111 (the baseline includes the cumulative effects of past actions).

---

[10] In 2020, the Fish and Wildlife Service made a finding that ESA listing for the monarch butterfly is "warranted" but "precluded by work on higher priority listing actions and final listing determinations." 85 Fed. Reg. 81,813, 81,815 (Dec. 17, 2020).

The EIS's lack of any meaningful discussion about past pesticide treatments and the status of vulnerable species that are located across multiple states violates NEPA.

**B.    The EIS Does Not Take a "Hard Look" at the Impacts of APHIS's Program on Bees, Butterflies, and Moths.**

The EIS fails to take a "hard look" at the risks APHIS's program poses to bees, butterflies, and moths. For one thing, as discussed above, the EIS makes no attempt to establish baseline conditions for key species such as the monarch butterfly and several species of bees that can be found across the West. In addition to this "baseline" problem, the EIS's analysis of effects to bees, butterflies, and moths suffers from two major problems: (1) an inadequate analysis of mitigation measures and (2) an inadequate discussion of the cumulative effects of APHIS's program combined with other pesticide applications.

*1.   Mitigation*

"Pursuant to NEPA, an agency must ... consider appropriate mitigation measures that would reduce the environmental impact of the proposed action." *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 581–82 (9th Cir. 2016). "The agency must provide 'an assessment of whether the proposed mitigation measures can be effective ... [and] whether anticipated environmental impacts can be avoided.'" *Id.* at 581 (quoting *S. Fork Band Council of W. Shoshone of Nev. v. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (per curiam)).

One of the key mitigation measures for pollinators discussed in the EIS is adherence to pesticide label requirements. *See* EIS000053; EIS000064; EIS000123. But pesticide label requirements are developed under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), and "FIFRA does not require or even contemplate the same examination that [agencies are] required to undertake under NEPA." *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1248 (9th Cir. 1984), *abrogated on other grounds by Amoco Prod. Co. v. Village of*

*Gambell, Alaska*, 480 U.S. 531 (1987). For that reason, agencies cannot substitute a promise to adhere to pesticide label restrictions for an analysis of the efficacy of such restrictions; they must independently assess the efficacy of mitigation measures included on pesticide labels. *See S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475, 1480 (9th Cir. 1983) ("The BLM must assess independently the safety of the herbicides that it uses."). The EIS makes no attempt to do this, and instead simply assumes that label restrictions will be effective.

This assumption is not a valid one, because the relevant labels contain mitigation measures that are unlikely to be effective for aerial pesticide applications. For instance, the label for Dimilin (diflubenzuron) says to "[m]inimize exposure of this product to bees" and "[m]inimize drift of this product on to beehives or to off-site pollinator attractive habitat." EIS013551. These measures presuppose that the applicator knows where bees are located—a dubious assumption for a pilot 75 feet up in the air.[11] EIS020918. By relying on these kinds of label restrictions without assessing their efficacy, the EIS understates the likely effects of APHIS's program on bees and other sensitive pollinators, undermining the document's utility as a decisionmaking tool and violating NEPA. *See S. Fork Band Council of W. Shoshone of Nev.*, 588 F.3d at 727 ("An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective.").

---

[11] In some cases, APHIS may actually know where honeybees are located, because some states have beekeeper registries. EIS000021–22; EIS000122–23. But, as APHIS admits, "it may prove difficult to locate all hives that are in the treatment area" and "states can vary in their registration requirements." EIS000123. And wild, native bees are not registered. APHIS's response to this in the EIS is to rely on adherence to label restrictions as a mitigation measure. EIS000123. But, as discussed in the main text, these restrictions presuppose knowledge of bee location.

## 2. Cumulative Impacts

"NEPA always requires that an environmental analysis for a ... project consider the cumulative impacts of that project together with past, present and reasonably foreseeable future actions." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 895 (9th Cir. 2002) (cleaned up). "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (2019). The cumulative impacts requirement ensures that an agency "give a realistic evaluation of ... total impacts" rather than "isolat[ing] a proposed project, viewing it in a vacuum." *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002). "[I]n considering cumulative impact[s], an agency must provide some quantified or detailed information; [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005) (cleaned up).

