Andrew R. Missel (OSB # 181793)
Elizabeth H. Potter (OSB # 105482)
Hannah A. Goldblatt (OSB # 205324)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388
amissel@advocateswest.org
epotter@advocateswest.org
hgoldblatt@advocateswest.org


*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **XERCES SOCIETY FOR INVERTEBRATE CONSERVATION and CENTER FOR BIOLOGICAL DIVERSITY,** | **Case No.: 3:22-cv-00790-HZ** |
| Plaintiffs, | |
| v. | **PLAINTIFFS' SUMMARY JUDGMENT REPLY/RESPONSE** |
| **KEVIN SHEA, in his official capacity as Administrator of the Animal and Plant Health Inspection Service; and the ANIMAL AND PLANT HEALTH INSPECTION SERVICE,** | |
| Federal Defendants, | |
| and | |
| **STATE OF WYOMING and STATE OF MONTANA,** | |
| Intervenor-Defendants. | |

## PLAINTIFFS' SUMMARY JUDGMENT REPLY/RESPONSE

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.    Plaintiffs Have Article III Standing to Pursue Their Claims. ................................ 2

    A.    APHIS's Standing Arguments Are Either Misdirected or Incorrect. ......... 2

    B.    This Court Can Consider the Treatment Maps for Standing Purposes. ...... 7

II.    APHIS's Arguments Regarding the Scope of the 2019 EIS and Range of Alternatives Reflect a Misunderstanding of both the Agency's Statutory Obligations and NEPA. ........................................................................................ 9

    A.    Plaintiffs Administratively Exhausted Their Arguments Regarding the EIS's Range of Alternatives. ........................................................................ 9

    B.    APHIS Cannot Explain the Mismatch Between the Statutes Governing Its Grasshopper Control Program and the Scope of the EIS. ......................... 10

    1.    *The Statutes Governing APHIS's Grasshopper Program Require a Holistic Approach.* ................................................................................. 11

    2.    *APHIS Cannot Escape the Fact That the 2019 EIS Is Focused on Reactive Pesticide Treatments.* ........................................................... 13

    C.    APHIS's Reasons for Not Giving Full Consideration to a Holistic, Prevention-First Alternative Do Not Carry Water. ................................... 15

III.    APHIS's and Intervenors' Hand-Waving About the Adequacy of the EIS Underscores Its Deficiencies. ...................................................................................... 17

    A.    APHIS and Intervenors Do Not Deny That the EIS Lacks Baseline Information About the Locations of Past Pesticide Treatments, the Status of Sensitive Species in Those Areas, and Any Observed Effects to Those Species. ............................................................................................... 17

    B.    The EIS Fails to Assess Cumulative Impacts from the Grasshopper Program Considered in Combination with Other Pesticide Treatments... 20

IV.    Plaintiffs Have Proved Their ESA Claim. ......................................................... 21

    A.    Plaintiffs Have Standing for the ESA Claim, and the Claim Is Not Moot. ............................................................................................................... 21

    B.    On the Merits, APHIS Has Clearly Violated the ESA. ............................. 24

V.    The State-Level EAs Violate NEPA. ................................................................ 26

    A.    The State-Level EAs Are Insufficiently Site-Specific. ............................. 26

    B.    The State-Level EAs Fail to Publicly Disclose and Analyze Baseline Information Regarding Past Pesticide Treatments and Sensitive Species. 32

    C.    The State-Level EAs Lack Any Quantified or Detailed Information About the Cumulative Effects of APHIS's Grasshopper Program. ..................... 35

CONCLUSION ..................................................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*350 Montana v. Haaland*,
  50 F.4th 1254 (9th Cir. 2022) ....................................................................... 21

*Arizona v. Yellen*,
  34 F.4th 841 (9th Cir. 2022) ........................................................................... 3

*Bark v. U.S. Forest Service*,
  958 F.3d 865 (9th Cir. 2020) ......................................................................... 37

*Bruce v. Azar*,
  389 F.Supp.3d 716 (N.D. Cal. 2019) ............................................................. 28

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
  631 F.3d 1072 (9th Cir. 2011) ....................................................................... 25

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ................................................................... 26, 28

*Cascadia Wildlands v. Bureau of Indian Affairs*,
  801 F.3d 1105 (9th Cir. 2015) ....................................................................... 37

*City of Tenakee Springs v. Block*,
  778 F.2d 1402 (9th Cir. 1985) ....................................................................... 29

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015) ................................................................. passim

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
  623 F.3d 633 (9th Cir. 2010) ......................................................................... 21

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
  36 F.4th 850 (9th Cir. 2022) ..................................................... 14, 16, 20, 25

*Forest Guardians v. APHIS*,
  309 F.3d 1141 (9th Cir. 2002) (per curiam)............................................ 29, 31

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)......................................................................................... 4

*Gifford Pinchot Task Force v. Perez*,
  No. 03:13-CV-00810-HZ, 2014 WL 3019165 (D. Or. July 3, 2014)............ 35

*Grand Canyon Tr. v. FAA*,
  290 F.3d 339 (D.C. Cir. 2002) ....................................................................... 38

*Great Basin Res. Watch v. BLM*,
    844 F.3d 1095 (9th Cir. 2016) ........................................................... 30, 35, 38

*Kern v. BLM*,
    284 F.3d 1062 (9th Cir. 2022) ...................................................................... 21

*Lands Council v. McNair*,
    629 F.3d 1070 (9th Cir. 2010) ....................................................................... 9

*League of Wilderness Defs./Blue Mtns. Biodiversity Project v. Connaughton*,
    No. 3:12-cv-02271-HZ, 2014 WL 6977611 (D. Or. Dec. 9, 2014) ........................... 19, 32

*Maldonado v. Lynch*,
    786 F.3d 1155 (9th Cir. 2015) ..................................................................... 23

*Meland v. Weber*,
    2 F.4th 838, 849 (9th Cir. 2021) .................................................................. 23

*Murphy v. Smith*,
    583 U.S. 220 (2018) .................................................................................. 12

*N. Alaska Env't Ctr. v. Kempthorne*,
    457 F.3d 969 (9th Cir. 2006) ....................................................................... 15

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ...................................................................... 19

*Nat'l Audubon Soc'y v. Dep't of Navy*,
    422 F.3d 174 (4th Cir. 2005) ....................................................................... 28

*Nat'l Family Farm Coal. v EPA*,
    966 F.3d 893 (9th Cir. 2020) ...................................................................... 6, 8

*Nat'l Parks Conservation Ass'n v. BLM*,
    606 F.3d 1058 (9th Cir. 2010) ................................................................. 13, 15

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    184 F.Supp.3d 861 (D. Or. 2016) ............................................................. 18, 20

*NRDC v. EPA*,
    38 F.4th 34 (9th Cir. 2022) ......................................................................... 22

*Nuclear Info. & Res. Serv. v. Nuclear Regulatory Com'n*,
    457 F.3d 941 (9th Cir. 2006) ........................................................................ 2

*Nw. Env't Advocs. v. U.S. Dep't of Com.*,
    Case No. C16-1866-JCC, 2019 WL 110985 (W.D. Wash. Jan. 4, 2019) ...................... 8

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*,
    479 F.Supp.3d 1003 (D. Or. 2020) ............................................................ 23

*Nw. Res. Info. Ctr., Inc. v. Nw. Power & Conservation Council*,
    730 F.3d 1008 (9th Cir. 2013) .................................................................. 38

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005) ............................................................ 20, 37

*ONDA v. BLM*,
    625 F.3d 1092 (9th Cir. 2010) .................................................................. 14

*ONDA v. Jewell*,
    840 F.3d 562 (9th Cir. 2016) ............................................................ 29, 35

*ONDA v. Rose*,
    921 F.3d 1185 (9th Cir. 2019) .......................................................... 20, 35

*Pinnacle Armor v. United States*,
    923 F.Supp.2d 1226 (E.D. Cal. 2013) ...................................................... 28

*Protect Our Cmtys. Found. v. Jewell*,
    825 F.3d 571 (9th Cir. 2016) .................................................................. 33

*Protect Our Cmtys. Found. v. LaCounte*,
    939 F.3d 1029 (9th Cir. 2019) ............................................................ 9, 10

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) .................................................................. 28

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
    443 F.Supp.3d 995 (D. Alaska 2020) ........................................ 26, 29, 32

*Solar Energy Indus. Ass'n v. FERC*,
    80 F.4th 956 (9th Cir. 2023) .................................................................. 30

*Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dep't of the Interior*,
    608 F.3d 592 (9th Cir. 2010) .................................................................. 31

*Thomas v. Peterson*,
    753 F.2d 754 (9th Cir. 1985) ............................................................ 24, 25

*W. Watersheds Project v. Grimm*,
    921 F.3d 1141 (9th Cir. 2019) .............................................................. 4, 6

*Wash. Env't Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) .................................................................. 5

*Westlands Water Dist. v. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) ........................................................................ 13, 15

*WildEarth Guardians v. Mont. Snowmobile Ass'n*,
   790 F.3d 920 (9th Cir. 2015) .............................................................................. 32

*WildEarth Guardians v. USDA*,
   795 F.3d 1148 (9th Cir. 2015) ....................................................................... 5, 6, 7

*Wilderness Watch v. BLM*,
   799 F.Supp.2d 1172 (D. Nev. 2011) ................................................................... 31

## Statutes

43 U.S.C. § 1782 .............................................................................................................. 27

7 U.S.C. § 136r-1 ........................................................................................ 11, 12, 14, 15

7 U.S.C. § 148 (1982) ..................................................................................................... 12

7 U.S.C. § 7717 ........................................................................................................ passim

## Other Authorities

USDA, A National Road Map for Integrated Pest Management (revised Sep. 21, 2018),
   https://www.ars.usda.gov/arsuserfiles/opmp/ipm%20road%20map%20final.pdf (last
   visited Dec. 21, 2023) ......................................................................................... 11

## Rules

Fed. R. Civ. P. 65 ............................................................................................................. 23

## Regulations

40 C.F.R. § 1502.14 (2019) ............................................................................................ 17

## 8

85 Fed. Reg. 81,813 (Dec. 17, 2020) ............................................................................. 18

# INTRODUCTION

The Animal and Plant Health Inspection Service ("APHIS") sprays pesticides on large swaths of public lands across the American West every year—sometimes millions of acres—in order to control grasshoppers. In its environmental reviews of this program under the National Environmental Policy Act ("NEPA"), APHIS has failed to tell the public where it has applied pesticides; what environmental effects those applications have had; where spraying is most likely to occur in the future; and what sensitive environmental resources are located in those specific areas that have been or might be affected by the agency's pesticide treatments.

