IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

XERCES SOCIETY FOR                          No. 3:22-cv-00790-HZ
INVERTEBRATE CONSERVATION
and CENTER FOR BIOLOGICAL                   OPINION & ORDER
DIVERSITY,

       Plaintiffs,

   v.

KEVIN SHEA, in his official capacity
as Administrator of the Animal and Plant
Health Inspection Service; and the
ANIMAL AND PLANT HEALTH
INSPECTION SERVICE,

       Federal Defendants,

and

STATE OF WYOMING and
STATE OF MONTANA,

       Intervenor-Defendants.

Andrew R. Missel
Elizabeth H. Potter
Hannah A. Goldblatt
ADVOCATES FOR THE WEST
3701 SE Milwaukie Avenue, Ste. B
Portland, OR 97202

      Attorneys for Plaintiffs

Todd Kim
Assistant Attorney General
Environment and Natural Resources Division
John P. Tustin
Senior Attorney
Natural Resources Section
U.S. Department of Justice
P.O. Box 7611
Washington D.C. 20044-7611

      Attorneys for Federal Defendants

Christopher Griffith
Eric Brickenstein
HAGLUND KELLY LLP
2177 SW Broadway
Portland, OR 97201

J.D. Sater
Senior Assistant Attorney General
Travis Jordan
Senior Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82202

Austin Knudsen
Montana Attorney General
Christian B. Corrigan
Solicitor General
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT, 59620

      Attorneys for Intervenor-Defendants

HERNÁNDEZ, District Judge:

Plaintiffs Xerces Society for Invertebrate Conservation and Center for Biological Diversity bring this case against Defendants Kevin Shea and the Animal and Plant Health Inspection Service ("APHIS") alleging violations of the National Environmental Policy Act ("NEPA") and the Administrative Procedures Act ("APA").[1] Specifically, Plaintiffs challenge APHIS's 2019 Environmental Impact Statement ("EIS") and associated Record of Decision ("ROD") as well as its operative state-level Environmental Assessments ("EA") and findings of no significant impact ("FONSI") for Oregon, Idaho, Wyoming, and Montana. On September 21, 2022, the Court granted a motion to intervene by the State of Wyoming and the State of Montana (the "Intervenor-Defendants").

Plaintiffs, APHIS, and the Intervenor-Defendants now move for summary judgment on all of Plaintiffs' claims.[2] Pls.' Mot. Summ. J. ("Pls. Mot."), ECF 47; APHIS' Mot. Summ. J ("APHIS Mot."), ECF 57; Int. Defs.' Mot. Summ. J. ("State Mot."), ECF 64. On March 22, 2024, the Court held oral argument on the Parties' motions. For the reasons that follow, the Court grants Plaintiffs' motion for summary judgment on Plaintiffs' First, Second, Third, Fifth, and Eighth Claims for Relief. Defendants' motions are denied.

## BACKGROUND

This case concerns APHIS's Rangeland Grasshopper and Mormon Cricket Suppression Program ("the Program"). "Grasshoppers and Mormon crickets are part of rangeland ecosystems,

---

[1] In their Amended Complaint, Plaintiffs also alleged APHIS violated the Endangered Species Act by "reauthorizing and carrying out its rangeland pesticides program without first completing programmatic section 7(a)(2) consultation with [the U.S. Fish and Wildlife Service]." Second Am. Compl. ¶ 11, ECF 43. On March 21, 2024, APHIS informed the Court that it had completed programmatic consultation with USFWS. At oral argument, Plaintiffs conceded that this claim is now moot. Accordingly, the Court dismisses Plaintiff's Endangered Species Act claim.
[2] Plaintiffs are not pursuing their Fourth and Seventh Claims for Relief. Pl. Mot. 2.

serving as food for wildlife and playing an important role in nutrient cycling." EIS13, ECF 46.[3]
Some grasshopper populations, however, can negatively affect the amount of forage available for
livestock. EIS13.

The Plant Protection Act charges APHIS with carrying out a program to control
grasshopper and Mormon cricket populations to protect rangeland. 7 U.S.C. § 7717(a). Under the
statute, APHIS must immediately treat lands infested with grasshoppers or Mormon crickets
when their populations rise to levels of economic infestation. *Id.* at (c)(1). APHIS must also
"work in conjunction with other Federal, State, and private prevention, control, or suppression
efforts to protect rangeland." *Id.* at (c)(2). The Program—which stems from this statutory
authority—operates in seventeen western states, including Idaho, Wyoming, Oregon, and
Montana. EIS11.

The first EIS for the program was prepared in 1987 "to study the feasibility of using
integrated pest management (IPM) for managing grasshoppers." EIS24. In 2002, a new EIS was
prepared with new information about technological advances in pesticide treatments. EIS25. In
the 2002 EIS, a new method of pesticide application—called "reduced agent area treatment" or
RAAT—was adopted to reduce the amount of pesticides applied to combat grasshopper
outbreaks. EIS25.

The present case concerns the Program's most recent update. In the 2019 EIS, APHIS
laid out three alternatives: (1) a "no action" alternative, which would continue the grasshopper
suppression program in the 2002 EIS; (2) a "no suppression" alternative, under which APHIS
would abandon any efforts to suppress grasshopper infestations; and (3) an "adaptive

---

[3] "EIS" refers to the record relevant to the 2019 EIS. Similarly, citations to "OR," "ID," "WY,"
and "MT" refer to the record for the respective state-specific EAs.

management" alternative in which APHIS would opt for RAATs or conventional (non-reduced) treatments depending on the situation. EIS31. Under the third alternative, APHIS can also use chlorantraniliprole—a new pesticide—in addition to the three previously authorized under the 2002 EIS—malathion, diflubenzuron, and carbaryl. EIS24. In the 2019 EIS, APHIS selected alternative three. EIS3. Tiered to the 2019 programmatic EIS are site-specific EAs that address local issues. EIS11, 16, 26. Relevant to this case are APHIS's 2020 Idaho EA, 2022 Oregon EA, 2022 Wyoming EA, and two of the 2023 Montana EAs. In EAs for Idaho, Oregon, and Wyoming, APHIS selected the same alternative as the EIS but with an additional limitation on the use of pesticides to malathion, carbaryl, and diflubenzuron, the three pesticides previously authorized under the 2002 EIS. ID14-15; OR16-18, 69; WY12-14. In the Montana EA, APHIS selected alternative three without limitation on the type of pesticide used. MT10845-46, 10992-93.