A programmatic EIS need not discuss cumulative impacts at the same level of detail as later site-specific analyses. *N. Alaska Env't Ctr. v. Lujan*, 961 F.2d 886, 890–91 (9th Cir. 1992). But a programmatic EIS should analyze and disclose cumulative impacts flowing from the program *as a whole*, because such impacts cannot be adequately captured in later site-specific analyses. *See Native Village of Point Hope*, 740 F.3d at 504; *see also Kern v. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002) ("NEPA ... is designed to require ... analysis [of environmental consequences] as soon as it can reasonably be done").

APHIS should have analyzed the cumulative impacts of its program as a whole in combination with other pesticide treatments on sensitive species of bees, butterflies, and moths (as well as the sage-grouse). *Cf. supra* pp. 24–27 (discussing baseline problem). The EIS does no

such thing. The EIS *mentions* other sources of pesticides, EIS000088–90, but there is no "quantified or detailed information" about such treatments. *Ocean Advocates*, 402 F.3d at 868. The public—and decisionmakers—are left utterly in the dark about the scale of other pesticide treatments that occur near and even on the public lands that APHIS treats, and how those treatments might combine with APHIS's treatments to affect species like the monarch butterfly that are found in multiple states covered by the EIS. APHIS should have considered and disclosed to the public how its program, when added to other pesticide treatments, will contribute to the decline of insect populations across the American West.

The EIS suggests that the cumulative impacts of APHIS's program and other pesticide applications will be negligible because they will not overlap—that is, other treatments will not take place on precisely the same plots of land as APHIS's grasshopper treatments. *See* EIS000089 ("[I]t is unlikely there would be significant overlap between most APHIS-PPQ programs and the grasshopper program because [the others] would not occur in rangeland habitats."); EIS000090 (similar statement regarding mosquito control). But even assuming that treatments don't overlap, it doesn't follow that cumulative impacts to bees, butterflies, and moths will be negligible. For one thing, some pollinators forage over a relatively large area, and may be exposed to pesticides from an APHIS grasshopper treatment and a nearby treatment from another source. *See* EIS003771 ("Bees' flight range can greatly affect their exposure to insecticides. Extensive flight distances between nests and flowering plants increase their foraging time and make them more vulnerable to insecticides."); EIS013862 ("[M]any species of bees are capable of flying several miles to return to their nests."). This is especially likely given that APHIS often treats rangelands adjacent to private croplands. *See supra* p. 8. Moreover, even if no individual

organism is likely to be affected by both an APHIS treatment and a non-APHIS treatment, the two treatments may have a cumulative effect on the *population*.

It is only at the programmatic stage that APHIS can adequately consider the cumulative effects of its program *as a whole* in combination with other pesticide treatments. *See Native Village of Point Hope*, 740 F.3d at 504. The EIS does not contain that analysis, and thus violates NEPA.

III.     **APHIS Violated the ESA by Failing to Complete Consultation with the Fish and Wildlife Service Before Adopting the 2019 ROD.**

APHIS violated the ESA by failing to complete consultation with the Fish and Wildlife Service over the grasshopper program before adopting the 2019 ROD. The ESA requires federal agencies to complete consultation *before* they carry out actions that "may affect" listed species or critical habitat. *See Conner v. Burford*, 848 F.2d 1441, 1455 (9th Cir. 1988) (The ESA has a "clear mandate that a comprehensive biological opinion … be completed before initiation of the agency action"). Because the ROD affirmatively authorizes the rangeland pesticides program, allowing APHIS to treat rangelands in 17 states using the specific pesticides and application methods approved therein, the adoption of the ROD required consultation under the ESA. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 884 (9th Cir. 2022) (setting out the test for when ESA consultation is required).

In 2015, APHIS submitted to the Fish and Wildlife Service a biological assessment for the rangeland pesticides program. EIS020889–021058. APHIS determined that the program "may affect" more than 100 species listed under the ESA, confirming the need for consultation. EIS021059–66; 50 C.F.R. 402.14(a). But APHIS never completed consultation over the program as a whole prior to finalizing the EIS and adopting the ROD. *See* APHIS Answer (ECF No. 20) ¶ 138. By proceeding to adopt the ROD without first obtaining a valid biological opinion or letter

of concurrence from the Service covering the grasshopper program as a whole, APHIS violated

its duty to insure against jeopardy and/or adverse modification of critical habitat. *See* 16 U.S.C.

§ 1536(a)(2); *Conner*, 848 F.2d at 1455 ("a comprehensive biological opinion [must] be

completed before initiation of the agency action").