APHIS and Intervenors do not really dispute any of this. Instead, they insist, against all reason, that this sort of information is not important to APHIS's decisionmaking or to meaningful public participation and so need not be disclosed or analyzed under NEPA. They also throw up a host of distracting, specious arguments; demand a level of deference that would require the Court to wear blinders; and misinterpret both the record and the relevant caselaw. Further, they argue that APHIS was within its discretion to refuse to consider a holistic, prevention-first approach to grasshopper control that could reduce the need for pesticides, even though that is what the statutes governing APHIS's grasshopper program demand.

This Court should reject APHIS's and Intervenors' attempts to distract from the simple truth at the heart of this case: NEPA does not allow APHIS to spray pesticides on millions of acres of public lands without giving the public meaningful information about that spraying or its effects. APHIS cannot be allowed to continue to operate its grasshopper program in the dark, and it cannot be allowed to avoid at least *considering* a holistic approach to grasshopper control that could reduce reliance on reactive pesticide treatments.

# ARGUMENT

## I.     Plaintiffs Have Article III Standing to Pursue Their Claims.

### A.     APHIS's Standing Arguments Are Either Misdirected or Incorrect.

APHIS misconceives Plaintiffs as seeking to establish standing through the *global* decline of insect populations caused by the overuse of pesticides. To be sure, Plaintiffs are concerned about the overuse of pesticides in general and the global decline of insects and other invertebrates, and they are concerned that APHIS is contributing to these problems. But Plaintiffs' standing is based on their members' interests in specific public lands in Oregon, Idaho, Wyoming, and Montana and the species that live there—that is why Plaintiffs included detailed geographic information in their members' standing declarations and compiled information about areas frequently selected for treatment by APHIS. *See, e.g.*, Burd Decl. ¶¶ 20–21 (describing activities in specific areas of Oregon). These declarations establish the required "geographic nexus" between APHIS's activities and Plaintiffs' areas of interest to support Article III standing. *See, e.g.*, *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Com'n*, 457 F.3d 941, 952 (9th Cir. 2006) (discussing the "geographic nexus" test).

Consider, as one example, Sharon Selvaggio, one of Plaintiffs' standing declarants. Ms. Selvaggio worked for the U.S. Forest Service and the U.S. Fish and Wildlife Service for more than 25 years, most of them as a scientist. Selvaggio Decl. ¶ 6. She has a "longstanding connection to certain places in Oregon," including public lands in "the Malheur Wildlife Refuge and the Steens Mountain area and Alvord Desert." *Id.* ¶ 13. When visiting these places, Ms. Selvaggio "enjoy[s] wildlife viewing, birding, walking, and enjoying the scenery," *id.* ¶ 14, and is concerned that APHIS's pesticide treatments in these areas "kill[] grasshoppers and Mormon crickets at their peak population cycles, which in turn reduces the prey base for birds and other

species that depend on these insects," *id.* ¶ 19. Ms. Selvaggio is also concerned about the effects of APHIS's treatments on invertebrate abundance. *See id.* ¶ 16. In 2021, Ms. Selvaggio traveled to "the east side of Steens [Mountain] and the Alvord Desert area." *Id.* She returned there in June 2022, and also visited other areas that have been selected for treatment by APHIS in recent years—Bureau of Land Management ("BLM") land west of the Pueblo Mountains and "The Narrows," where Malheur and Harney Lakes converge. *Id.* ¶ 16–17; *see also* Goldblatt Decl. Ex. B (map showing Oregon areas selected for treatment from 2008–2021). She plans to continue visiting these and other nearby areas.[1] Selvaggio Decl. ¶ 21. This plainly establishes the requisite "geographic nexus" for Plaintiffs' claims related to the environmental impact statement ("EIS"), lack of Endangered Species Act ("ESA") consultation, and Oregon environmental assessment ("EA"). *See, e.g.*, *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1080–81 (9th Cir. 2015) (finding standing where the plaintiff "establish[ed] that its members extensively utilize specific National Forests where the [challenged decisions] apply and demonstrate their date-certain plans to visit the forests").

Plaintiffs' remaining declarations demonstrate the required "geographic nexus" for their claims related to the Wyoming, Idaho, and Montana EAs and provide independent bases to challenge the EIS, lack of ESA consultation, and (for Ms. Burd) Oregon EA. *Compare* Burd Decl. ¶¶ 19–23, 27 (describing activities in Oregon), *with* Goldblatt Decl. Ex. B (map showing Oregon areas selected for treatment from 2008–2021); Rosentreter Decl. ¶¶ 11–17 (describing activities in Idaho), *with* ID008764–66 (maps showing treatments in Idaho from 2006–2018); Ostermann Decl. ¶¶ 4–9 (describing activities in the Bighorn Basin), *with* WY000446 (map

---

[1] For purposes of Plaintiffs' challenges to the 2019 environmental impact statement and the Oregon environmental assessment, the future is measured from May 31, 2022. *See Arizona v. Yellen*, 34 F.4th 841, 848 (9th Cir. 2022) ("standing is measured at the time of the complaint").

showing treatments in Wyoming from 2010–2021); Lyman Decl. ¶¶ 9–15 (describing activities around Montana), *with* Goldblatt Decl. Exs. F–H (maps showing Montana areas selected for treatment from 2008–2021). Ms. Lyman has standing to challenge the two Montana EAs and the EIS for an additional reason: she has a scientific interest in documenting the "diversity, distribution, abundance, and ecology of moths in Montana," and APHIS's program frustrates that effort. *See* Lyman Decl. ¶¶ 3, 16–19, 21–24 (describing Ms. Lyman's scientific interests and how APHIS's program threatens those interests).[2]

As explained above, Plaintiffs' declarations establish injury-in-fact for each of their claims. *See W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1147 (9th Cir. 2019) (finding injury-in-fact based on the declarants' "interests in enjoying the wildlife and ecosystems of Idaho, which may be threatened by the ripple effects of wolf mortality or changes in behavior caused by wolf killings"); *see also Cottonwood*, 789 F.3d at 1080–81. APHIS contends, however, that Plaintiffs have not established the other two elements of Article III standing: causation (traceability) and redressability. APHIS Mem. at 6–9. APHIS's arguments miss the mark.

---

[2] APHIS tries to paint Plaintiffs' declarants as somewhat hysterical, as if their concerns about hundreds of thousands of acres being blanketed with pesticides were unreasonable. *See* APHIS SJ. Mem. at 6. This characterization of Plaintiffs' declarants is hard to square with reality: all of Plaintiffs' declarants have science backgrounds, and three of them have graduate degrees in scientific disciplines. *See* Rosentreter Decl. ¶ 3 (Ph.D. in botany and 33 years of work with BLM); Selvaggio Decl. ¶ 6 (M.S. in Energy and Resources and 25+ years of work with the Forest Service and Fish and Wildlife Service); Lyman Decl. ¶ 2 (M.S. in entomology). Their concerns about APHIS's pesticide sprays, and the resultant negative impacts to their interests, are entirely reasonable. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183–84 (2000) (holding that the defendant's "discharges [of pollutants], and the affiant members' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests").

APHIS's primary contention is that Plaintiffs have failed to show how APHIS contributes to the global decline of insect populations. APHIS Mem. at 6–7.[3] APHIS relies heavily on *Washington Environmental Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013), a case involving climate change. This entire argument, and especially APHIS's reliance on *Bellon*, is misdirected: again, Plaintiffs' standing is not based on the global decline of insects, and so there is no need for Plaintiffs to establish a causal link between APHIS's activities and that decline. APHIS authorizes and pays for pesticides to be sprayed on large swaths of public lands across the American West, including areas that Plaintiffs' members visit. Unlike the greenhouse gases at issue in *Bellon*, those pesticides do not "quickly mix and disperse in the global atmosphere," 732 F.3d at 1143, but instead kill insects and other invertebrates in and around the areas where they are applied. Thus, unlike in *Bellon*, there is a clear, direct line between APHIS's activities and Plaintiffs' threatened injuries. Moreover, *Bellon*, unlike this case, "did not involve a procedural right, so the [causation and] redressability requirements there were not relaxed in the way they are here." *WildEarth Guardians v. USDA*, 795 F.3d 1148, 1158 (9th Cir. 2015).