The focus of the 2019 Program is on the use of pesticides to suppress grasshopper and Mormon cricket outbreaks. As a first step in this process, "[t]he Program conducts region-wide surveys for both nymph and adult populations of grasshoppers in order to assist with predictions of grasshopper population levels in the following year." EIS19. This is an imperfect science, and "[o]utbreaks are difficult to predict[.]" EIS19. Nevertheless, nymph and adult populations are surveyed annually in states where outbreaks are common. EIS20. APHIS receives written requests for treatment from public or private landowners. EIS20. To determine whether treatment is warranted, personnel visit the site and assess pest species, the state of the pest species population, timing of treatment, cost benefits, and ecological considerations, among other things. EIS20. Prior to applying any treatments, APHIS maps the treatment area to identify sensitive sites and notifies State-registered beekeepers, organic producers, and residents of the treatment

area. EIS21. Pesticides can be applied aerially or by ground equipment at either the conventional

rates or using RAATs. EIS20. "APHIS also conducts environmental monitoring of some

treatments to ensure that buffers and other mitigation measures are effective in reducing risk and

that treatments are effective." EIS5.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). However,

"[t]he legal standards for resolving a motion for summary judgment are inconsistent with the

standards for judicial review of agency action[.]" *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,

962 F. Supp. 2d 1230, 1233 (D. Or. 2013), *aff'd*, 638 F. App'x 648 (9th Cir. 2016) (citation

omitted). Nonetheless, where, as here, there are no material factual disputes and the

administrative record before the court is complete, summary judgment serves as the appropriate

vehicle for the court to conduct its review of the agency action. *Occidental Eng'g Co. v. I.N.S.*,

753 F.2d 766, 770 (9th Cir. 1985); *Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1215 (D.

Mont. 2010) ("Summary judgment is a particularly appropriate tool for resolving claims

challenging agency action.").

The claims in this case are governed by the APA, which requires a court to "compel

agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and to "hold

unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C.

§ 706(2)(A); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir.

2014) (applying the APA to claims under NEPA). Agency action is arbitrary and capricious

where: "the agency fails to consider an important aspect of a problem, . . . the agency offers an

explanation for the decision that is contrary to the evidence, . . . the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or . . . the agency's decision is contrary to the governing law." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) and 5 U.S.C. § 706(2)).

The arbitrary and capricious standard is "searching and careful, but the ultimate standard of review is a narrow one." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)) (internal quotation marks omitted). The court asks whether the agency's action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* The agency's decision is "entitled to a presumption of regularity," and a reviewing court "may not substitute [its] judgment for that of the agency." *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 601 (citation omitted). Although deference is owed to an agency, a reviewing court "must not 'rubber-stamp . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quoting *N.L.R.B. v. Brown*, 380 U.S. 278, 291 (1965)) (first alteration in original).

## DISCUSSION

Plaintiffs and Defendants move for summary judgment on the merits of all of Plaintiffs' claims, which challenge APHIS's 2019 EIS and five state-level EAs implementing the Rangeland Grasshopper and Mormon Cricket Suppression Program under NEPA. In addition, Defendants argue that Plaintiffs lack standing.

///

I.    **Standing**

Defendants argue that Plaintiffs lack Article III standing. "To establish standing, a plaintiff must show that (1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (quotation and citation omitted). Here, Defendants argue only that Plaintiffs have failed to establish the causation and redressability elements of standing. *See* APHIS's Reply 1 n.1, ECF 75.

"Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed." *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001); *see also Lujan v. Defs. Of Wildlife*, 504 U.S. at 572 n.7 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."). "Plaintiffs alleging procedural injury must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." *WildEarth Guardians*, 795 F.3d at 1154. The Court finds that Plaintiffs have standing in this case.

A.    Causation

The causation requirement is satisfied for procedural claims when "[t]he asserted injury is not too tenuously connected to the agencies' failure" to take action. *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008). Plaintiff must show a "'reasonable probability of the challenged action's threat to [its] interests.'" *Nat'l Fam. Farm Coal v. U.S. Env't Prot. Agency,* 966 F.3d 893, 910 (9th Cir. 2020) (quoting *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001)).

Plaintiffs satisfy the causation requirement because there is a "reasonable probability" that APHIS's actions threaten their interests. Plaintiffs have recreational, scientific, spiritual, and aesthetic interests in Western rangeland ecosystems, including areas in Oregon, Wyoming, Montana, and Idaho. *See* Burd Decl., ECF 49; Selvaggio Decl., ECF 48; Lyman Decl., ECF 51; Ostermann Decl., ECF 52; Rosentretter Decl, ECF 50. These are areas that have been or are likely to be subject to APHIS's pesticide applications under the Program. For example, Oregon treatment data show that regions in southeastern Oregon have been selected for treatment in the recent past.[4] *See* OR10210 (2021 Suppression Program data notes 19,456 treated acres in Harney County, Oregon). The state-specific EAs also identify this area as a potential treatment area. OR11 (noting that "larger than historically expected outbreaks . . . are occurring more in counties with the largest amounts of federally managed public land (e.g., Harney, Lake, and Malheur counties) from which most of the treatment requests to APHIS originate"). And Plaintiffs have submitted declarations from members that extensively utilize these areas and plan to visit in the future. *See* Burd Decl. ¶¶ 19, 21 (noting twice annual travel in eastern Oregon, including areas in Harney and Malheur counties, for recreational purposes and to observe insects; plans to continue these visits); Selvaggio Decl. ¶¶ 15-16, 21 (documents travel to eastern Oregon for recreation since 1987, participation in a bee survey, and plans to return in 2024). The record also shows a similar causal chain with regard to Idaho, Montana, and Wyoming. *Compare* Rosentretter Decl. ¶¶ 11– 14 (documenting scientific and recreative interests in the Owyhee Front) *with* ID8770 (application on over 45,000 acres in Owyhee County, Idaho) and ID88 (Map of potential treatment areas in Idaho). *Compare* Ostermann Decl. ¶¶ 5–9 (documenting past and future

---

[4] Defendants object to maps attached to the Goldblatt Declaration that purport to show areas that were authorized for pesticide application. Goldblatt Decl., ECF 54. The Court declines to address these objections because the maps are not necessary to resolve the Parties' motions.

recreation near Big Horn basin) *with* WY102 (2021 grasshopper hazard map). *Compare* Lyman

Decl. ¶¶ 9–15 (documenting trips around Montana for scientific and recreational purposes near

Yellowstone and Carbon Counties and concerns with the decline of pollinators and their effect

on different plant species) *with* MT10839 (grasshopper hazard map). In sum, Plaintiffs'

declarations establish that they extensively visit and enjoy the areas where Program activities

have occurred and may occur in the future for the purpose of viewing, studying, and enjoying

crickets, grasshoppers, pollinators, and other plant and animal life that may be impacted by the

Program through its application of pesticides. APHIS may have further minimized any alleged

harm to Plaintiffs' interests had it adopted Plaintiffs' arguments. Thus, Plaintiffs have established

a causal link.