APHIS's failure to complete consultation over the rangeland pesticides program as a

whole is particularly troubling given that the most recent completed programmatic consultation

is nearly 30 years old. The programmatic biological opinion issued by the Fish and Wildlife

Service in 1995 does not analyze the effects of diflubenzuron—which is currently the most

commonly used pesticide in the program, EIS000088—or chlorantraniprole, the use of which

was first approved in the 2019 EIS, EIS000002. Nor does the 1995 BiOp address impacts on

several newly-listed species like the yellow-billed cuckoo, bull trout, and Oregon spotted frog.

*See* EIS020744–56 (list of species from 1995 BiOp). What this means is that APHIS has *never*

completed programmatic consultation with the Fish and Wildlife Service over the effects of all

pesticides approved for use in the 2019 ROD and the effects of its program on all currently listed

species.

APHIS has attempted to satisfy its consultation obligations through annual state-level

consultations. *See supra* p. 19. But annual consultations for each state do not satisfy the need for

a completed consultation over the rangeland pesticides program *as a whole*. Simply put, "[s]ite-

specific review cannot cure a failure to consult at the programmatic level." *Env't Def. Ctr.*, 36

F.4th at 890; *see also N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 454 F.Supp.3d 985,

993 (D. Mont. 2020) (project-level review on a nationwide Clean Water Act permit did not

obviate the need for a programmatic consultation on the permit).

By failing to complete programmatic consultation *before* adopting the ROD—and by authorizing and funding dozens of pesticide treatments since then—APHIS has failed to ensure that the rangeland pesticides program will not jeopardize the continued existence of any endangered species, as consultations are required to do. 16 U.S.C. § 1536(a)(2). Thus, APHIS has violated section 7 of the ESA. *See Conner*, 848 F.2d at 1455.

## IV.       The State-Level EAs Violate NEPA.

The challenged state-level EAs violate NEPA, for three reasons. First, they are not "site-specific" enough—that is, they do not address in sufficient geographic detail the environmental conditions and likely effects of APHIS's program. Second, the state-level EAs fail to establish baseline conditions in the relevant areas, because they do not discuss or analyze the state of the environment and the effects of past treatments in those areas. Third, the EAs do not adequately assess the cumulative impacts of spraying in the relevant areas.

### A.       The State-Level EAs Fail to Analyze the Site-Specific Impacts of the Rangeland Pesticides Program.

When an agency engages in tiered review under NEPA, the question "is not whether the project's site-specific impact[s] should be evaluated in detail, but when such detailed evaluation should occur." *Block*, 690 F.2d at 761. Whenever site-specific impacts are assessed, the discussion and analysis of such impacts must "be specific enough to ensure informed decision-making and meaningful public participation." *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F.Supp.3d 995, 1009 (D. Alaska 2020). A supposedly "site-specific" NEPA document that does not provide sufficient detail about where activities will occur or "describe their impacts on localized cognizable values" violates NEPA. *Id*. at 1010.

In the 2019 EIS, APHIS deferred its obligation to conduct detailed site-specific environmental analyses to later "site-specific" EAs. EIS000026. But the challenged EAs do not

discuss the areas where spraying will likely occur with any detail or precision and thus do not adequately analyze the site-specific environmental effects of APHIS's program. Instead, each EA discusses, in very general terms, a broad geographic area spanning millions of acres. *See supra* pp. 14–18 (describing the contents of the EAs). And, in many places, the EAs for different states contain nearly identical discussions of environmental effects, highlighting how non-site-specific they are. *Compare, e.g.*, ID000031, *with* OR000031, *with* WY000027, *with* MT010852, MT011000.

This generic approach cannot fulfill APHIS's duties under NEPA. The EAs' lack of site-specific analysis undermines both of NEPA's main goals: fostering informed agency decisionmaking and allowing for meaningful public engagement. *Ground Zero for Non-Violent Action*, 860 F.3d at 1256. As APHIS itself has admitted, "[t]he specific impacts" of pesticide treatments "are highly dependent upon the ... location of infestation." *See, e.g.*, OR000031. But the EAs lack detailed information about the areas likely to be treated, so neither APHIS nor the public can assess the likely effects of APHIS's program. *See Se. Alaska Conservation Council*, 443 F.Supp.3d at 1010 ("Nor does the ... EIS allow the public to identify where specific harvest activities will occur in relation to various cognizable values [in the project area]."). Nor can the public "tailor its comments" appropriately. *See ONDA v. Jewell*, 840 F.3d at 571.