APHIS also argues that Plaintiffs have not shown "that pesticides were applied in areas identified in their declarations ... or that any pesticides were applied as part of Program activities." APHIS Mem. at 7. These assertions are premised on a misunderstanding of the relevance of the treatment data to the standing analysis. As APHIS itself has said, its "programs frequently repeat in specific areas where the public demand for such work is high." OR000125. The treatment data confirms this and reveals where those areas are located: the data tends to show that certain regions—the Owyhee Front in Idaho, areas east of Steens Mountain in Oregon, parts of eastern Hot Springs County and western Washakie County in Wyoming, etc.—are more

---

[3] All page citations to filings in this case are to internal page numbers, not ECF page numbers.

likely to be selected for treatment.[4] *See* Pls. Mem. at 6–7. Plaintiffs have submitted declarations

from members with ties to areas within those regions and concrete plans to visit those areas in

the future. This demonstrates the requisite "geographic nexus" between Plaintiffs' members

interests and APHIS's activities. *See Cottonwood*, 789 F.3d at 1080–81); *see also Nat'l Family*

*Farm Coal. v EPA*, 966 F.3d 893, 909, 912 (9th Cir. 2020) (a "credible threat of harm" or "an

increased risk of harm based on a violation of a statute" can constitute injury-in-fact for

procedural claims) (cleaned up).[5]

      Finally, APHIS argues that there is a lack of causation/redressability because pesticides

are applied by other actors. APHIS Mem. at 7–9. As a factual matter, this argument is

undermined by APHIS's assertions that "additional treatments by landowners or managers are

very uncommon" in areas that APHIS treats. MT010866; *accord* ID000058; OR000042;

WY000042. As a legal matter, APHIS has had this very argument rejected twice by the Ninth

Circuit in recent years. *See Grimm*, 921 F.3d at 1147–48; *WildEarth Guardians*, 795 F.3d at

1156–59. As the Ninth Circuit put it in *WildEarth Guardians*, "the mere existence of multiple

causes of an injury does not defeat redressability, particularly for a procedural injury." 795 F.3d

at 1157. As in *WildEarth Guardians* (and unlike in *Bellon*), "APHIS contributes very discernibly

to [Plaintiffs'] injury." *Id.* at 1158. And, if APHIS changed its methods of treatment or reduced

---

[4] APHIS's evidentiary objections to the maps attached to the Goldblatt Declaration are addressed below.
[5] Arguably, under *Cottonwood*, Plaintiffs could have established standing by submitting declarations from members averring to interests in *any* areas covered by the challenged decisions—*i.e.*, any rangelands that APHIS might spray pursuant to the EIS and one of the challenged EAs. *See* 789 F.3d at 1080–81. But Plaintiffs went one step further and used treatment data to identify geographic areas that are more likely to be sprayed in the future, confirming that there is a "credible threat of harm" to their interests. *Nat'l Family Farm Coal.*, 966 F.3d at 909.

its use of pesticides as a result of this lawsuit, it would at least partially redress Plaintiffs' injuries. *Id.* at 1156 n.6 & 1158.

**B.      This Court Can Consider the Treatment Maps for Standing Purposes.**

APHIS's evidentiary objections to the Court considering Plaintiffs' maps for standing purposes are meritless. APHIS claims that "the maps are not accurate" because they reflect "contract solicitations and treatment planning phases, but not all solicitations or planning phases result in completed treatments." APHIS Mem. at 40–41. Plaintiffs were upfront about the fact that the maps might include areas selected for treatment but not ultimately treated: the Goldblatt Declaration states that "not every contract solicitation posted on sam.gov results in a completed pesticide treatment." Goldblatt Decl. ¶ 5. For standing purposes, though, what matters is that each contract solicitation reflects a *request for treatment* by a land manager and a subsequent *decision to treat* by APHIS, which necessarily means that APHIS found a grasshopper outbreak of economic significance. *See* EIS000020–21; *see also* 7 U.S.C. § 7717(c)(1) (setting out the conditions for APHIS to treat). A cluster of treatment requests and decisions to treat in the same area over time—even if some of those requests/decisions did not result in completed treatments due to last-minute technical issues—establishes that area as one of the areas where APHIS's "program[] frequently repeat[s]" due to high public demand. OR000125. Plaintiffs' maps, which accurately reflect the contract and treatment data that Plaintiffs have been able to gather, are relevant for determining which areas have seen more outbreaks, treatment requests, and decisions to treat in the past, and are thus more likely to be treated in the future. By then

establishing a "geographic nexus" with each of these areas, Plaintiffs have demonstrated injury-in-fact. *See supra*.[6]

As explained above, Plaintiffs' maps are relevant to the standing question, and they should be considered by the Court for that reason. *See, e.g.*, *Nw. Env't Advocs. v. U.S. Dep't of Com.*, Case No. C16-1866-JCC, 2019 WL 110985, at *1 (W.D. Wash. Jan. 4, 2019) ("extra-record evidence in record review cases is appropriate to provide evidence of a party's standing"). But if the Court declines to consider the maps for standing purposes, the administrative record and Plaintiffs' members' declarations together contain ample evidence to establish standing for each of Plaintiffs' claims. For instance, the record contains maps of *actual* treatments in Idaho from 2006–2018, ID008764–66, and Wyoming from 2010–2021, WY000446. Comparing these to the Rosentreter and Ostermann Declarations, respectively, shows a "geographic nexus" in Idaho and Wyoming. And the biological assessment prepared for Oregon for 2022 shows a proposed treatment in Harney County for that summer covering many areas that overlap with areas described in the Burd and Selvaggio Declarations. *Compare* OR000599, *with* Selvaggio Decl. ¶¶ 16–18, *and* Burd Decl. ¶¶ 20–21. Although that Harney County treatment did not end up occurring, what matters for standing purposes is that, at the time the complaint was filed in May 2022, there was a credible threat that it would occur. *See Nat'l Family Farm Coal.*, 966 F.3d at 909. As for the Montana EAs, Ms. Lyman's scientific interests are threatened by APHIS's treatments in Montana, regardless of what areas she personally visits. *See supra* p. 4.[7]

---

[6] Plaintiffs have made every effort to obtain information from APHIS about which areas have actually been sprayed in the past, but to little avail. *See* Burd Decl. ¶¶ 7, 15–18 (describing efforts to obtain details on past sprays); Selvaggio Decl. ¶ 27 (discussing the lack of final treatment maps released by APHIS in response to FOIA requests); Goldblatt Decl. ¶¶ 5–6. For APHIS to withhold this information and then fault Plaintiffs for not having it is exasperating.
[7] Before moving on to the merits, it is necessary to object to APHIS's filing of a separate statement of material facts. *See* ECF No. 58. This filing—which effectively bought APHIS more

## II. APHIS's Arguments Regarding the Scope of the 2019 EIS and Range of Alternatives Reflect a Misunderstanding of both the Agency's Statutory Obligations and NEPA.

### A. Plaintiffs Administratively Exhausted Their Arguments Regarding the EIS's Range of Alternatives.

As an initial matter, APHIS is wrong that Plaintiffs failed to administratively exhaust their "purpose and need"/alternatives claim. APHIS Mem. at 14–15. The Supreme Court has "indicate[d] that to preserve an argument that an alternatives analysis is deficient, comments must merely identify 'any rulemaking alternative beyond those evaluated' or urge the agency 'to consider alternatives.'" *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1037–38 (9th Cir. 2019) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004)). There is no need for commenters to "explain[] the[ir] precise legal challenge," *id* at 1038; rather, comments are sufficient if they provide "enough clarity ... that the [agency] understands the issue raised," *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010).

The comments submitted by Plaintiffs were more than adequate to exhaust their purpose and need/alternatives claim. At the scoping stage, the Center for Biological Diversity ("Center") asked APHIS to "consider integrated pest management and use of any nonchemical methods, such as mechanical, ecological, cultural, or biological control." EIS000238. In comments on the draft EIS, the Center criticized APHIS for focusing on alternatives that would "perpetuate[] a reactive strategy rather than one that is proactive" and urged the agency to "propose and analyze alternatives that include cooperation and planning with land managers to take appropriate steps to prevent the types of grasshopper and cricket outbreaks that require chemical control."

---

space to make arguments in its summary judgment memorandum—was not proper under the Local Rules, which contemplate that a separate statement may be filed only if "ordered by the Court." LR 56-1(a). Plaintiffs ask the Court to simply disregard APHIS's separate statement of facts, which is not even cited in the argument section of APHIS's memorandum.

EIS001290. Xerces urged APHIS to consider "collaborat[ing] with the agencies that manage rangelands to maintain healthy grasslands that are better able to withstand the natural grasshopper fluctuations" and "incentiviz[ing] habitat manipulations and other IPM strategies in an effort to avoid the need for suppression." EIS002942. Plaintiffs clearly wanted APHIS to consider an alternative that would include more preventive measures and more non-pesticide components—a *true* integrated pest management ("IPM") alternative—even if implementing such measures would involve other agencies. Plaintiffs were not required to describe that alternative in exhaustive detail. *See LaCounte*, 939 F.3d at 1037–38.

Importantly, APHIS replied to Plaintiffs' comments by stating that "[p]reventive measures have the potential to keep population numbers of grasshoppers low," but that most such measures "are not managed by APHIS and are outside the scope of this document." EIS000115. APHIS then reaffirmed that "[t]he scope of the [EIS] is on the actions APHIS may consider after making a determination whether treatments are warranted." *Id.* APHIS thus clearly understood Plaintiffs' criticisms of the scope of the EIS and the range of alternatives. For that reason alone, Plaintiffs' purpose and need/alternatives claim is exhausted. *See LaCounte*, 939 F.3d at 1037 ("Generally, we will not invoke the waiver rule if an agency has had an opportunity to consider the issue even if the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party.") (cleaned up).

**B.      APHIS Cannot Explain the Mismatch Between the Statutes Governing Its Grasshopper Control Program and the Scope of the EIS.**

In response to Plaintiffs' argument that the scope/"purpose and need" of the EIS is too narrowly focused on reactive pesticide treatments, APHIS makes two basic arguments: (1) the scope of the EIS is proper because the statutes governing APHIS's grasshopper program do not emphasize prevention or a holistic approach, APHIS Mem. at 10–11; and (2) the scope of the

EIS includes some limited IPM techniques, *id.* at 12. The first argument is legally incorrect, and the second is disingenuous and largely nonresponsive to Plaintiffs' argument.

       1.      *The Statutes Governing APHIS's Grasshopper Program Require a Holistic Approach.*

APHIS repeatedly cites 7 U.S.C. § 7717(c), which authorizes APHIS to "immediately treat" grasshopper outbreaks. But APHIS conveniently ignores § 7717(b), which authorizes APHIS to carry out activities "for the *prevention*, suppression, and control of actual *or potential* grasshopper and Mormon cricket outbreaks on" lands managed by the Department of the Interior, and even requires Interior to transfer money to APHIS for that purpose. (Emphasis added.)[8] Furthermore, APHIS fails to grapple with 7 U.S.C. § 136r-1's directive to agencies to use an integrated pest management approach. Although IPM can involve reactive pesticide treatments, it is primarily focused on measures that prevent outbreaks in the first place or mitigate their effects in order to minimize the use of pesticides. *See* EIS000115 ("Preventative measures have the potential to keep population numbers of grasshoppers low, and are collectively referred to in the EIS as integrated pest management (IPM)."); USDA National Road Map for Integrated Pest Management App. 1C ("IPM ... [f]ocuses on pest prevention" and "[u]ses pesticides only as needed."). IPM is by its nature a holistic approach to pest management, in that it "combin[es] biological, cultural, physical, and chemical tools in a way that minimizes economic, health, and environmental risks." 7 U.S.C. § 136r-1; *see also* EIS000135 (defining IPM as "the process of integrating and applying practical methods of prevention and control to

---

[8] The *amicus* brief filed by the National Cattlemen's Beef Association *et al.* suffers from the same problem: *amici* repeatedly invoke APHIS's duties under 7 U.S.C. § 7717(c)(1), as if that were the only relevant statutory provision. *See Amicus* Br. at 2, 3, 9, 11.

keep pest situations from reaching damaging levels while minimizing potentially harmful effects of pest control measures on humans, non-target species, and the environment").