Defendants' arguments to the contrary fail. Defendants emphasize that some of Plaintiffs'

injury—specifically, the reduction of insects in these ecosystems—is not caused by APHIS,

which is "perhaps *the* most responsible user of the four Program pesticides in the United States."

APHIS Mot. 7 (emphasis in original). In making this argument, Defendants focus on *Washington*

*Environmental Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013). There, the plaintiffs brought a

suit under the Clean Air Act seeking to compel the State of Washington to regulate greenhouse

gas emissions from oil refineries. *Id.* at 1135. The Ninth Circuit concluded that the plaintiffs did

not have Article III standing to bring their claim, finding the plaintiffs could not show causation.

*Id.* at 1141. While the plaintiffs had alleged that greenhouse gas emissions were linked to a

"litany of adverse environmental effects in Washington," they "offer[ed] only vague, conclusory

statements" that the defendant's actions contributed to greenhouse gas emissions that contributed

to climate-related changes leading to their alleged injuries. *Id.* at 1142. The circuit court also

recognized the difficulty the plaintiffs faced in trying to establish a causal link, noting the

"natural disjunction between [the p]laintiffs' localized injuries and the greenhouse effect" and the "limited scientific capability in assessing, detecting, or measuring the relationship between a certain [greenhouse gas] emission source and localized climate impacts in a given region." *Id.* at 1143.

But *Bellon* is not determinative here. Unlike *Bellon*, this case involves a procedural right. As the circuit court recognized, the standing requirement is relaxed in cases involving a procedural right, allowing a plaintiff to "assert [a] right without meeting all the normal standards for redressability and immediacy." *Id.* at 1144–45; *see also Salmon Spawning*, 545 F.3d at 1229 (finding causation was satisfied under the relaxed requirements for procedural claims because "the asserted injury was not too tenuously connected with the agency's failure to reinitiate consultation"). Further, unlike in *Bellon*, where the relevant oil refineries were only responsible for 5.9% of greenhouse gas emissions in Washington, *Bellon*, 732 F.3d at 1143, the EAs in this case explain that additional treatments by landowners or managers are presently uncommon in areas that APHIS treats, *see* MT10866, ID58, OR42, WY42. And the decision documents demonstrate that the Program can affect insect populations in the potential treatment areas. *See* EIS52 (carbaryl is highly toxic to insects), 57 (diflubenzuron toxic to larval honeybees), 68 (malathion highly toxic to bees and toxic to most terrestrial invertebrates).

Defendants also argue Plaintiffs have not shown that pesticides were applied to specific areas as part of Program activities. But Defendants' own documents suggest that identifying precise treatment areas is difficult due to the very nature of the Program:

> The NEPA process for grasshopper management is complicated by the fact that there is very little time between requests for treatment and the need for APHIS to act swiftly with respect to those requests. Surveys help to determine general areas, among the millions of acres where harmful grasshopper infestation may occur in the spring of the following year. Survey data provides the best estimate of future grasshopper populations, while short-term climate or environmental factors change

> where the specific treatments will be needed. Therefore, examining specific
> treatment areas for environmental risk analysis under NEPA is typically not
> possible. At the same time, the program strives to alert the public in a timely manner
> to its more concrete treatment plans and avoid or minimize harm to the environment
> in implementing those plans.

OR14. Indeed, the lack of more specific location data from APHIS is one of the very problems

Plaintiffs identify with the Program documents in this case. *See infra* Section II.B. As Plaintiffs

have demonstrated a reasonable probability that the challenged action threatens their interests,

the Court finds that Plaintiffs' injuries here are not too tenuously connected with APHIS's

actions for purposes of Article III standing.

B.    Redressability

Plaintiffs have also established redressability. Defendants argue that Plaintiffs cannot

demonstrate that "halting APHIS's program for additional NEPA analysis would not benefit the

health of rangeland ecosystems." APHIS's Reply 3, ECF 75. But in cases alleging a procedural

injury, the redressability requirement "is satisfied when 'the relief requested—that the agency

follow the correct procedures—may influence the agency's ultimate decision.'" *WildEarth*, 795

F.3d at 1156 (quoting *Salmon Spawning*, 545 F.3d at 1226). Plaintiffs "need not show that [the

relief sought] would lead to a different result at either the programmatic or project-specific

level." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1083 (9th Cir. 2015).

And "the mere existence of multiple causes of injury does not defeat redressability, particularly

for a procedural injury." *WildEarth Guardians*, 795 F.3d at 1157. "So long as a defendant is at

least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant

is just one of multiple causes of the plaintiff's injury." *Id.* The redressability requirement,

however, is not toothless: a procedural claim may not be redressable if the ultimate agency

decision could never be influenced.  *Cf. Salmon Spawning*, 545 F.3d at 1226–27 (noting that the

ultimate agency decision in that case—whether to enter into a treaty—could never be influenced by a decision resolving the claimant's procedural injury).

Were Plaintiffs to succeed on their claims in this case, it could influence the agency's ultimate action. For example, Plaintiffs argue that APHIS failed to consider IPM techniques in its EIS. Were APHIS to engage in additional NEPA analysis, it could result in the use of IPM techniques and a reduction in the use of pesticides, thus changing APHIS's activities in the long term and protecting Plaintiffs' interests. Moreover, contrary to Defendants' arguments, it is far from clear that, without APHIS, other actors would implement pesticide programs that are "'entirely redundant in [their] effect on Plaintiffs' interests." *W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1148 (9th Cir. 2019 (finding the plaintiffs had standing where it was speculative that other actors would replace the agency's lethal wolf management program); *see also Nat'l Fam. Farm Coalition*, 966 F.3d at 910 (rejecting the defendants' argument that the plaintiffs' claims were not redressable because vacatur of the pesticide registration would not alter existing uses of the pesticide). Accordingly, the Court finds that Plaintiffs have standing.

## II.    NEPA

Plaintiffs allege APHIS violated NEPA in both its programmatic EIS and five of its state-level EAs. NEPA has two principal aims. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983).  First, NEPA requires government agencies to "consider every significant aspect of the environmental impact of a proposed action." *Id.* (internal quotation marks omitted). Second, NEPA guarantees that relevant information is available to the public. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011); *see also Citizens Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1021 (10th Cir. 2002)

("NEPA mandates that government agencies inform the public of the potential environmental impacts of proposed actions and explain how their decisions address those impacts.").