With the exception of the Idaho EA, each of the EAs all but admits that it is not truly "site-specific." *See* OR000010 (acknowledging that "site-specific treatment details cannot be known, analyzed, and published in advance"); MT010840 (same); MT010987 (same); WY000008 (same). The excuse given for the lack of true site-specific analysis is that, "[i]n most circumstances, APHIS is not able to accurately predict specific treatment areas and treatment

strategies months or even weeks before grasshopper populations reach economic infestation levels." MT010840.

This excuse does not get APHIS off the hook. The fact that APHIS may not know the precise locations where treatments will occur in the future does not relieve it of its obligation to conduct a reasonable site-specific analysis. "Because at least some degree of speculation is implicit in NEPA, agencies may not shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry." *Solar Energy Indus. Ass'n v. FERC*, – F.4th –, 2023 WL 5691711, at *25 (9th Cir. Sep. 5, 2023) (cleaned up). "Some 'educated assumptions are inevitable in the NEPA process,' and the 'effects of assumptions on estimates can be checked by disclosing those assumptions so that readers can take the resulting estimates with the appropriate amount of salt.'" *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d at 740 (quoting *Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2018)).

At the time it prepared each of the challenged EAs, APHIS had a variety of information that would have allowed it to engage in "reasonable forecasting" and make some "educated assumptions" about areas likely to be treated in the future. *See Sierra Club v. FERC*, 867 F.3d at 1374 ("NEPA analysis necessarily involves some 'reasonable forecasting,' and that agencies may sometimes need to make educated assumptions about an uncertain future.") (quoting *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014)). For one thing, APHIS had data about the locations of past treatments, which is highly relevant because "APHIS programs frequently repeat in specific areas where the public demand for such work is high." OR000125. *See also supra* pp. 6–7 (discussing how APHIS has repeatedly selected areas in certain geographic regions for treatment). APHIS also had the "hazard maps" prepared the

previous winter and preliminary treatment requests for the upcoming spraying season. *See supra* pp. 7–8 (discussing APHIS's surveying and planning efforts).

Indeed, at least in Oregon, the record shows that APHIS *did* do some kind of reasonable forecasting using this data, producing "tentative treatment request maps for 2022, based on recent reported outbreak issues and survey results." OR000596–605.[12] APHIS could have done the same for the other states and then, for all states, taken the next step of analyzing the likely "impacts on localized cognizable values" in those areas. *Se. Alaska Conservation Council*, 443 F.Supp.3d at 1009–10.

APHIS's state-level EAs are not "specific enough to ensure informed decision-making and meaningful public participation." *Id.* Accordingly, they violate NEPA.

### B. The State-Level EAs Fail to Disclose and Analyze Baseline Information Regarding Past Pesticide Treatments and Sensitive Species.

Just as the 2019 EIS fails to disclose baseline information relevant to an analysis of the grasshopper program as a whole, the state-level EAs fail to disclose baseline information relevant to "site-specific" analysis of the program's effects. The challenged EAs—which purport to be *the* "site-specific" NEPA analyses for the areas they cover—fail to disclose information regarding past pesticide treatments, fail to consider the effects of such treatments in the environmental baseline, and fail to discuss or analyze the status of sensitive species. "Without establishing the baseline conditions which exist ... before [a project] begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." *Great Basin Res. Watch*, 844 F.3d at 1101 (quoting *Carlucci*, 857 F.2d at 510).

---

[12] These tentative treatment request maps were not included in the Oregon EA, so the public never had a chance to comment on them or use them to tailor their comments.

Each of the challenged EAs lacks *any* information on the locations of past pesticide treatments and what pesticides were used for each treatment. Instead, the EAs include generic statements or state-wide maps that depict general trends but withhold any concrete information about where past treatments actually occurred.[13] Oregon's 2022 EA, for example, includes a map showing economic infestations from 1953 through 2020, but does not show where pesticide treatments occurred. OR000011. The 2020 Idaho EA merely mentions that most pesticide treatments over the past two decades "have been on lands administered by BLM," but does not include a map or give any details regarding where those treatments occurred. ID000017. The 2022 EA for Wyoming and 2023 EAs for Montana do even less. *See* WY000003–104 (no mention of past treatments); MT010866 (noting only that APHIS conducted no aerial treatments in Montana in 2022 but failing to mention anything about prior years); MT011014 (same). This omission is particularly glaring given that APHIS clearly has this information. *See* ID008765–66 (maps of past treatments in Idaho, which are not included in the Idaho EA); WY000446 (map of past treatments in Wyoming, which is not included in the Wyoming EA).