Read together, § 7717 and § 136r-1 require a holistic approach to grasshopper management with a focus on preventive measures. APHIS's duty to "immediately treat" outbreaks under § 7717(c) is just one part of that approach—it is not, as APHIS seems to suggest, the focus of the relevant statutes. *See* APHIS Mem. at 11 ("The Act's emphasis (if any) is control and immediate treatment, not prevention."). APHIS's reading of § 7717 and § 136r-1 is inconsistent with those statutes' text (as explained above), *and* it ignores the statutes' history. *See* Pls. Mem. at 21–22 (discussing the history of statutes governing APHIS's grasshopper program).

Regarding statutory history, APHIS misunderstands the relevance of the pre-1985 statutory regime governing the grasshopper program. Plaintiffs' point is *not* that long-repealed statutes "provide the statutory basis for the current" grasshopper program. APHIS Mem. at 11. Plaintiffs' point is that the contrast between the old (pre-1985) regime and the current regime sheds light on the meaning of the *current* statutes and confirms that Congress did not intend for APHIS to continue with the almost entirely reactive pesticides-based approach to controlling grasshoppers it employed before 1985. *See, e.g.*, *Murphy v. Smith*, 583 U.S. 220, 226–27 (2018) (interpreting the meaning of a current statute by comparing it to its predecessor). Prior to 1985, the statutes governing APHIS's grasshopper program authorized APHIS to control "incipient or emergency outbreaks of ... grasshoppers," did not mention "prevention" or "potential" outbreaks at all, and certainly did not mention IPM. *See* 7 U.S.C. § 148, 148a (1982). Had Congress intended for APHIS to continue with a reactive, pesticide-forward approach to grasshopper control, it could have simply kept the pre-1985 statutory regime in place. *See Murphy*, 583 U.S. at 226.

"Where an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS." *Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004). Here, APHIS essentially prepared an EIS for one subsection of one statute (7 U.S.C. § 7717(c)) rather than looking to the overall statutory objectives of § 7717 and § 136r-1. The scope/purpose and need of the EIS is thus unreasonably narrow, leading to the elimination of reasonable alternatives, *see infra*, and violating NEPA. *Nat'l Parks Conservation Ass'n v. BLM*, 606 F.3d 1058, 1072 (9th Cir. 2010).

> 2.       *APHIS Cannot Escape the Fact That the 2019 EIS Is Focused on Reactive Pesticide Treatments.*

APHIS next suggests that, because all of the alternatives in the 2019 EIS include limited IPM measures, the scope of the EIS is commensurate with the statutes governing the grasshopper program. APHIS Mem. at 12; *see also* APHIS Mem. at 13–14 (discussing APHIS's technical assistance and survey activities), 16 (stating that the alternatives "incorporat[e] IPM"). There are two problems with this argument.

*First*, this is a post hoc rationalization. At the time it prepared the EIS, APHIS candidly admitted that "[t]he scope of the [EIS] is on the actions APHIS may consider *after making a determination whether treatments are warranted*." EIS000115 (emphasis added); *see also id.* ("most IPM actions ... are outside the scope of this document"). APHIS did mention its past research into IPM measures and related technical assistance to other agencies, but it did not pretend that the inclusion of these features rendered any of the alternatives an actual IPM alternative along the lines of the preferred alternative in the 1987 EIS.[9] *See, e.g.*, EIS000129 ("APHIS supports the use of IPM

---

[9] The only specific example of "technical assistance" cited by the EIS and APHIS's memorandum is the agency's sharing of the results of the Grasshopper IPM Program. EIS000028–29; APHIS Mem. at 14. Those results are contained in the Grasshopper Integrated

in the management of grasshoppers and Mormon Crickets," but "implementation of on-the-ground

IPM activities is limited to land management agencies and Tribes, as well as private land owners.").

APHIS cannot now argue that the scope of the EIS is broader. *See Env't Def. Ctr. v. Bureau of

Ocean Energy Mgmt.*, 36 F.4th 850, 878 (9th Cir. 2022) (declining to consider an agency's post

hoc rationalizations for not considering certain alternatives in a NEPA analysis because "'an

agency's action must be upheld, if at all, on the basis articulated by the agency itself' rather than

'appellate counsel's *post hoc* rationalizations'") (quoting *ONDA v. BLM*, 625 F.3d 1092, 1120

(9th Cir. 2010)).

*Second*, even putting that aside, the inclusion of a few limited IPM features in the EIS

does not render the scope of the EIS commensurate with the grasshopper program's governing

statutes. The distinguishing feature of IPM is that it "combin[es] biological, cultural, physical,

and chemical tools in a way that minimizes economic, health, and environmental risks." 7 U.S.C.

§ 136r-1. The EIS excludes most of these "tools" from consideration and focuses on reactive

pesticide treatments. *See* EIS000115 ("most IPM actions ... are outside the scope of this

document"). For instance, APHIS explicitly rejected considering the use of microsporidia

(parasites that can kill grasshoppers) in any alternative, EIS000036, and the EIS does not

consider any mechanical or cultural practices, such as alterations to grazing management and

direct egg destruction, EIS008707–10. Were the EIS's scope actually commensurate with § 7717

and § 136r-1, it would have included a wide variety of IPM measures—not excluded most of them—

because IPM requires having all the tools in the toolbox available, so to speak. *See* EIS008701

(statement from the 1987 EIS that "the selection of the IPM alternative would allow biological or

chemical methods to be selected singly or in combination for immediate and long-term grasshopper

---

Pest Management User Handbook, which was released in 2000 and which reflects research
conducted starting in the late 1980s. *See* ID007911–8445.

control and would involve ongoing testing to identify other feasible control methods (including cultural/mechanical methods) that could be phased into future IPM programs"); EIS008702–17 (describing features of the IPM alternative).

In sum, the 2019 EIS considers three alternatives that are all focused on "the actions APHIS may consider after making a determination whether treatments are warranted," EIS000115, reflecting the "purpose and need of the ... EIS to *suppress* economically damaging *outbreaks*," APHIS Mem. at 16 (emphasis added). In light of the statutory objectives of 7 U.S.C. § 7717 and § 136r-1, the EIS's purpose and need is unreasonably narrow. *See Westlands Water Dist.*, 376 F.3d at 866.

C.      **APHIS's Reasons for Not Giving Full Consideration to a Holistic, Prevention-First Alternative Do Not Carry Water.**

The EIS contains an explanation for why APHIS did not consider a holistic/prevention-first alternative: such an alternative would be outside the scope/"purpose and need" of the EIS.[10] *See* EIS000115. The problem with that explanation is that the scope of the EIS is unlawfully narrow, as explained above. "As a result of th[e] unreasonably narrow" scope of the EIS, APHIS eliminated a holistic/prevention-first alternative, and thus "considered an unreasonably narrow range of alternatives." *Nat'l Parks Conservation Ass'n*, 606 F.3d at 1072.

In its memorandum, APHIS provides a new reason for why the agency did not need to consider a holistic/prevention-first alternative: such an alternative is not meaningfully different from the alternatives considered in the EIS, and thus its inclusion would not have helped foster informed decisionmaking. APHIS Mem. at 15–16. This explanation is nowhere to be found in the EIS itself; it is a post hoc rationalization invented for purposes of this litigation. As such, it cannot be used to justify APHIS's choice of alternatives in the EIS. *See Env't Def. Ctr.*, 36 F.4th

_____

[10] "An agency must ... explain its reasoning for eliminating an alternative" from detailed consideration. *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978–79 (9th Cir. 2006).

at 878 (declining to consider an agency's post hoc rationalizations for not considering certain alternatives in a NEPA analysis). But, even putting that aside, this explanation makes no sense. By APHIS's own admission, the alternatives analyzed in the EIS do not include most IPM/preventive measures, as discussed above. An alternative along the lines suggested by Plaintiffs would necessarily include consideration of a wide suite of IPM measures not included in any of the alternatives in the EIS, including the use of microsporidia and changes to grazing management practices. *See* EIS008701–17 (describing the IPM alternative from the 1987 EIS).

APHIS makes two additional arguments related to the EIS's alternatives analysis, both of which respond to arguments that Plaintiffs have never made. First, APHIS argues that, "to the extent that Plaintiffs advocate for a prevention only alternative or one that does not involve suppression, such an alternative conflicts with APHIS's statutory mandate." APHIS Mem. at 16. Plaintiffs are not advocating for a "prevention only alternative." They are advocating for a holistic, prevention-first alternative—a *real* IPM alternative rather than one that excludes most IPM measures. Reactive pesticide treatments might be a component of such an alternative, though hopefully a small component.[11]

Second, APHIS argues that Plaintiffs have impermissibly introduced a new "claim" to the effect that APHIS violated NEPA by failing to ask other agencies to participate in the preparation of the EIS as cooperating agencies. APHIS Mem. at 16–17. Plaintiffs have pressed

---

[11] The *amicus* brief evinces a similar misunderstanding of Plaintiffs' claims and goals. This case is about APHIS's compliance with NEPA and the ESA, not whether the grasshopper program, as currently carried out, is illegal. In light of that, *amici*'s hyperbolic suggestion that Plaintiffs are trying to have the program "[d]eclar[ed] ... unlawful" makes no sense. *Amicus* Br. at 3. And, contrary to *amici*'s arguments, Plaintiffs do not claim that the use of pesticides in the program is unlawful. Finally, *amici*'s apparent fear that APHIS will be prevented from using pesticides in its grasshopper program as a result of this lawsuit is not relevant to the *merits* of Plaintiffs' claims, which is all that is at issue right now. *See* APHIS Mem. at 41 n.9 ("Federal Defendants agree with Plaintiffs that further briefing on remedy may be warranted.").

no such claim. Plaintiffs discussed the cooperating agency mechanism in their memorandum in order to explain why it was impermissible for APHIS to justify the narrow the scope of its EIS on the ground that a broader scope would include activities involving other agencies. *See* Pls. Mem. at 22–23. The key point is that, under the applicable NEPA regulation, agencies must consider "reasonable alternatives not within the[ir] jurisdiction," 40 C.F.R. § 1502.14 (2019); if conducting an adequate analysis of such alternatives requires the participation of other agencies in the NEPA process, the cooperating agency mechanism allows for such participation.