"NEPA is a procedural statute that does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639–40 (9th Cir. 2004) (internal quotation marks omitted). To comply with NEPA, federal agencies must prepare an Environmental Impact Statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C). Alternatively, "the agency may prepare an Environmental Assessment ('EA') to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS." *High Sierra Hikers Ass'n*, 390 F.3d at 639–40. An EA is "a concise public document" that should: "(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact[;] (2) Aid an agency's compliance with [NEPA] when no environmental impact statement is necessary[;] (3) Facilitate preparation of [an EIS] when one is necessary." 40 C.F.R. § 1508.9(a)(1)–(3).

Here, Plaintiffs contend that APHIS's 2019 EIS failed to consider a holistic alternative to grasshopper control, failed to establish baseline conditions, and failed to take a hard look at the Program's impact on sensitive species, such as pollinators and sage grouse. Plaintiffs contend that the state-specific EAs failed to analyze the site-specific impacts of the Program, baseline information regarding past pesticide treatment and sensitive species, and the cumulative effects of the program with other applications.

///

///

A.     Programmatic 2019 EIS

Under NEPA, an EIS must contain a detailed discussion of the environmental impact of

the proposed action, adverse environmental effects that cannot be avoided, alternatives to the

proposed action, and a statement of the purpose and need for the action. 42 U.S.C. § 4332(2)(C);

40 C.F.R. § 1502.13. The NEPA regulations also encourage "tiering":

> *Tiering* refers to the coverage of general matters in broader environmental impact
> statements (such as national program or policy statements) with subsequent
> narrower statements or environmental analyses (such as regional or basinwide
> program statements or ultimately site-specific statements) incorporating by
> reference the general discussions and concentrating solely on the issues specific to
> statement subsequently prepared.

40 C.F.R. § 1508.28. "A programmatic EIS must provide 'sufficient detail to foster informed

decision-making,' but an agency need not fully evaluate site-specific impacts 'until a critical

decision has been made to act on site development.'" *'Ilio'ulakalani Coalition v. Rumsfeld*, 464

F.3d 1093, 1094 (9th Cir. 2006) (quoting *Friends of Yosemite Valley v. Norton*, 348 F.3d 789,

800 (9th Cir. 2003)). In determining whether a programmatic EIS is adequate, courts must

balance "the efficiency benefits of tiering, . . . deference to the agency's definition of the purpose

and need of the proposed action, and the recognition that the [programmatic EIS] constrains

future decision-making and must therefore analyze alternatives in sufficient detail to prevent

foreclosure of options with insufficient consideration." *Id.* at 1096. "[I]t may turn out that a

particular environmental consequence must be analyzed in both the EIS and EA. But an earlier

EIS analysis will not have been a wasted effort, for it will guide the EA analysis and, to the

extent appropriate, permit 'tiering' by the EA to the EIS in order to avoid wasteful duplication."

*Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002).

In challenging the 2019 EIS, Plaintiffs argue that the 2019 EIS is unreasonably narrow

and does not contain adequate detail to comply with NEPA. Defendants respond by emphasizing

APHIS's statutory authority and that the EIS is a programmatic document. The Court agrees with Plaintiffs. The 2019 EIS is too narrow and does not contain sufficient detail to foster reasoned decision-making.

         i.      Purpose & Need Statement

Plaintiffs first argue that the 2019 EIS is unreasonably narrow by focusing on the use of pesticides because the EIS must include IPM techniques as mandated by statute. The 2019 EIS states:

> The purpose of the proposed action is to protect rangelands and nearby crops of the western United States from the adverse effects of grasshopper outbreaks. Despite the best land management efforts to prevent outbreaks, grasshopper populations may build to levels of economic infestation where direct intervention may be the most viable option to suppress them.

EIS13. The EIS also identifies as its objectives: (1) surveying grasshopper populations; (2) providing technical assistance to land managers, and (3) suppressing economically damaging grasshoppers outbreaks when requests are made and funds permit. EIS14.

Congress created NEPA "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Barnes v. U.S. Dep't of Transp.,* 655 F.3d 1124, 1131 (9th Cir. 2011) (internal quotation marks omitted). "The scope of an alternatives analysis depends on the underlying 'purpose and need' specified by the agency for the proposed action." *League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012). Thus, "a court begins by determining whether or not the Purpose and Need Statement was reasonable." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004).

"The [purpose and need] statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives of the proposed action." 40 C.F.R § 1502.13. Courts have "afforded agencies considerable discretion to define the purpose and need of a project." *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998) (citing *City of Angoon v. Hodel,* 803 F.2d 1016 (9th Cir. 1986)). However, a statement of purpose and need "will fail if it unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained." *Alaska Survival v. Surface Trasp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013). Courts evaluate a Statement of Purpose and Need under a reasonableness standard. *Friends of Southeast's Future*, 153 F.3d. at 1066–67. "Where an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS." *Westlands Water Dist.*, 376 F.3d at 866.

In *Westlands Water District*, the plaintiffs challenged an EIS to restore a river fishery, arguing that the defendants improperly narrowed the geographic scope of its Statement of Purpose and Need and limited its consideration of non-flow measures to restore the river fish population. *Id.* at 866. There, the EIS's purpose and was to "restore and maintain the natural production of anadromous fish on the Trinity River mainstem downstream of Lewiston Dam." *Id.* But the governing statutes did not limit restoration of the river to the mainstem and included the entire river basin. *Id.* The circuit court noted that "[i]n specifically limiting its goals to the Trinity River mainstem, the Statement of Purpose and Need [did] not follow the letter of the statutes." *Id.* at 867. The court ultimately concluded, however, that this did not make the EIS "arbitrary or capricious": "Restoring the fishery in the mainstem is a central, primary part of restoring the fishery in the basin as a whole . . . The federal agencies were within their discretion

in focusing the EIS on the mainstem rehabilitation as part of promoting fishery basin-wide." *Id.*
The Ninth Circuit similarly held that the EIS's focus on increasing flows was not an error. *Id.* In
so finding, the Court emphasized that (1) the Statement of Purpose and Need did not limit
consideration of non-flow measures; (2) that the focus on instream habitat—with less attention
not other factors—was within the discretion of the EIS team and not arbitrary or capricious; and
(3) non-flow measures were considered in each of the alternatives. *Id.* at 867–68.

Here, unlike in *Westlands Water District*, the EIS's purpose and need statement is not
reasonable. There are two statutes relevant to the Court's analysis. First, the Plant Protection Act
tasks APHIS with "carry[ing] out a program to control grasshoppers and Mormon crickets on all
Federal lands to protect rangeland." 7 U.S.C. § 7717(a). The statute goes on to require the
immediate treatment of land infested with grasshoppers or Mormon crickets at levels of
economic infestation:

> Subject to the availability of funds pursuant to this section, on request of the
> administering agency or the agriculture department of an affected State, [APHIS],
> to protect rangeland, shall immediately treat Federal, State, or private lands that are
> infested with grasshoppers or Mormon crickets at levels of economic infestation,
> unless [APHIS] determines that delaying treatment will not cause greater economic
> damage to adjacent owners of rangeland.