Each EA also fails to disclose or analyze the *effects* of APHIS's past treatments on the environment, including on sensitive resources, non-target species, and special areas. *See supra* pp. 14–18 (describing contents of EAs). For example, the EAs do not report the results of past environmental monitoring, even though APHIS conducts monitoring as part of its program. *See, e.g.*, MT013283–93 (environmental monitoring report for 2022); WY000044–45 (discussing monitoring program). APHIS has called environmental monitoring "an essential part of [its] decision support system which provides valuable program-related feedback to decision makers,"

---

[13]  In fact, APHIS admits that when preparing its EAs it *did not consider* "granular treatment information," relying only on "summary data." *See* APHIS Resp. to Mot. to Complete (ECF No. 35) at 17-18.

APHIS Directive 5640.1, and yet the EAs fail to disclose monitoring data, thus "frustrating NEPA's goal of allowing the public the opportunity to 'play a role in ... the decisionmaking process.'" *Great Basin Res. Watch*, 844 F.3d at 1104 (quoting *Roberston v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).

The EAs also fail to disclose or analyze baseline data concerning sensitive species, including native bees, butterflies, and moths. As both the Center and Xerces pointed out in comments, rangelands in Oregon, Idaho, Wyoming, and Montana are host to a wide variety of native bees and butterflies. *See* OR000784 (discussing three different species of native bees and seven species of butterflies that have been seen in or around areas that have been sprayed in Oregon in the past); MT001908–09 (native bees and butterflies in Montana); ID000832–39 (Idaho); WY001340–41 (Wyoming). These animals are barely mentioned in the EAs, and there is no discussion of their range or abundance. This oversight is particularly alarming given the decline of pollinators across North America. *See supra* pp. 4–5.

In sum, the challenged state-level EAs violate NEPA by failing to disclose and assess baseline conditions. There is simply no way of knowing what effect APHIS's program will have on the environment, because there is no detailed information about what the environment *is.* This alone is a serious defect that renders the EAs inadequate. *See ONDA v. Jewell*, 840 F.3d at 568–73; *N. Plains Res. Council*, 668 F.3d at 1083–85; *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925–28 (9th Cir. 2015).

The lack of baseline data is particularly problematic when viewed in combination with the lack of site-specific analysis of potential *future* treatments: the EAs neither describe what APHIS has done in the past, where it has done it, what effects it had, or where APHIS is likely to treat in the future. This lack of any hindsight *or* foresight is what has allowed APHIS to recycle

the same EA year after year. *Compare, e.g.*, MT000003–52 (2022 EA), *with* MT009832–91 (2021 EA).

C.     **The State-Level EAs Fail to Analyze the Cumulative Effects of APHIS's Program Combined with Other Pesticide Applications.**

As discussed earlier, the 2019 EIS does not adequately disclose or analyze the cumulative impacts of the rangeland pesticides program as a whole when combined with other pesticide applications. *See supra* pp. 29–31. Similarly, the state-level EAs fail to include an adequate analysis of cumulative effects at the state- and site-specific level.

Each EA makes the following statement regarding pesticide use by other actors:

There may be an increased use of these insecticides in an area under suppression when private, State, or Federal entities make applications to control other pests. However, the vast majority of the land where program treatments occur is uncultivated rangeland and additional treatments by landowners or managers are very uncommon making possible cumulative or synergistic chemical effects extremely unlikely.

OR000042; ID000058; WY000042; MT010866; MT011014–15. This statement is flawed for several reasons. First, the EAs discuss the potential cumulative impacts in wholly relative terms: for instance, "increased use" does not give the public any useful information about absolute impacts, as commenters have repeatedly pointed out. *See, e.g.*, OR000126; ID000849 (Idaho BLM comments); MT010917; MT011067.

Second, APHIS's program and other pesticide applications can have cumulative impacts even when they do not occur on precisely the same plots of land. *See supra* pp. 30–31. Although program treatments may occur largely on uncultivated rangeland, they frequently occur *adjacent* to cropland where pesticide use is likely to be substantial. *See supra* p. 8. Pesticide applications occurring on adjacent or nearby plots of land can have cumulative impacts on pollinators such as bees, which can travel several miles while foraging. EIS003771; EIS013862.