Because APHIS defined the scope/ "purpose and need" of the 2019 EIS too narrowly and failed to consider a reasonable range of alternatives, it violated NEPA. APHIS must prepare a new EIS that is appropriately scoped and must consider a holistic/prevention-first alternative.

## III. APHIS's and Intervenors' Hand-Waving About the Adequacy of the EIS Underscores Its Deficiencies.

### A. APHIS and Intervenors Do Not Deny That the EIS Lacks Baseline Information About the Locations of Past Pesticide Treatments, the Status of Sensitive Species in Those Areas, and Any Observed Effects to Those Species.

In their opening memorandum, Plaintiffs identified three major problems with the "baseline" established in the 2019 EIS: (1) the lack of "information about where APHIS has applied pesticides in the past"; (2) the lack of information about sensitive, non-ESA-listed species in those areas and other areas potentially subject to treatment; and (3) the lack of "discussion of whether any impacts to those species have been observed in or near sprayed areas since the 2002 EIS." Pls. Mem. at 24.[12] Neither APHIS nor Intervenors deny that the EIS lacks

---

[12] As stated in Plaintiffs' memorandum, the term "sensitive species" is used to refer to species especially likely to be harmed by the pesticides used in APHIS's program which are not listed under the ESA, including butterflies, certain bees, moths, and sage-grouse. Pls. Mem. at 24 n.9.

such information. Rather, they advance several arguments as to why it was reasonable for APHIS to omit this information from the EIS.

Both APHIS and Intervenors argue that it was appropriate for APHIS to defer establishing baseline conditions until the state-level EAs. APHIS Mem. at 20–22; Intervenors Mem. at 11–13. Plaintiffs agree that it was permissible for APHIS to defer establishing *some* baseline conditions until the state-level EAs.[13] But, as Plaintiffs have argued, "certain baseline conditions should be established in a programmatic EIS, because it is only at the programmatic stage that the agency considers the impact of the program *as a whole* on the environment." Pls. Mem. at 25. Here, "APHIS should have established baseline conditions for sensitive environmental resources and species that are found throughout multiple states in which the rangeland pesticides program operates." *Id.*

APHIS and Intervenors have no response to this argument. They do not explain (nor could they) how the state-level EAs could possibly establish West-wide baselines or analyze the impacts of the grasshopper program *as a whole* on sensitive species that are found throughout multiple states in which the program operates. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F.Supp.3d 861, 941 (D. Or. 2016) ("the site-specific NEPA documents cannot suffice to evaluate the large-scale project"). This baseline data is especially important for species such as the monarch butterfly, which has been declining in population for 20 years and whose western subpopulation has at least a 60% chance of reaching a population level "at which extinction is inevitable" before 2030. 85 Fed. Reg. 81,813, 81,815 (Dec. 17, 2020); *see also* MT011704 (Xerces comments concerning the sensitivity of the monarch to pesticides used by APHIS).

---

[13] Of course, as discussed in Plaintiffs' memorandum and *infra* pp. 32–35, the state-level EAs fail at the task of establishing appropriate baseline conditions.

APHIS argues that the 2019 EIS must not be viewed "in isolation, but rather must be considered together with the 2002 EIS and the programmatic biological assessment from 2015. APHIS Mem. at 21. The logic of this argument is hard to discern. The 2002 EIS cannot possibly contain an adequate discussion of the environmental baseline *as of 2019*, especially when it comes to the abundance and range of species like the monarch butterfly, which have declined since then. *See, e.g.*, *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085–87 (9th Cir. 2011) (holding that it was arbitrary and capricious for the agency to rely on "stale" data). And the biological assessment is not a NEPA document and is not "'described and analyzed in the text' [of the EIS] and included in an appendix." *League of Wilderness Defs./Blue Mtns. Biodiversity Project v. Connaughton*, No. 3:12-cv-02271-HZ, 2014 WL 6977611, at *16 (D. Or. Dec. 9, 2014) (quoting *Pacific Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1031 (9th Cir. 2012), *vacated as moot*, 133 S.Ct. 2843 (2013)). It is not even incorporated by reference into the EIS. *See* EIS000097 (stating only that "[t]he biological assessment ... is part of the administrative record for this EIS"). Therefore, any analysis it contains does not factor into this Court's assessment of whether APHIS complied with NEPA in preparing the 2019 EIS. *See Connaughton*, 2014 WL 6977611, at *16.

A decisionmaker or member of the public reading the 2019 EIS would learn *nothing* about the status of sensitive species like the monarch butterfly and Western bumble bee that are found in multiple states affected by the grasshopper program—not those species' abundance, distribution, or evidence of past effects from APHIS's program. Because later NEPA analyses of the grasshopper program consider the effects of the program at the state (or portion of a state) level, those analyses cannot possibly assess the effects of the program as a whole on species that are found in multiple states affected by the program. In order for APHIS to be able to take a

"hard look" at the effects of its program as a whole on such species, it had to "to assess, in some reasonable way, the actual baseline conditions" associated with those species in the EIS, "but it failed to perform that duty." *ONDA v. Rose*, 921 F.3d 1185, 1190 (9th Cir. 2019) (internal quotation marks and citation omitted).

   **B.     The EIS Fails to Assess Cumulative Impacts from the Grasshopper Program Considered in Combination with Other Pesticide Treatments.**

   Both APHIS and Intervenors defend the cumulative impacts analysis in the EIS as being appropriate for a programmatic NEPA analysis. APHIS Mem. at 26–27; Intervenors Mem. at 15–16. But it is precisely *because* the EIS is a programmatic document that APHIS had a duty to analyze the cumulative effects flowing from the grasshopper program *as a whole* in combination with other pesticide treatments. *See* Pls. Mem. at 29–31. The later state-level analyses cannot possibly capture such effects. *See Nat'l Wildlife Fed'n*, 184 F.Supp.3d at 941 ("the site-specific NEPA documents cannot suffice to evaluate the large-scale project"); *cf. Env't Def. Ctr.*, 36 F.4th at 890 (discussing how, in the ESA context, "[s]ite-specific review cannot cure a failure to consult at the programmatic level").

   APHIS claims that the EIS "explain[s] how there are other sources of pesticides." APHIS Mem. at 27. But, as discussed in Plaintiffs' memorandum, the EIS contains no "quantified or detailed information" about other pesticide treatments or how those treatments might combine with APHIS's treatments. *See* Pls. Mem. at 29–30 (quoting *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005)).

   Intervenors argue that APHIS was "not required to ... speculate and prematurely analyze ... every treatment by someone other than APHIS." Intervenors Mem. at 15. Plaintiffs are not claiming that APHIS erred by failing to analyze "every treatment by someone other than APHIS"; Plaintiffs are arguing that APHIS failed to provide *any* quantified or detailed information about treatments by

third parties and how those treatments might interact with APHIS's program as a whole. Instead, the EIS's cumulative impacts analysis is comprised of the sort of "general statements about 'possible' effects and 'some risk' [that] do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Kern v. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2022) (quoting *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998)). Remarkably, the EIS does not even contain information about the scale of APHIS's pesticide treatments compared to other treatments in the same or nearby areas, leaving the public in the dark about the relative importance of APHIS's program. *See 350 Montana v. Haaland*, 50 F.4th 1254, 1269–70 (9th Cir. 2022) (faulting the agency for failing to "contextualiz[e] the significance of the project's environmental consequences").[14]

APHIS had a duty in the EIS to assess baseline conditions for sensitive species found in multiple states subject to grasshopper program treatments, and it had a duty to look at the cumulative impacts of the grasshopper program as a whole in combination with other pesticide applications—particularly the impacts on sensitive species of butterflies, bees, moths, and the sage-grouse. APHIS failed to do so.

**IV.     Plaintiffs Have Proved Their ESA Claim.**

**A.     Plaintiffs Have Standing for the ESA Claim, and the Claim Is Not Moot.**

APHIS argues that Plaintiffs lack Article III standing for their ESA claim and/or that the claim is moot. The gist of both arguments is that, because APHIS has "already transmitted its

---

[14] Intervenors argue that Plaintiffs' criticism of APHIS's discussion of overlapping treatments is a "disagree[ment] with APHIS's conclusion." Intervenors Mem. at 15. But the problem is APHIS's *reasoning*, and in particular its faulty logic to the effect that pesticide treatments must literally overlap in order to have a cumulative effect. *See* Pls. Mem. at 30–31. Plaintiffs are merely holding APHIS to the requirement that it "support and explain [its] conclusions with ... reasoned analysis." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 623 F.3d 633, 648 (9th Cir. 2010).

biological assessment to FWS," there is nothing for this Court to order *APHIS* to do, and thus no effective relief available. APHIS Mem. at 29–30. In APHIS's view, any order to complete consultation would presumably have to be directed to the Fish and Wildlife Service, which is not a party to this case. This argument is wrong, for three independent reasons.

*First*, according to APHIS, it has not yet submitted its final biological assessment to the Fish and Wildlife Service. *See* Warren Decl. ¶¶ 9–10 ("APHIS ... is updating the 2015 programmatic Biological Assessment" and "will engage in best efforts to provide [the] updated programmatic Biological Assessment to FWS by the end of the calendar year."). Thus, this Court has the power (and had the power at the time the relevant complaint was filed) to order APHIS to act faster by, for instance, imposing a deadline for the submission of its updated biological assessment. *See NRDC v. EPA*, 38 F.4th 34, 56 (9th Cir. 2022) (finding standing where the action agency had not yet completed its ESA duties and "[a]n aggressive deadline ... presumably would have spurred [the agency] to act at least somewhat faster than it otherwise would have, redressing [Petitioners'] injury").