*Id.* at (c)(1). In carrying out this mandate, APHIS must "work in conjunction with other Federal,
State, and private prevention, control, or suppression efforts to protect rangeland." *Id.* at (c)(2).
Second, under the Food Quality and Protection Act of 1996, federal agencies are also required to
"use Integrated Pest Management techniques in carrying out pest management activities and
shall promote Integrated Pest Management through procurement and regulatory policies, and
other activities." 7 U.S.C. § 136r-1. Integrated Pest Management or "IPM" is "a sustainable
approach to managing pests by combining biological, cultural, physical, and chemical tools in a
way that minimizes economic, health, and environmental risks." *Id.* Taken together, the Court

finds that APHIS has been tasked with carrying out a program to control grasshoppers to protect rangelands, and, in doing so, must use IPM techniques *and* treat lands infested with grasshoppers at a level of economic infestation when requested.

By specifically focusing on suppression via direct intervention—or, in this case, the use of pesticides—the EIS is narrower than the relevant statutes and the purpose and need statement is invalid. Here—unlike in *Westlands Water District*—there is no evidence that focusing on pesticide treatments fulfills the overall purpose of the relevant statutes. Nor is there evidence that IPM techniques were just given *less* attention than the use of pesticides. *Cf. Westlands Water District*, 376 F.3d at 867. Instead, the EIS appears to foreclose consideration of any non-suppression methods of managing the grasshopper population: "Regardless of the various IPM strategies taken, the primary focus of this EIS is on the potential impacts from immediate chemical treatment needs during an outbreak of economic importance." EIS29. It describes IPM techniques as the responsibility of other agencies, while also acknowledging that "[t]he best grasshopper management strategies are preventative in nature and are long-term efforts that are designed to head off, rather than combat, outbreaks." EIS29; *see also* EIS115 ("[M]ost IPM actions are not managed by APHIS and are outside the scope of this document."), 129 ("APHIS's authority under the Plant Protection Act is to treat Federal, State, and private lands for grasshoppers and Mormon cricket populations."). Accordingly, the Court finds that the Purpose and Need statement is unreasonably narrow and contrary to law because it ignores any pest management technique other than the application of pesticides.

///

///

///

ii.    Range of Reasonable Alternatives

Plaintiffs argue that the EIS is deficient in its consideration of alternatives.[5] Regulations implementing NEPA require that an EIS must consider and assess the environmental consequences of the proposed action and reasonable alternatives to the action. 40 C.F.R. § 1502.14. Consideration of alternatives is "the heart of the environmental impact statement." *Id.* The court "reviews an agency's range of alternatives under a 'rule of reason' standard that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th Cir. 1998) (brackets omitted). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior,* 608 F.3d 592, 602 (9th Cir. 2010) (quoting *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir. 1992)).

The 2019 EIS considers three alternatives. The first alternative—the "no action" alternative—maintains the Program under the 2002 EIS. EIS31. Under the second alternative—

---

[5] Defendants also argue that Plaintiff has waived this argument because it was "not properly raised in the comments." APHIS Mot. 14. Specifically, APHIS argues that "Plaintiffs failure to identify a specific alternative during the administrative process Plaintiffs wanted to be considered results in waiver of the claim." *Id.* at 14–15. But that is not what is required: Under NEPA, a plaintiff "must structure its participation so that it . . . alerts the agency [of its] positions and contentions, in order to allow the agency to give the issue[s] meaningful consideration." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006). "[A]lerting the agency in general terms will be enough if the agency has been given a chance to bring its expertise to bear to resolve the claim." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010). Plaintiffs asked APHIS to "consider integrated pest management and use of any nonchemical methods, such as mechanical, ecological, cultural or biological control. EIS238; EIS1290; EIS2942 (similar comments and objections). APHIS responded to these comments by noting that IPM techniques "are not managed by APHIS and outside the scope of this document." EIS115. In other words, the record shows that APIHS was alerted to Plaintiffs' positions in a way that allowed them to give them meaningful consideration. Plaintiffs have not waived this argument.

the "no suppression" alternative—APHIS would not fund or participate in any grasshopper suppression program. EIS31. Under the third alternative—the "adaptive management" strategy alternative—APHIS could apply insecticides at conventional rates or RAATs and can use a new insecticide not authorized under the 2002 EIS. EIS31. In addition, Alternative 3 allows APHIS to add other treatments that might become available for use in the future. EIS33. APHIS also discussed two other alternatives that would use mycoinsecticides or microsporidia but did not include them in the 2019 EIS because their use has too many disadvantages. EIS35-36.

APHIS's range of alternatives was unreasonable under NEPA. By limiting the project to treating outbreaks of grasshoppers and defining its objectives in unreasonably narrow terms, APHIS has limited its range of alternatives to only those that involve responsive pesticide use. *See Nat'l Parks & Cons. Ass'n v. Bureau of Land Mgmt*, 606 F.3d 1058, 1072 (9th Cir. 2010) ("As a result of this unreasonably narrow purpose and need statement, the BLM necessarily considered an unreasonably narrow range of alternatives."). This is not adequate in light of the statutory objectives of the Program as discussed above. APHIS never considers IPM techniques as either a standalone alternative or in conjunction with other treatment. *See* EIS31-36; EIS115 (response to comment emphasizing IPM techniques are outside the scope of the 2019 EIS). And Defendants' argument that that IPM is a component of all three alternatives is belied by the record. Def. MSJ 12. Indeed, the EIS expressly shirks incorporating any IPM techniques, stating that these are the responsibility of other land managers and landowners. EIS115, 122. Accordingly, APHIS erred in its alternatives analysis.

iii.    Adequate Baseline Information

Plaintiffs argue that the 2019 EIS lacks baseline information about past pesticide application; sensitive, non-ESA-listed species; and "whether any impacts to those species have

been observed in or near sprayed areas since the 2002 EIS." Pls. Resp. 17. Essentially, the parties

here dispute how much baseline information a programmatic EIS must include. *See* APHIS Mot.

21.

 "NEPA requires that the agency provide the data on which it bases its environmental

analysis." *N. Plains Res. Council*, 668 F.3d at,1083. "Such analyses must occur before the

proposed action is approved" because "once a project begins, the 'pre-project environment

becomes a thing of the past, and evaluation of the project's effects becomes simply impossible.'"

*Id.* (quoting *LaFlamme v. F.E.R.C.*, 852 F.2d 389, 400 (9th Cir. 1988)) (brackets and quotation

marks omitted). Thus, "[e]stablishing appropriate baseline conditions is critical to any NEPA

analysis." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir.