The EAs entirely fail to provide any "quantified or detailed information," *Ocean Advocates*, 402 F.3d at 868, about pesticide applications by other actors, including widespread mosquito spraying and nearby agricultural uses, OR000091. As for the State of Oregon's allocation of $5 million to grasshopper suppression efforts that will occur in proximity to APHIS's treatments, OR000080, APHIS discounts the potential cumulative effects of this state program simply because "[t]here will be no planned overlap," OR000083. This misses the point: cumulative impacts can occur from adjacent or nearby pesticide treatments.

The Idaho EA acknowledges the possibility of pesticide use by other actors, but only in vague and conclusory terms. It acknowledges, for instance, the existence of mosquito abatement programs in or near potential APHIS treatment areas, but brushes off potential cumulative effects with the same flawed reasoning discussed above. *See* ID000058 (relying on the assumption that mosquito program treatments would not occur in same *exact* area as APHIS's treatments). The Idaho EA also acknowledges that the state or private individuals might conduct their own grasshopper suppression treatments, but again provides no "quantified or detailed information" about the scope or scale of those treatments. *Id.* The EA merely states that APHIS will plan its own pesticide treatments in a "complimentary [sic]" way. *Id.* This is entirely uninformative—it is "the kind of conclusory statement[], based on 'vague and uncertain analysis,' that [is] insufficient to satisfy NEPA's requirements." *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020) (quoting *Ocean Advocates*, 402 F.3d at 869).

Commenters raised additional concerns about other pesticide uses, which APHIS ignored. For example, BLM officials asked that APHIS analyze "county and private weed spraying, state weed spraying, private crop spraying, private pesticide spraying and the amount of chemical runoff from all sources affecting for example Snake River water quality." ID000848. It also

critiqued APHIS for failing to adequately address impacts of annual applications. *See* ID000846. APHIS addressed none of these concerns.

The Wyoming EA acknowledges that BLM could apply pesticides in the same areas as APHIS, but dismisses the potential cumulative impact because "they would not treat for Grasshopper or Mormon cricket." WY000093. This completely ignores the cumulative pesticide impacts on non-target species. And, as with the Oregon and Idaho EAs, the Wyoming EA entirely fails to provide any "quantified or detailed information," *Ocean Advocates*, 402 F.3d at 868, about past, present, or future pesticide treatments in the area by other actors, *see* WY000042–43.

The Montana EAs are similarly devoid of any detail and respond to commenters with the same "vague and uncertain analysis" as the Oregon, Idaho, and Wyoming EAs. *See* MT010909, 010959, 011109, 011059 (2023 EAs); MT000125, 000249 (2022 EAs); MT009917, 009921, MT010038–39 (2021 EAs).

Each of the challenged EAs fails to provide any "quantified or detailed information" about other pesticide applications and waves away concerns about cumulative effects with "vague and uncertain analysis." The result is that each EA "isolate[s]" APHIS's program, "viewing it in a vacuum." *Grand Canyon Tr.*, 290 F.3d at 342. That is precisely what a cumulative impacts analysis is intended to avoid. *Id.*

V.     **If the Court Grants Summary Judgment to Plaintiffs on Any of Their Claims, It Should Order Additional Briefing Regarding the Proper Remedy.**

The default remedy for unlawful agency action is vacatur. *See, e.g.*, *Alliance for the Wild Rockies*, 907 F.3d 1105, 1121 (9th Cir. 2018). But here, Plaintiffs' preferred remedy may depend on which decisions are found to be unlawful and why, and may be different for different decisions. Accordingly, Plaintiffs ask that, if the Court grants summary judgment to them on any

of their claims, the Court give the parties an opportunity to file additional briefs on remedies rather than simply vacating the challenged decisions. *See, e.g.*, *Cascade Forest Conservancy v. Heppler*, No. 3:19-cv-00424-HZ, 2021 WL 641614, at *9, *25 (D. Or. Feb. 15, 2021) (ordering further briefing on remedies after finding for the plaintiffs on some, but not all, of their claims).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment.


Respectfully submitted on this 3rd day of October, 2023.


*/s/ Andrew R. Missel*
Andrew R. Missel (OSB # 181793)
Elizabeth H. Potter (OSB # 105482)
Hannah A. Goldblatt (OSB # 205324)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
Phone: (503) 914-6388
amissel@advocateswest.org
epotter@advocateswest.org
hgoldblatt@advocateswest.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

The memorandum in support of Plaintiffs' motion for summary judgment contains 12,460 words, as counted by Microsoft Word's "word count" feature. Thus, it complies with the Court's order of December 9, 2022. ECF No. 27.