*Second*, even though the Fish and Wildlife Service is a not a party, this Court has the power to order the *completion* of consultation by a date certain, and such an order would sufficiently remedy Plaintiffs' injuries. *Id.* The Ninth Circuit recently addressed this exact issue in *NRDC v. EPA* and concluded that it "would seem permissible" for a court to enter an order setting a deadline for the completion of ESA consultation in a case in which only the action agency is a party. *Id.* at 57 n.18. The reason for this is that "injunctive court orders may 'bind[] the parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control.'" *Id.* (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)). "In general, '[t]here is privity between officers of the same government.'" *Id.*

(quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–03 (1940)). Thus, this Court has the power to order ESA consultation to be *completed* by a date certain, notwithstanding the fact that the Fish and Wildlife Service is a not a party.[15]

*Third*, the Court has the power to order injunctive relief against APHIS pending the completion of ESA consultation. *See, e.g.*, *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 479 F.Supp.3d 1003, 1025 (D. Or. 2020) (discussing how injunctive relief is a potential remedy for procedural ESA violations). Indeed, the Court could conceivably order APHIS to halt all grasshopper spraying operations pending completion of ESA consultation. This would certainly redress Plaintiffs' injuries.

APHIS makes a puzzling argument that this Court should dismiss Plaintiffs' ESA claim on the grounds of "prudential mootness." APHIS Mem. at 30–31. The Ninth Circuit has never adopted the "prudential mootness" doctrine outside the bankruptcy context. *See Maldonado v. Lynch*, 786 F.3d 1155, 1161 n.5 (9th Cir. 2015) ("we have applied prudential mootness only in the bankruptcy context ..."). The Ninth Circuit's refusal to extend the doctrine stems from the fact that "federal court[s] [have a] 'virtually unflagging' obligation to 'hear and decide cases within [their] jurisdiction,'" so a case that is not moot within the meaning of Article III must be heard rather than dismissed for "prudential" reasons. *Meland v. Weber*, 2 F.4th 838, 849 n.7 (9th Cir. 2021) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)).

---

[15] APHIS's insistence that it lacks control over the Fish and Wildlife Service is beside the point. *See* APHIS Mem. at 29. An order requiring consultation to be completed by a date certain would bind the Service *directly*, as a non-party in privity or "active concert or participation with" APHIS. *See* Fed. R. Civ. P. 65(d)(2).

### B. On the Merits, APHIS Has Clearly Violated the ESA.

APHIS clearly violated the ESA by reauthorizing its grasshopper program in the 2019 ROD without first completing programmatic consultation with the Fish and Wildlife Service. *See* Pls.' Mem. at 31–33. It really is that simple. *See Thomas v. Peterson*, 753 F.2d 754, 765 (9th Cir. 1985) ("[P]laintiffs' burden in establishing a procedural violation is to show that the circumstances triggering the procedural requirement exist, and that the required procedures have not been followed."), *abrogated on other grounds as recognized in Cottonwood*, 789 F.3d at 1090–91.

APHIS barely contests this, arguing in a footnote that its annual state-by-state consultations satisfy the ESA. APHIS Mem. at 31 n.5. Intervenors make this same argument at greater length, and also argue that APHIS has ensured that its actions are not violating the ESA's substantive prohibitions. Intervenors Mem. at 16–20. Both of these arguments are wrong.

As to the first argument—that the annual state-by-state consultations satisfy the ESA— APHIS and Intervenors ignore that there are many ESA-listed species found in multiple states in which the grasshopper program operates, and that none of the annual state-level consultations considers the effects of APHIS's program *as a whole* on these species. *See* EIS021080–86 (listing dozens of species found in multiple states that may be affected by the grasshopper program, including the yellow-billed cuckoo and Ute-ladies' tresses); *see also, e.g.*, MT011345 ("This [concurrence] letter addresses the Program only within Montana for the current calendar year."). Moreover, each of the state-level EAs only considers the effects of the program *for one year*. *E.g.*, MT011345. To adequately account for the effects of the grasshopper program as a whole on species found across multiple states over a longer period of time, APHIS must complete programmatic consultation, and in fact should have completed programmatic consultation *before* implementing the 2019 ROD. *See Cottonwood*, 789 F.3d at 1082 ("project-

specific consultations do not include a unit-wide analysis comparable in scope and scale to consultation at the programmatic level"). "Site-specific review" such as the annual state-level consultations "cannot cure a failure to consult at the programmatic level, and incremental-step consultation is inadequate to comply with the ESA." *Env't Def. Ctr.*, 36 F.4th at 890. Had APHIS satisfied its duty to consult at the programmatic level, it might have realized (with the help of the Fish and Wildlife Service) that more stringent mitigation measures or other protections would be needed in order to protect listed species found across multiple states affected by the grasshopper program.[16]

Intervenors' second argument—that APHIS has "ensured that its action [i]s unlikely to affect listed species and critical habitat both in its programmatic biological assessment and during the state-level consultations," Intervenors Mem. at 19–20—evinces a misunderstanding of how the procedural protections of the ESA work. "Congress has assigned to the agencies and to the Fish & Wildlife Service the responsibility for evaluation of the impact of agency actions on endangered species, and has prescribed procedures for such evaluation. Only by following the procedures can proper evaluations be made." *Thomas*, 753 F.2d at 765. Neither the programmatic biological assessment prepared by APHIS nor the annual state-level consultations contain a procedurally "proper evaluation[]" of the effects of APHIS's grasshopper program as a whole. The former analysis is programmatic, but lacks a concurrence from the Fish and Wildlife Service. The latter analyses do not consider the effects of APHIS's program as a whole on species found in multiple

---

[16] Of course, it is not incumbent on Plaintiffs to spell out what additional mitigation measures would have been adopted; it is enough in the context of a consultation requirement to show that an agency's violation led to "a decisionmaking process that was contrary to that mandated by Congress." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011); *see also Cottonwood*, 789 F.3d at 1082 (discussing how, in the context of standing, a plaintiff "is not required to establish what a Section 7 consultation would reveal, or what standards would be set," because "that is the objective and purpose of the consultation process").

states, as discussed above. Thus, APHIS continues to carry out its grasshopper program without having completed programmatic consultation, violating the procedural protections of the ESA.[17] Again, it really is that simple.

## V.    The State-Level EAs Violate NEPA.

The state-level EAs consist mostly of generic descriptions of huge areas spanning millions of acres, with little (if any) analysis of probable impacts to local resources and no information about the grasshopper program's past effects on the local environment. Pls. Mem. at 33–41. APHIS and Intervenors attempt to excuse these inadequacies by relying on information not disclosed to the public, generalized risk assessments, and APHIS's need to respond quickly to grasshopper outbreaks. But APHIS can do better and was required to do better under NEPA.

### A.    The State-Level EAs Are Insufficiently Site-Specific.

NEPA requires agencies to conduct a detailed evaluation of site-specific impacts. *See, e.g.*, *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). A meaningfully thorough site-specific analysis is critical to achieving NEPA's overarching purposes of informed decision-making and public participation. *See Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F.Supp.3d 995, 1009–10 (D. Alaska 2020). The challenged EAs are the *only* site-specific analyses conducted for APHIS's grasshopper program in Oregon, Idaho, Montana, and Wyoming, and they are (according to the EIS) supposed to "address unique local issues" and be "more detailed and precise as to geographical locations." EIS000026. These documents do neither. *See* Pls. Mem. at 33–36. Instead, the state-level EAs leave the public in the dark about local impacts.

_____

[17] Insofar as Intervenors invoke APHIS's programmatic biological assessment, they are effectively arguing that an agency can avoid a *procedural* ESA violation by pointing to its *own analysis* as proof that there will be no *substantive* ESA violation. If this reasoning were adopted, it would eviscerate the role of the Fish and Wildlife Service in the ESA consultation process.

APHIS argues that its inclusion of various maps in the EAs satisfied its duty to analyze site-specific impacts. APHIS Mem. at 33. But even if these maps provide some information about areas likely to be impacted by APHIS's grasshopper program, APHIS does not and cannot cite where the EAs actually *consider* this information in their analysis of environmental impacts.

This is the critical problem: APHIS's generic, regional analyses entirely fail to consider impacts to specific areas based on their unique resource concerns. As APHIS itself acknowledges, "[t]he specific impacts" of its program "are highly dependent upon the particular action and location of infestation." WY000027. Some of these potentially impacted locations— like Wilderness Study Areas—have special environmental protections under federal law. *See* 43 U.S.C. § 1782(c) (Wilderness Study Areas subject to "non-impairment" standard under the Federal Land Policy and Management Act). Areas within and surrounding Wilderness Study Areas are regularly selected for treatment, yet APHIS never considers localized impacts to these protected areas. *See* Goldblatt Decl. Ex. B, Ex. E, Ex. G, Ex. H; *see also* OR000698 (BLM email stating that "future EAs should likely consider [Wilderness Study Areas] to show that treatment meets a non-impairment standard"). Other locations—like popular recreation and conservation areas—may see higher-than-average human visitation and contain special resources, but the EAs provide no information about how they might be impacted by program treatments. *See* OR000599 (proposed treatments near the Malheur National Wildlife Refuge, Steens Mountain, and the Oregon Desert Trail); Goldblatt Decl. Ex. D (treatments near National Conservation Area, Wild & Scenic River, and National Monument); Goldblatt Decl. Ex. E (treatments within

Thunder Basin National Grassland); WY000017–18 (listing recreation areas but not analyzing impacts); MT010847, 10850 (same); MT010995, 10997 (same).[18]

Courts routinely find generic analyses that fail to address local impacts violate NEPA. For instance, in *California v. Block*, the Ninth Circuit found insufficient an EIS's overly-generalized description of the affected environment that merely listed the location and acreage of the area, its classification as one of forty basic landform types, its ecosystem type classification, and numerical values of wildlife species and wilderness attributes. 690 F.2d at 763. According to the Ninth Circuit, this description—which is similar to those in the challenged EAs—was too generalized because it did not take into account the variation among ecosystems, including wildlife types and quantity. *Id. See also Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 186–87 (4th Cir. 2005) (agency's "hard look" analysis "must … take particular care to evaluate how its actions will affect the unique biological features" of nearby National Wildlife Refuge).