2016). "Without establishing the baseline conditions which exist . . . before [a project] begins,

there is simply no way to determine what effect the [project] will have on the environment and,

consequently, no way to comply with NEPA." *Id.* (quoting *Half Moon Bay Fishermans' Mktg.*

*Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)).

 "An agency need not conduct measurements of actual baseline conditions in every

situation[,] . . . [b]ut whatever method the agency uses, its assessment of baseline conditions

'must be based on accurate information and defensible reasoning.'" *Id.* (quoting *Or. Nat. Desert*

*Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016)). As noted above, however, "[a]n EIS for a

programmatic plan . . . must provide 'sufficient detail to foster informed decision-making,' but

'site-specific impacts need not be fully evaluated until a critical decision has been made[.]'"

*Native Vill. Of Point Hope v. Jewell*, 740 F.3d 489, 497 (9th Cir. 2014) (quoting *N. Alaska Envtl.*

*Ctr. v. Lujan,* 961 F.2d 886, 890–91 (9th Cir. 1992)). In *Kleppe v. Sierra Club*, for example, the

Supreme Court emphasized the "special competency of the appropriate agenc[y]" in determining

"the extent and effect[] and . . . the geographic area" of cumulative environmental impacts. 427 U.S. 390, 414 (1976). It held that an agency did not act arbitrarily in addressing the interrelationship of environmental impacts regionwide for a coal development project: "[E]ven if environmental interrelationships could be shown conclusively to extend across basins and drainage areas, practical considerations of feasibility might very well necessitate restricting the scope of comprehensive statements." *Id.*

Turning first to Plaintiff's argument that the 2019 EIS should include more specific geographic information about the use of pesticides, the Court finds APHIS did not err in deferring this analysis until the site-specific EAs. No critical decision has been made in the EIS. As the EIS notes, the project extends to 17 Western states, each with their own site-specific EA. EIS38. The agency explains that it would be "impossible to analyze specific impacts of each alternative within each of the 17 states" because "[t]he physical environmental and other conditions among and within the various states vary so dramatically." EIS38. Thus, the programmatic EIS has "general" discussions of the potential environmental impacts of the Program. EIS38. While the impacts of the Program may extend beyond state borders, the Court cannot say that it was arbitrary or capricious for APHIS to restrict the scope of its comprehensive documents in this case and discuss past treatments in general terms.

Similarly, the EIS contains an adequate discussion of the sage grouse. Specifically, the EIS notes that the Greater Sage-Grouse is an "additional species of concern" in Western rangeland ecosystems, and that sage grouse have been in a "state of decline throughout most of their entire range, with habitat loss being a major factor in their decline." EIS98-99. It acknowledges that grasshoppers can be a diet item for sage grouse chicks, and it includes some

mitigation measures to reduce the Program's effect on the species. EIS99–100. In the context of

a programmatic document, this is sufficient detail to foster informed decision-making.

Notably absent from the EIS, however, is a similar discussion of the current state of other

"sensitive environmental resources" or species not listed under the ESA, including butterflies,

moths, and native bees. While the EIS recognizes that the Program may have direct effects on

these populations, *see, e.g.*, EIS48 (noting documented negative effects of carbaryl pesticides on

bees), it does not provide any context for the current state of those insects in Western rangelands.

And contrary to Defendants' argument, is not sufficient for APHIS to rely on the stale data from

the 2002 EIS and the 2015 biological assessment. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries

Serv.,* 184 F. Supp. 3d 861, 936 (D. Or. 2016) (noting habitat data that is more than five years old

may be stale). Without even a cursory discussion of the current baseline populations of these

insects, the agency cannot determine what effect the Program will have on the environment.

Though APHIS has discretion to decide how detailed and site-specific it must be in the EIS, it

cannot exclude this information completely. Without it, the EIS cannot foster informed decision-

making or public participation.

iv.    Hard Look: Mitigation & Cumulative Impacts

Plaintiffs argue the EIS does not take a "hard look" at the impacts of the Program on

bees, butterflies, or moths because it lacks an adequate analysis of mitigation measures and the

cumulative effects of APHIS's program when combined with other pesticide applications.

"NEPA imposes a procedural requirement on federal agencies to 'take a "hard look" at the

potential environmental consequences of the proposed action.'" *N. Plains Res. Council, Inc.*, 668

F.3d at 1075 (quoting *Or. Nat. Res. Council v. Bureau of Land Mgmt.*, 470 F.3d 818, 820 (9th

Cir. 2006)) (brackets omitted). "Taking a 'hard look' includes 'considering all foreseeable direct

and indirect impacts'" and "'should involve a discussion of adverse impacts that does not improperly minimize negative side effects.'" *League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v. U.S. Forest Serv.*, 689 F.3d 1060, 1075 (9th Cir. 2012) (citation omitted).

Turning first to mitigation measures, the Court finds that the agency's analysis was adequate. "Pursuant to NEPA, an agency must . . . consider appropriate mitigation measures that would reduce the environmental impact of the proposed action." *Protect Our Communities Fund v. Jewell*, 825 F.3d 571, 581–82 (9th Cir. 2016) (citing 42 U.S.C. § 4332(2)(C)(ii)). Specifically, "the agency must provide an assessment of whether the proposed mitigation measures can be effective . . . [and] whether anticipated environmental impacts can be avoided." *Id.* at 582 (quoting *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009)). "A 'mere listing' of mitigating measures, without supporting analytical data, . . . is inadequate." *Okanogan Highlands All. v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000).

Plaintiffs argue that the mitigation analysis was inadequate because "[o]ne of the key mitigation measures for pollinators discussed in the EIS is adherence to pesticide label requirements" and APHIS makes no attempt to independently assess the efficacy of these mitigation measures. Pl. Mot. 27. Plaintiffs, however, fail to address any of the other mitigation measures included in the 2019 EIS, including using RAATs, application buffers, identifying and avoiding sensitive sites, notifying state-registered beekeepers and organic farmers before applying pesticides, and considering wind speed and direction to minimize exposure. *See, e.g.*, EIS21, 43, 48, 54, 72, 96. In light of the additional mitigation measures identified by Defendants and the programmatic nature of the 2019 EIS, the Court cannot find that the 2019 EIS was arbitrary or capricious in its discussion of mitigation.

The 2019 EIS's discussion of cumulative effects, however, is arbitrary.

A cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. The EIS contains a five-page cumulative impacts analysis which largely focuses on the cumulative impacts of repeated pesticide use. EIS86–91. First, it notes (1) that APHIS does not overlap insecticide treatments or mix or combine insecticides, (2) that the Program historically has not treated the same location every year or the same area in the same year, and (3) that the insecticides do not bioaccumulate. EIS87, 90. Thus, APHIS's own pesticide use under the Program reduces the possibility of significant cumulative impacts. EIS87. The EIS acknowledges that other entities—including private landowners and other government actors— may make pesticide applications, and that APHIS itself may apply pesticides as part of other programs. EIS88-89. The EIS finds that cumulative impacts are unlikely because of "how the Program uses the insecticides" and the low probability of geographic overlap between pesticide applications. EIS89.

Plaintiffs argue that this was inadequate under NEPA because the EIS mentions other sources of pesticides but fails to analyze "the cumulative impacts of its program as a whole in combination with other pesticide treatments on sensitive species[.]" Pl. Mot. 29–30. The Court agrees. Missing from the analysis is a discussion of how adjacent pesticide use or overlapping pesticide use by different actors could have a cumulative effect on the environment. The 2019 EIS analysis arbitrarily focuses on the lack of temporal overlap between pesticide applications and references other pesticide users in very general terms. It notes the Program does not overlap treatments of different insecticides or repeat treatments in the same area in the same year. EIS

88–90. But it acknowledges that other APHIS programs, federal and state agencies, and individuals may use pesticides in the same or nearby areas. EIS 87–90. Despite this acknowledgment, APHIS concludes the cumulative effects would be unlikely because of the low probability treatments would "overlap." But pesticide or herbicide applications on adjacent or nearby plots of land could reasonably have a cumulative effect on an insect population, especially when there is a possibility that those applications are substantial. While the Court agrees with Defendants that they were not required to do site-specific or granular analyses of the cumulative effects in the programmatic EIS, they had to at least address—in general terms—the possible cumulative effect on the environment of insecticide use by other land managers in proximity to treatments under the Program. APHIS may ultimately conclude that the effects of nearby pesticide use is minimal. But failure to consider it at all was an error.

B.    State-Level EAs

Plaintiffs also challenge the 2020 Idaho EA, the 2022 Oregon EA, the 2022 Wyoming EA, and two of the 2023 Montana EAs. Pl. Mot. 15. An EA is "a concise public document" that should: "(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact[;] (2) Aid an agency's compliance with [NEPA] when no environmental impact statement is necessary[;] and (3) Facilitate preparation of [an EIS] when one is necessary." 40 C.F.R. § 1508.9(a)(1)–(3). In this case, the state-specific EAs are tiered to the programmatic EIS and focus on the site-specific impacts of the program. *W. Watersheds Project v. Abbey,* 719 F.3d 1035, 1049 (9th Cir. 2013) (finding a programmatic EIS "does not reduce or minimize [the agency's] critical duty to 'fully evaluate' the site-specific impacts").

Plaintiffs make three arguments in challenging the state-specific EAs that largely mirror the challenges they make to the 2019 EIS. First, Plaintiffs argue that the EAs "do not address in sufficient geographic detail the environmental conditions and likely effects of APHIS's program." Pl. Mot. 33. Second, Plaintiffs argue that "the state-level EAs fail to establish baseline conditions in the relevant areas, because they do not discuss or analyze the state of the environment and the effects of past treatments in those areas." *Id.* Finally, Plaintiffs argue that the EAs "do not adequately assess the cumulative impacts of spraying in the relevant areas." *Id.* The Court agrees.

i.    Site-Specific Impacts of the Program

Plaintiffs argue that the state-specific EAs "do not adequately analyze the site-specific environmental effects of APHIS's program" because they "do not discuss the areas where spraying will likely occur with any detail or precision" and, instead, discuss "in very general terms, a broad geographic area spanning millions of acres." Pl. Mot. 33–34. Plaintiffs also emphasize that the five EAs challenged here "contain nearly identical discussions of environmental effects, highlighting how non-site-specific they are." *Id.* at 34. Defendants respond by arguing that the nature of the program—that APHIS has to "provide assistance over a wide geographic range on short notice"—essentially exempts them from having to analyze more precise site-specific effects. APHIS. Mot. 33–35 ("Even though precise locations of future treatments are unknowable, APHIS explained the limitations of its forecasting and each state prepared an EA to the best of the Agency's ability." (internal quotation and citation omitted)).

The Court agrees with Plaintiffs. Here, the EAs contain only general information about where suppression activities are likely to occur and the effects on resources in those areas. The Oregon EA, for example, encompasses over 42 million acres in Eastern Oregon. OR22. The EA

claims that it will "concentrate on the areas of historical grasshopper outbreaks, as delineated by trends indicated in previous years of survey work, as well as land-manager requests for mitigating support." OR22; OR11 (Map of Economic Infestations of Grasshoppers in Oregon 1953 through 2020). The EA also states that "patterns of reoccurring economic infestation levels . . . show where future outbreaks are likely to reoccur." OR10–11. But the EA lacks any specificity as to site-specific resources near these areas, only generally describing the geography and resources of the entire possible treatment area. OR22–25 (describing geography and climate of Eastern Oregon), 26 (noting rangelands may be used for recreation), 28–29 (noting parks, wilderness areas, and sensitive areas). There is no discussion of whether any of these resources are near areas with recurring or historical outbreaks or how they might be affected by the Program. Comments demonstrate why this analysis matters, citing increasingly popular locations for recreation in the treatment area and adjacent to areas of historical treatment. OR79 (emphasizing potential treatment near popular Steens Mountain, Pueblo Mountain, Alvord Desert, and Malheur Lake). The Wyoming and Montana EAs suffer from the same flaws. WY102 (grasshopper survey map), WY16–18 (general description of affected environment); MT10839 (MT grasshopper hazard map), MT10846–47 (general description of affected environment); MT10986 (MT grasshopper hazard map), MT10994–95 (general description of affected environment). The Idaho EA fares slightly better, including a more detailed list of excluded program areas that encompasses specific watersheds, areas of critical environmental concern, wilderness study areas, and other specific locations within the potential treatment area. ID25–26. But it fails to continue this level of specificity in the discussion of the Program's possible environmental consequences. *See* ID26-30.