The lack of site-specificity in the state-level EAs impeded APHIS's ability to assess impacts, as discussed above, *and* it frustrated the public's ability to "tailor its comments"

---

[18] Plaintiffs' request to supplement the record is not a "sleight of hand" or a "resurrect[ion]" of their earlier request to complete the record. *See* APHIS Mem. at 40. Plaintiffs initially sought to *complete* the record because they believed that APHIS must have considered treatment-specific documents when preparing the state-level EAs. When APHIS denied that it had done so, Plaintiffs accepted that admission. Pls. Reply in Support of Mot. Complete at 19. Now, Plaintiffs seek to *supplement* the record with maps reflecting treatment data. *See Bruce v. Azar*, 389 F.Supp.3d 716, 724 n.5 (N.D. Cal. 2019) (explaining the difference between completion and supplementation of the record), *aff'd*, 826 F. App'x 643 (9th Cir. Oct. 20, 2020) (unpublished). The maps show that certain areas have been repeatedly selected for treatment, which APHIS ignored when claiming an inability to conduct more site-specific analyses in the EAs. *See, e.g.*, WY000008. Thus, the maps help the Court "develop a background against which it can evaluate the integrity of the agency's analysis," and should be considered by the Court. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014). APHIS's argument that the maps must point out an entirely new subject matter in order to be considered is based on a district court case whose reasoning has never been endorsed by the Ninth Circuit. *See* APHIS Mem. at 40 (citing *Pinnacle Armor v. United States*, 923 F.Supp.2d 1226 (E.D. Cal. 2013)).

appropriately. *ONDA v. Jewell*, 840 F.3d 562, 571 (9th Cir. 2016). Faced with an EA that covers 62.5 million acres, WY000017, and which offers little to no clue as to which areas within those 62.5 million acres are most likely to be treated and/or have been treated in the past and what the specific resource concerns are in those areas, how can a typical member of the public know how to structure their comments? "NEPA requires that environmental analysis be specific enough to ensure ... meaningful public participation." *Se. Alaska Conservation Council*, 443 F.Supp.3d at 1009. The state-level EAs do not meet that standard of specificity.

Intervenors defend the EAs on the ground that an "agency has discretion to determine the geographic scope of its NEPA analyses." Intervenors Mem. at 21–23 (quoting *Forest Guardians v. APHIS*, 309 F.3d 1141, 1143 (9th Cir. 2002) (per curiam)). But the discretion an agency has to determine the geographic scope of its NEPA analyses does not allow an agency to completely avoid analyzing the site-specific impacts of its activities. As the Ninth Circuit once put it, "[a]lthough the agency does have discretion to define the scope of its actions, such discretion does not allow the agency to determine the specificity required by NEPA." *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407 (9th Cir. 1985) (internal citation omitted). Rather, that discretion allows an agency to either analyze impacts to several sites in one document covering a larger geographic area or produce several separate analyses.[19]

---

[19] *Forest Guardians* illustrates this principle. In that case, APHIS had conducted a statewide NEPA analysis that "specifically addressed the effects of lethal predator control in wilderness areas including the Santa Teresa Wilderness." 309 F.3d at 1143. The plaintiffs argued that APHIS should have instead "*solely* evaluate[d] the environmental impact of predator control in the Santa Teresa Wilderness." *Id.* (emphasis added). The Ninth Circuit rejected that argument on the ground that APHIS had "discretion to determine the geographic scope of its NEPA analyses." *Id.* What the Ninth Circuit did *not* say in *Forest Guardians* was that APHIS had no obligation at all to assess impacts in the Santa Teresa Wilderness specifically.

Intervenors also claim that APHIS "revisits its EA analysis by evaluating each specific site for which treatment is requested and warranted." Intervenors Mem. at 22–23. There is no evidence in the record that APHIS actually conducts these evaluations. But, even if it does, these evaluations cannot cure the EAs' failure to disclose and analyze site-specific effects under NEPA, because there is no opportunity for public involvement in these later evaluations. *See Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1104 (9th Cir. 2016) (discussing how a post-NEPA analysis "conducted without any input from the public ... cannot cure deficiencies" in a NEPA analysis). At some point, APHIS must disclose to the public the site-specific impacts of its program.

Both APHIS and Intervenors insist that APHIS could not have done more site-specific analyses in the EAs because it "cannot predict *if or when* an affected landowner will request assistance, or what level of intervention will be needed" at the time draft EAs are published; they argue that Plaintiffs are asking APHIS to "peer into a crystal ball" and "do the impractical." APHIS Mem. at 34–35; Intervenors Mem. at 21. Plaintiffs are not asking APHIS to engage in psychic thinking. They are also not arguing for an "on-the-fly" site-specific analysis for each treatment *request*. *See* APHIS Mem. at 34. Rather, Plaintiffs' argument is that APHIS had an abundance of information at its disposal to make educated assumptions about *likely* treatment areas that it could have used to do *some* kind of reasonable analysis of the local impacts of pesticide treatments, and that it failed to do so. *See* Pls. Mem. at 35–36 (discussing the data that APHIS had at the time it prepared the EAs). The fact that APHIS may not know the exact parcels where treatments will occur does not relieve it of its obligation to conduct a reasonable site-specific analysis of some kind based on educated assumptions. *See Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 995 (9th Cir. 2023) ("Because at least some degree of speculation is

implicit in NEPA, agencies may not shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry.") (cleaned up).

The cases relied on by APHIS and Intervenors do not help them, and in some instances cut against them. As discussed above, *Forest Guardians* does not support the idea that an agency's discretion to set the geographic scope of its NEPA analyses allows it to shirk its duty to analyze site-specific impacts. *Wilderness Watch v. BLM*, 799 F.Supp.2d 1172 (D. Nev. 2011), did not even involve the question whether a NEPA analysis was sufficiently site-specific; rather, it concerned whether certain future actions were foreseeable enough that they should be included in a cumulative-impacts analysis. 799 F.Supp.2d at 1183. Finally, contrary to Intervenors' suggestion, *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Department of the Interior*, 608 F.3d 592 (9th Cir. 2010), does not give APHIS license to avoid analyzing site-specific impacts just because of uncertainty as to where those impacts may occur. *See* Intervenors Mem. at 21. In that case, the Ninth Circuit upheld an environmental assessment as sufficiently site-specific even though it did not disclose the exact locations of future activities, but only because the EA "analyze[d] the impact of drilling activities in *all parts of the project area*." *Te-Moak Tribe*, 608 F.3d at 600 (emphasis added). Here, the EAs don't analyze impacts in *any* parts of the project areas, but instead provide generic descriptions of entire states or large portions of states. *See supra*. Moreover, the facts in *Te-Moak Tribe* were far different than the facts here: the project area was around 30,000 acres, 608 F.3d at 596, whereas the state-level EAs here cover *millions* of acres apiece, *see* Pls. Mem. at 15–18.

The state-level EAs make no attempt to inform the public where pesticide spraying will occur or is likely to occur and make no attempt to "describe the[] impacts" of pesticide spraying "on localized cognizable values" in those areas. *Se. Alaska Conservation Council*, 443 F.Supp.3d

at 1010. This is despite the fact that, according to APHIS, "[t]he specific impacts" of its grasshopper program "are highly dependent upon the particular action and location of infestation." WY000027. For this reason, the state-level EAs do not constitute a "hard look" at the site-specific impacts of the grasshopper program.

B.     **The State-Level EAs Fail to Publicly Disclose and Analyze Baseline Information Regarding Past Pesticide Treatments and Sensitive Species.**

The state-level EAs lack adequate baseline information about past pesticide treatments and their effects on the environment as well as baseline information about sensitive species. Pls. Mem. at 36–39. APHIS and Intervenors attempt to justify these deficiencies, but their arguments rely on general studies that lack baseline information and on data and analyses that were never disclosed to the public during the NEPA process.

APHIS and Intervenors claim that APHIS's "environmental [monitoring] reports provide the baseline information Plaintiffs claim is missing." APHIS Mem. at 36; Intervenors Mem. at 24. These monitoring reports cannot satisfy APHIS's NEPA obligations. For one thing, they were not included in the draft EAs or otherwise made available to the public during the relevant NEPA processes.[20] To satisfy NEPA, baseline information must actually be incorporated and considered in an EA and made available to the public; it is not enough to merely identify that monitoring data exists. *See, e.g.*, *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925–28 (9th Cir. 2015) (maps and analysis of wildlife habitat contained in the

---

[20] Intervenors claim that the monitoring reports were "referenced" in the EAs, albeit perhaps "indirectly," and that the reports were "available to the public." Intervenors Mem. at 25. But none of the challenged EAs incorporates the monitoring reports by reference or summarizes the contents of the monitoring reports. *See, e.g.*, MT010872, 010899, 010938 (referring to, but not discussing any further, the environmental monitoring reports). Under NEPA, that is not enough. *See Connaughton*, 2014 WL 6977611, at *16. At any rate, the reports do not actually contain useful baseline data. *See infra*.

administrative record, but not included or referenced in the EIS for public review, could not be used to substantiate NEPA analysis).

Moreover, even if the monitoring reports had been properly incorporated in the EAs, the reports contain only a spot analysis of potential pesticide drift and variations in pesticide concentrations. *See, e.g.*, MT013285–87. They do not provide any information about or analysis of the *environmental effects* of APHIS's past treatments, including any observed impacts to sensitive species and resources. Further, the only information about past treatments in the monitoring reports is a table of total acres treated per county. *See, e.g.*, MT013284. There are no maps or analysis of past treatment data in the monitoring reports. And the monitoring data contains no information about the distribution or abundance of sensitive species such as the monarch butterfly and Western bumble bee.