While the Court understands that forecasting pesticide treatments will be imprecise—particularly in light of the uncertainty surrounding annual treatment requests and the need for rapid action when outbreaks occur—these challenges do not alleviate APHIS from consideration of site-specific resources. *See Western Watersheds Proj. v. Bernhardt*, 543 F.Supp.3d 958, 992 (D. Idaho 2021) (finding an EA deficient where "it was reasonably possible for BLM to synthesize available information and analyze in better detail the site-specific impacts of the lease sales on greater sage-grouse"); *see also Conner*, 848 F.2d at 1450-51 ("The government's inability to fully ascertain the precise extent of the effects of mineral leasing in a national forest is not, however, a justification for failing to estimate what those effects might be before irrevocably committing to the activity. Appellants' suggestion that we approve now and ask questions later is precisely the type of environmentally blind decision-making NEPA was designed to avoid.") (internal citation omitted). Likely treatment areas are far from unknowable, and the state-specific EAs do not contain sufficient detail to satisfy NEPA.

   ii.   Baseline Information

Plaintiffs argue that the state-level EAs fail to disclose baseline information relevant to site-specific analysis of the program's effects. Pl. Mot. 36. Plaintiffs specifically identify (1) past pesticide treatments and their effects and (2) baseline data concerning sensitive species as missing from the state-specific EAs. *Id.* at 37–38. As to the first item, Defendants respond that the EAs do include information about past treatments through the annual environmental monitoring reports. APHIS Mot. 36. As to the second, Defendants argue that the EAs' risk assessments adequately discuss the pesticides' effects on non-target species and conclude there is no effect. *Id.*

As noted above, "NEPA requires that the agency provide the data on which it bases its environmental analysis." *N. Plains Res. Council*, 668 F.3d at 1083. "Such analyses must occur before the proposed action is approved" because "once a project begins, the 'pre-project environment becomes a thing of the past, and evaluation of the project's effects becomes simply impossible." *Id.* (quoting *LaFlamme v. F.E.R.C.*, 852 F.2d 389, 400 (9th Cir. 1988)) (brackets and quotation marks omitted). Thus, "[e]stablishing appropriate baseline conditions is critical to any NEPA analysis." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). "Without establishing the baseline conditions which exist . . . before [a project] begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." *Id.* (quoting *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)). "An agency need not conduct measurements of actual baseline conditions in every situation. . . . But whatever method the agency uses, its assessment of baseline conditions 'must be based on accurate information and defensible reasoning.'" *Id.* (quoting *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016)).

The EAs fail to disclose the above-identified baseline information. With regard to past pesticide treatments, the EAs are, again, largely silent, providing instead historical data on outbreaks, hazard maps, and general geographic information. And they do not consider how those past treatments effect the environment in conjunction with the proposed alternatives. Defendants' emphasis on the monitoring reports does nothing to remedy this problem. Defendants have not shown that the reports were actually included in the EAs, specifically cited

in the EAs, or otherwise made public during the NEPA process.[6] *Coal. for Canyon Pres. v. Bowers*, 632 F.2d 774, 782 (9th Cir. 1980) (where "the EIS gave no hints where to search or whether studies were in fact performed, . . . . the EIS fail[ed] to give decision makers who are removed from the initial decision sufficient data from which to draw their own conclusions[.]"). It may be that the effect of past pesticide treatments is minimal or nonexistent, but without discussion of this information in the EAs, they do not comply with NEPA's twin aims of "(1) ensur[ing] that agencies carefully consider information about significant environmental impacts and (2) . . . guarant[ing] relevant information is available to the public." *N. Plains Res. Council,* 668 F.3d at 1085.

As to non-target species, the EAs—like the EIS—are inadequate. The EAs all recognize that the pesticides authorized for use under the program could impact insects besides the target grasshopper species. OR32-39, ID33-41, WY28-36, MT10853-10864, MT11001-11012. Yet, there is no information on the status of pollinators or other sensitive species, and Defendants have not explained how such data would be impossible to gather or unreliable. The EAs are merely silent. APHIS's emphasis on the effects analysis and mitigation measures in its response is misplaced because—without adequate baseline information—the success of mitigation and environmental impact of an action cannot be adequately assessed. *See N. Plains*, 668 F.3d at 1085 (finding that baseline data must exist *"before approval* so that the [agency] can understand the adverse environment effects *ab initio*"). Accordingly, APHIS did not take the requisite "hard

---

[6] Defendants note that the EAs "identify the environmental monitoring conducted by APHIS," but the results of the monitoring are not included anywhere in the EAs and there is no suggestion that there are available reports for the public to review. *See* APHIS Mot. 36-37. A member of the public would not learn that this information was available to them by reading the EAs.

look" in assessing the potential environmental effects of the project. *See id.* (finding the agency erred when it did not attempt to obtain baseline data for plants and wildlife).

               iii.     Cumulative Effects

Just as they argued with regard to the 2019 EIS, Plaintiffs contend that the state-level EAs fail to adequately analyze the cumulative effects of the Program when combined with pesticide applications by other usesrs. Pl. Mot. 39. Again, this Court agrees. Like the 2019 EIS, the state-level EAs all fail to consider an important aspect of the problem: the cumulative effects of pesticide users in close proximity to land treated by APHIS under the Program. For example, the Oregon EA emphasizes that pesticide treatments do not overlap in discounting cumulative impacts from the Program:

> Potential cumulative impacts associated with the Preferred Alternative are not expected to be significant because the program applies an insecticide application once during a treatment. The program may treat an area with different insecticides but does not overlap the treatments. The program does not mix or combine insecticides. Based on historical outbreaks in the United States, the probability of an outbreak occurring in the same area where treatment occurred in the previous year is unlikely; however, given time, populations eventually will reach economically damaging thresholds and require treatment. The insecticide application reduces the insect population down to levels that cause an acceptable level of economic damage. The duration of treatment activity, which is relatively short since it is a one-time application, and the lack of repeated treatments in the same area in the same year reduce the possibility of significant cumulative impacts.

OR42. The Idaho, Wyoming, and Montana EAs contain the same language. WY42, ID57, MT10865-66, MT11014. But it does not appear that the EAs consider the cumulative effect pesticides could have on the environment when used in geographic and temporal proximity. Even if pesticide use by APHIS or other actors on the same plot of land is unlikely, *see* OR42; ID58; WY42; MT10866; MT11014–15, the use of multiple pesticides in a single season in the

same general area could have significant effects on an insect population. This analysis was arbitrary.[7]

## CONCLUSION

The Court GRANTS Plaintiffs' Motion for Summary Judgment [47] and DENIES Defendant APHIS's Motion for Summary Judgment [57] and Intervenor-Defendant's Motion for Summary Judgment [64]. Plaintiffs are granted summary judgment on their First, Second, Third, Fifth, and Eighth claims for relief. Plaintiffs' Fourth, Sixth, and Seventh claims are dismissed. Within 30 days of this Opinion & Order, the parties shall confer and file a joint status report that includes a proposed schedule for remedies in light of the Court's decision on the parties' cross motions for summary judgment.

IT IS SO ORDERED.

DATED:___August 1, 2024_____.


MARCO A. HERNÁNDEZ
United States District Judge

---

[7] Indeed, the Court notes that EIS in part defers its cumulative effects analysis for other non-Program applications to the state-level EAs: "A site-specific EA would better address potential program overlap areas." EIS89. But no such analysis is found in any of the relevant EAs.