APHIS and Intervenors also argue that general documents and studies such as human health and ecological risk assessments which "discuss the pesticides' effects on non-target species" somehow contain adequate baseline information about sensitive species. APHIS Mem. at 37; Intervenors Mem. at 24–25. But none of the cited documents actually contains baseline information—*e.g.*, information about the distribution and abundance of sensitive species in the areas potentially subject to pesticide treatments in Idaho, Oregon, Montana, and Wyoming. And APHIS's suggestion that its inclusion of mitigation measures can substitute for adequate baseline information is flatly contrary to Ninth Circuit precedent. *See Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016) (stating that mitigation measures cannot be used as a proxy for collecting baseline data).

Intervenors appear to suggest that no baseline information is required because studies have shown that the pesticides used in the grasshopper program will not significantly harm

sensitive species. Intervenors Mem. at 25–27. This misrepresents the results of the relevant studies and misunderstands why baseline information is so important. The Graham study cited in the Montana and Wyoming EAs and referenced by Intervenors found that "treatment with diflubenzuron was correlated with changes in abundance for ... non-ant Hymenoptera," which includes bees, EIS005904, and opined that "ecological function could be adversely affected by declines caused by diflubenzuron application," EIS005905. The Graham study also found evidence of a possible "lag effect" for diflubenzuron—*i.e.*, a significant delay from the time of treatment to adverse population-level effects. EIS000595. Given those findings, the Graham study cannot be invoked to justify a failure to collect or estimate baseline data concerning sensitive species. Rather, the study illustrates why such data is so important: if, as the Graham study suggests, the adverse effects of diflubenzuron treatments become more substantial after a delay, then a baseline could very well include the effects of recent treatments, giving APHIS (and the public) some idea of what its program has done to the environment and what it might be expected to do going forward.[21]

Predictably, APHIS accuses Plaintiffs of "flyspecking" the EAs, APHIS Mem. at 37—as if the lack of *any* information in the EAs about the locations of past treatments, the observed effects of those treatments on the environment, and the status of sensitive species were a minor oversight. "Without establishing the baseline conditions which exist ... before [a project] begins, there is simply no way to determine what effect the [project] will have on the environment and,

---

[21] It is worth noting the absurdity of the notion that diflubenzuron somehow only harms grasshoppers, leaving non-target species alone. Diflubenzuron was developed *to control the gypsy moth*, a species of the order Lepidoptera, EIS005345, and study after study has shown that many Lepidoptera species are particularly sensitive to the chemical. *See, e.g.*, EIS008624 ("Diflubenzuron has been used extensively in the control of forest defoliating caterpillars and has also shown adverse effects on non-target Lepidoptera in previous studies.").

consequently, no way to comply with NEPA." *Great Basin Res. Watch*, 844 F.3d at 1101 (quoting *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)). Without considering (1) what effects its program has already had on the environment (which is part of the baseline) and (2) the status of sensitive species in the relevant area, how could APHIS possibly make an informed decision about its program going forward? *See, e.g.*, *Rose*, 921 F.3d at 1190 (holding that "generic statements" about the condition of travel routes, rather than information about "the actual condition of the routes on the ground," made it impossible for the agency to "properly assess the environmental impact of allowing motorized travel" on those routes); *see also Gifford Pinchot Task Force v. Perez*, No. 3:13-cv-00810-HZ, 2014 WL 3019165, at *33 (D. Or. July 3, 2014) ("without baseline data, the impact to groundwater remains uncertain because there is no information as to the current conditions of the actual Project Area."). And, without that same information, how could the public properly tailor its comments? *See ONDA v. Jewell*, 840 F.3d at 571.

In sum, although millions of acres have been treated with pesticides under APHIS's program in recent years, the challenged EAs do not disclose or analyze the effects of that spraying on the local environment, nor do they disclose or analyze the status of sensitive species that are the most likely to be affected by spraying. This renders the EAs legally insufficient.

### C.     The State-Level EAs Lack Any Quantified or Detailed Information About the Cumulative Effects of APHIS's Grasshopper Program.

In response to Plaintiffs' claims that the challenged EAs fail to adequately consider the cumulative impacts of APHIS's grasshopper program, APHIS and Intervenors argue that Plaintiffs are asking for too much. APHIS Mem. at 37–39; Intervenors Mem. at 27–30. Their position relies on a series of flawed assumptions and runs afoul of controlling law.

First, APHIS and Intervenors assume that there are no cumulative effects to examine because the program's pesticides "are not expected to persist or bioaccumulate in the environment and there is a lack of significant routes of exposure." APHIS Mem. at 38; Intervenors Mem. at 28–29. But bioaccumulation is just one type of cumulative effect. APHIS's and Intervenors' argument entirely fails to consider two key types of cumulative impacts: (1) impacts at the population level from multiple pesticide applications and (2) near-in-time impacts to particular organisms. *See* Pls. Mem. at 30–31, 39 (discussing such impacts). Moreover, both APHIS and Intervenors ignore that diflubenzuron—the most commonly-used pesticide in the program—can remain adsorbed to plant surfaces for *months*, OR000570, where it poses a serious threat to certain leaf-eating insects, including caterpillars (*i.e.*, Lepidoptera larvae), EIS008624–26.

Next, APHIS continues to rely on the idea that its pesticide treatments "are unlikely to overlap" with pesticide treatments by other actors, making cumulative impacts negligible. APHIS Mem. at 38. As Plaintiffs have explained, however, cumulative impacts from pesticide applications may occur even when the treatments do not take place on precisely the same plots of land. Pls. Mem. at 30–31, 39. Species' population ranges extend beyond the precise plots of land where APHIS may authorize pesticides, and pollinators such as bees can travel several miles while foraging. *See* EIS003771; EIS013862. APHIS's argument is unresponsive to these issues.

Both APHIS and Intervenors accuse Plaintiffs of seeking the impossible—"an endless catalog of past, present, and future pesticide applications by state, federal, and private actors," in APHIS's words. APHIS Mem. at 38–39; *see also* Intervenors Mem. at 28 (similar). This misconstrues (or misrepresents) Plaintiffs' argument. The problem with the EAs is not that they lack an exhaustive list of other pesticide applications taking place near APHIS's applications; the problem is that the EAs lack *any* kind of "quantified or detailed information" about other pesticide treatments.

*Ocean Advocs.*, 402 F.3d at 868; *see also* Pls. Mem. at 40–41 (describing the shortcomings of the EAs). What Plaintiffs are asking is for APHIS to include *some* kind of useful analysis of the cumulative impacts of its program combined with third-party pesticide applications instead of "[g]eneral statements about possible effects and some risk." *Ocean Advocs.*, 402 F.3d at 868 (cleaned up).[22] APHIS can surely provide a legally sufficient analysis without listing every third-party pesticide application. *See, e.g.*, *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1112 (9th Cir. 2015) (allowing an agency to aggregate future projects in a cumulative impacts analysis). But what APHIS cannot do is what it did here: conduct a cursory cumulative impacts analysis containing *no* quantified or detailed information.

APHIS's cumulative effects analysis in the EAs suffers from similar problems as cumulative effects analyses that the Ninth Circuit has found to violate NEPA. In *Bark v. U.S. Forest Service*, 958 F.3d 865 (9th Cir. 2020), for instance, the Ninth Circuit found an EA's cumulative effects analysis that "included a table of other projects" was insufficient because it did not contain any "meaningful analysis of any of the [other] projects." *Id.* at 872. The court found "nothing in the EA that could constitute 'quantified or detailed information' about the cumulative effects of the" project. *Id.* at 873. And in *Great Basin Resource Watch*, the agency's cumulative impacts analysis on air was found to be deficient even though it specifically identified other sources of air pollution, because the analysis "fail[ed] to enumerate the environmental effects of other projects or consider the interaction of multiple activities." 844

---

[22] Intervenors argue that it would be "impractical" for APHIS to garner information about nearby pesticide treatments. Intervenors Mem. at 28. But APHIS insists that it coordinates treatments with other pesticide applicators, EIS000089–90, EIS000116, so presumably it has information about third-party pesticide treatments or knows where to get that information. At any rate, nowhere in the EAs does APHIS attempt to justify those documents' lack of quantified or detailed information about cumulative impacts on the ground that information about other treatments was too hard to obtain.

F.3d at 1105–06 (cleaned up). As in those cases, the EAs here provide no meaningful analysis of the combined effects of APHIS's treatments and nearby third-party treatments. Such an analysis is especially important given that APHIS frequently sprays areas near croplands, which are themselves usually subject to pesticide treatments. *See* Pls. Mem. at 8, 39.

In sum, without a more detailed evaluation of the possible cumulative effects of APHIS's program combined with pesticide applications by other actors, APHIS did not have a full understanding of the threat its additional pesticide use poses to the local environment or sensitive species. Thus, APHIS inappropriately "isolate[d]" its program, "viewing it in a vacuum." *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002). For this reason, the state-level EAs violate NEPA. [23]

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment and deny APHIS's and Intervenors' motions for summary judgment.

Respectfully submitted on this 21st day of December, 2023.

---

[23] Intervenors argue that any error in the EAs' cumulative impacts analysis is harmless. Intervenors Mem. at 30. In the context of APA cases, "an agency may rely on harmless error only when its mistake is one that clearly had no bearing on the procedure used or the substance of the decision reached." *Nw. Res. Info. Ctr., Inc. v. Nw. Power & Conservation Council*, 730 F.3d 1008, 1019 (9th Cir. 2013) (cleaned up). Here, the error—a total lack of quantified and detailed information that would allow the public and decisionmakers to put APHIS's program in proper context—clearly could have had an effect on the NEPA process and perhaps even the substance of APHIS's decision.

*/s/ Andrew R. Missel*
Andrew R. Missel (OSB # 181793)
Elizabeth H. Potter (OSB # 105482)
Hannah A. Goldblatt (OSB # 205324)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
Phone: (503) 914-6388
amissel@advocateswest.org
epotter@advocateswest.org
hgoldblatt@advocateswest.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

This reply in support of Plaintiffs' motion for summary judgment contains no more than 12,493 words, as counted by Microsoft Word's "word count" feature. Thus, it complies with the Court's order of December 9, 2022. ECF No. 27.

*/s/ Andrew R. Missel*
Andrew R. Missel (OSB # 181793)